ROBERT H. ROTSTEIN (SBN 72452)
  rxr@msk.com
ELAINE K. KIM (SBN 242066)
  ekk@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Defendants, Lions Gate
Entertainment Inc., Lions Gate Films Inc.,
Mutant Enemy, Inc., Joseph "Joss" Whedon,
and Andrew Goddard

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| PETER GALLAGHER, an individual<br><br>Plaintiff,<br><br>v.<br><br>LIONS GATE ENTERTAINMENT INC., a Delaware corporation; LIONS GATE FILMS INC., a Delaware corporation; MUTANT ENEMY, INC., a California corporation; JOSEPH "JOSS" WHEDON, an individual; ANDREW GODDARD, an individual; and DOES 1 through 50, inclusive,<br><br>Defendants. | CASE NO. 15-CV-02739-ODW-E<br><br>The Honorable Otis D. Wright II<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE COMPLAINT IN ITS ENTIRETY WITH PREJUDICE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**<br><br>**[[Proposed] Order; Request for Judicial Notice; Declaration of Elaine K. Kim; and Notice of Manual Filing Filed Concurrently Herewith]**<br><br>Date:      June 15, 2015<br>Time:     1:30 p.m.<br>Crtm:     11 – Spring Street |

6855042.2

---

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

## NOTICE OF MOTION

**TO THE COURT, ALL PARTIES, AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on June 15, 2015, at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 11, located at 312 N. Spring Street, Los Angeles, CA 90012, Defendants Lions Gate Entertainment Inc., Lions Gate Films Inc., Mutant Enemy, Inc., Joseph "Joss" Whedon, and Andrew Goddard will and hereby do move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an Order dismissing, with prejudice, in their favor Plaintiff Peter Gallagher's Complaint in its entirety.

This Motion is made on the grounds that Plaintiff's claim for copyright infringement fails because the works at issue, as a matter of law, are not substantially similar in copyrightable expression, and Plaintiff's allegations fail to establish any reasonable possibility of access to his work.  This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on May 1, 2015.

This Motion is based upon this Notice of Motion; the attached Memorandum of Points and Authorities; the concurrently submitted Request For Judicial Notice and Declaration of Elaine K. Kim and exhibits thereto; all pleadings and other records on file in this action; and such further evidence and arguments as may be presented at or before any hearing on the Motion.

DATED: May 18, 2015

Respectfully submitted,

MITCHELL SILBERBERG & KNUPP LLP

By: /s/ Robert H. Rotstein
Robert H. Rotstein
Elaine K. Kim
Attorneys for Defendants Lions Gate
Entertainment Inc., Lions Gate Films Inc.,
Mutant Enemy, Inc., Joseph "Joss"
Whedon, and Andrew Goddard

6855042.2

1

1

# **<u>TABLE OF CONTENTS</u>**

2
**Page**

3

I.   INTRODUCTION ...................................................................................1

II.   ALLEGATIONS OF THE COMPLAINT ........................................1

   A.   Defendants and *The Cabin in the Woods* ..............................1

   B.   Plaintiff and His Book, *The Little White Trip: A Night in the Pines* ....5

III.   RULE 12(b)(6) STANDARDS IN COPYRIGHT CASES ...........................8

IV.   PLAINTIFF CANNOT PLEAD SUBSTANTIAL SIMILARITY...............10

V.   PLAINTIFF HAS FAILED TO PLEAD ACCESS ......................................23

VI.   CONCLUSION ...................................................................................25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Art Attacks Ink, LLC v. MGA Entertainment Inc.*,
    581 F.3d 1138 (9th Cir. 2009) ..............................................................................23

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................9, 10

*Benay v. Warner Bros. Entm't, Inc.*,
    607 F.3d 620 (9th Cir. 2010)..............................9, 11, 13, 14, 16, 18, 20

*Berkic v. Crichton*,
    761 F.2d 1289 (9th Cir. 1985)...........................................11, 13, 14, 22

*Bernal v. Paradigm Talent & Literary Agency*,
    788 F. Supp. 2d 1043 (C.D. Cal. 2010)............................................14

*Bissoon-Dath v. Sony Comp. Entm't Am., Inc.*,
    694 F. Supp. 2d 1071, 1078 (N.D. Cal. 2010), *aff'd and adopted by*,
    653 F.3d 898 (9th Cir. 2011) ...........................................9, 11, 14

*Briggs v. Blomkamp*,
    2014 U.S. Dist. LEXIS 142016 (N.D. Cal. Oct. 3, 2014)...................................24

*Campbell v. The Walt Disney Co.*,
    718 F. Supp. 2d 1108 (N.D. Cal. 2010)...........................................9, 10

*Capcom Co., Ltd, v. The MKR Group, Inc.*,
    2008 U.S. Dist. LEXIS 83836 (N.D. Cal. Oct. 10, 2008).........................9, 18, 22

*Cavalier v. Random House, Inc.*,
    297 F.3d 815 (9th Cir. 2002) ...................................................11, 21, 22

*Christianson v. West Publ'g Co.*,
    149 F.2d 202 (9th Cir. 1945) ...................................................................9

*Clay v. Cameron*,
    2011 U.S. Dist. LEXIS 153496 (S.D. Fla. Oct. 20, 2011) ...................................24

*Davis v. ABC*,
    2010 U.S. Dist. LEXIS 76145 (W.D. Mich. July 28, 2010) .........................14, 17

ii

*DuckHole Inc. v. NBC Universal Media*,
 2013 U.S. Dist. LEXIS 157305 (C.D. Cal. Sept. 6, 2013) ....................................9

*Feldman v. Twentieth Century Fox Film Corp.*,
 723 F. Supp. 2d 357 (D. Mass. 2010) ............................................................ 10, 24

*Funky Films, Inc. v. Time Warner Entm't, Inc.*,
 462 F.3d 1072 (9th Cir. 2006) ...............................10, 11, 13, 16, 18, 20

*Gable v. Nat'l Broad. Co., Inc.*,
 727 F. Supp. 2d 815 (C.D. Cal. 2010) ......................................................... 21, 23

*Gadh v. Spiegel*,
 2014 U.S. Dist. LEXIS 64081 (C.D. Cal. Apr. 2, 2014) ....................................9

*Goldberg v. Cameron*,
 787 F. Supp. 2d 1013 (N.D. Cal. 2011) ...........................................................21

*Harper & Row Publrs., Inc. v. Nation Enters.*,
 471 U.S. 539 (1985) .........................................................................................11

*Hill v. Gaylord Entm't*,
 85 U.S.P.Q.2D (BNA) 1688 (S.D. Fla. 2008) ...................................................10

*Hogan v. DC Comics*,
 48 F. Supp. 2d 298 (S.D.N.Y. 1999) .................................................................14

*In re Countrywide Fin. Corp. Sec. Litig.*,
 588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...............................................................8

*Jason v. Fonda*,
 526 F. Supp. 774 (C.D. Cal 1981), *aff'd*,
 698 F.2d 966 (9th Cir. 1982) ............................................................................24

*Jason v. Fonda*,
 698 F.2d 966 (9th Cir. 1982) ............................................................................23

*Kenney v. Warner Bros. Entm't, Inc.*,
 984 F. Supp. 2d 9 (D. Mass. 2013) ...................................................................24

*Kouf v. Walt Disney Pictures & Television*,
 16 F.3d 1042 (9th Cir. 1994) ..................................................................... 11, 13

*Litchfield v. Spielberg*,
 736 F.2d 1352 (9th Cir. 1984) ..........................................................................21

iii

6855042.2

*Loomis v. Cornish*,
    2013 U.S. Dist. LEXIS 162607 (C.D. Cal. Nov. 13, 2013) .................................23

*Martinez v. McGraw*,
    2009 U.S. Dist. LEXIS 69862 (M.D. Tenn. Aug. 10, 2009) ................................1

*Meta-Film Assocs., Inc. v. MCA, Inc.*,
    586 F. Supp. 1346 (C.D. Cal. 1984).............................................................23, 24

*Muller v. Twentieth Century Fox Film Corp.*,
    794 F. Supp. 2d 429 (S.D.N.Y. 2011) .........................................................18, 20

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
    590 F. Supp. 2d 500 (S.D.N.Y. 2008)...................................................................24

*Olson v. Nat'l Broad. Co.*,
    855 F.2d 1446 (9th Cir. 1988) ..............................................................................18

*Peter F. Gaito Arch., LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010) .....................................................................................9

*Rice v. Fox Broad. Co.*,
    330 F.3d 1170 (9th Cir. 2003) ................................................................15, 23, 24

*Rosenfeld v. Twentieth Century Fox Film Corp.*,
    2009 U.S. Dist. LEXIS 9305 (C.D. Cal. Jan. 28, 2009)........................................9

*Schkeiban v. Cameron*,
    2012 U.S. Dist. LEXIS 145384 (C.D. Cal. Oct. 4, 2012), *aff'd*,
    566 Fed. Appx. 616 (9th Cir. 2014) ......................................................................9

*Schwarz v. United States*,
    234 F.3d 428 (9th Cir. 2000) ..................................................................................8

*Scott v. Meyer*,
    No. 2:09-cv-06076-ODW, Order Granting Defendants' Motion to
    Dismiss (C.D. Cal. Nov. 24, 2009)......................................................9, 16, 20, 21

*Segal v. Rogue Pictures*,
    2011 U.S. Dist. LEXIS 157933 (C.D. Cal. Aug. 19, 2011) ................................19

*Sheldon Abend Revocable Trust v. Spielberg*,
    748 F. Supp. 2d 200 (S.D.N.Y. 2010) .................................................................14

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
  562 F.2d 1157 (9th Cir. 1977) .................................................................. 11

*Thomas v. The Walt Disney Co.*,
  2008 U.S. Dist. LEXIS 14643 (N.D. Cal. Feb. 14, 2008), *aff'd*,
  337 Fed. Appx. 694 (9th Cir. 2009) ................................................... 9, 10

*Van v. Cameron*,
  566 Fed. Appx. 615 (9th Cir. 2014) ........................................................ 9

*Walker v. Time Life Films, Inc.*,
  615 F. Supp. 430 (S.D.N.Y. 1985), *aff'd*,
  784 F.2d 44 (2d Cir. 1986) ................................................................... 10

*Walker v. Time Life Films, Inc.*,
  784 F.2d 44 (2d Cir. 1986) ................................................................... 22

*Wild v. NBC Universal, Inc.*,
  513 Fed. Appx. 640 (9th Cir. 2013) ........................................................ 9

*Zella v. The E.W. Scripps Co.*,
  529 F. Supp. 2d 1124 (C.D. Cal. 2007) .............................................. 9, 10

**RULES**

Federal Rule of Civil Procedure 12(b)(6) ......................................................... 8

6855042.2

## I.   INTRODUCTION

Plaintiff Peter Gallagher's Complaint for copyright infringement fails as a matter of law because he has not alleged that Defendants had access to his book *The Little White Trip: A Night in the Pines* ("*Little White Trip*"), or that Defendants' motion picture *The Cabin in the Woods* ("*Cabin*") is substantially similar in copyrightable expression to *Little White Trip*.  The Court must dismiss the Complaint if it concludes that Plaintiff has failed to plead either element; in this case, Plaintiff has failed to plead both.

First, Plaintiff has failed to plead access—*i.e.*, that Defendants had a reasonable opportunity to read his book.  Plaintiff bases his access theory solely on the assertion that he distributed 5,000 copies of *Little White Trip* and that his book was discussed in a newspaper article and on the Internet.  Under clear Ninth Circuit law, such limited dissemination is insufficient to establish access as a matter of law.

Second, Plaintiff has not alleged, and cannot allege, that *Cabin* and *Little White Trip* are substantially similar in copyrightable expression.  Plaintiff cannot claim a protectable copyright interest in the mere idea of a horror story in which five people travel to a cabin and are terrorized by outside forces.  Upon even the most cursory examination of the copyrightable expression contained in the two works, it is apparent that the works at issue are not even remotely similar and in fact differ markedly in plot, characters, setting, dialogue, mood, pace, sequence of events, and themes.  Thus, Plaintiff cannot satisfy the Ninth Circuit's "extrinsic test" for substantial similarity.

For both these independent reasons, Plaintiff's Complaint should be dismissed with prejudice.

## II.   ALLEGATIONS OF THE COMPLAINT

### A.   Defendants and *The Cabin in the Woods*

According to the Complaint, Defendants are the writers, producers, and distributors of *Cabin*, which was released in 2012.  Compl., ¶¶ 4-8.

1

1    *Cabin* is a clear parody of horror movies with often broad comedic scenes.

2    The film opens in the break-room of an underground facility, where two middle-

3    aged men in office attire, Gary Sitterson and Steve Hadley, joke about Hadley's

4    family issues.  A young woman in a lab coat, Wendy Lin, nervously reports that

5    "Stockholm went south," and that only their facility and Japan are left.  Sitterson

6    and Hadley brush off her concerns, saying that they haven't had a glitch since 1998

7    and Japan has a perfect record.

8        The scene shifts to a house in a college town, where nice-girl Dana Polk, pre-

9    med student Jules Louden, football players Curt Vaughan and Holden McCrea, and

10   stoner Marty Mikalsi get into Curt's father's RV and take off on a summer trip.

11   Curt turns the RV into a dilapidated gas station, which looks abandoned until a

12   creepy old man suddenly appears.  Jules asks where Tillerman Road is, and Curt

13   explains that his cousin bought a house there.  The man says it is the old Buckner

14   place, from which a lot of owners have come and gone.  The man insults Jules,

15   calling her a "whore," and the characters leave.  They drive through a mountain

16   tunnel and soon arrive at a foreboding, ramshackle wooden cabin.

17       All the while, they are being watched on monitors by Sitterson and Hadley

18   from the facility's control room.  Lin reports that Jules Louden's bloodwork is back,

19   and that the Chem Department is recommending an increase in a chemical to raise

20   her libido.  In an over-the-top scene, Sitterson and Hadley act as bookmakers for an

21   office pool, callously taking wagers from the various facility departments over

22   which among an array of horrible monsters will kill the students.

23       Back at the cabin, the friends are playing Truth or Dare when a door in the

24   floor suddenly pops open, revealing a cellar filled with bizarre artifacts, such as a

25   puzzle ball and an old diary.  Each of the characters fiddles around with a different

26   object, until Dana starts reading aloud from the 1903 diary of "Anna Patience

27   Buckner," who aspires to torture and kill as her father and brothers did.  Over

28

2

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

1    Marty's objections, Dana reads some Latin phrases in the diary, causing a family of

2    zombies to rise from the grave.

3         Back at the facility, Sitterson announces that Maintenance and the intern have

4    won the pool by betting on the Buckners, the "Zombie Redneck Torture Family."

5    Hadley laments that he will never see his monster pick—the Merman.

6         When Jules and Curt go into the woods to make out, the male facility

7    employees watch salaciously from the control room.  Hadley and Sitterson get Jules

8    to take her top off by releasing pheromone mists.  As Curt and Jules are about to

9    have sex, the family of zombies attacks.  One zombie catches Jules in the back with

10   a bear claw, and another beheads her with a saw.  At her death, Hadley pulls a lever

11   in the control room, and blood flows into an outline etched in stone.

12        Marty is relieving himself outside when Curt grabs him and knocks out a

13   zombie girl behind Marty.  Back inside the cabin, Curt tells the others that Jules is

14   gone.  A zombie throws Jules's bloody head inside.  Curt comes up with a sensible

15   plan to barricade the cabin and for everyone to stay together.  Sitterson responds by

16   releasing a gas into the cabin, which causes Curt foolishly to instruct everyone to

17   split up instead.

18        In his room, Marty accidentally breaks a lamp and discovers a camera with

19   wires running up the wall.  Fearing that Marty could derail the ritual, Hadley

20   frantically calls for gas to be pumped in, but a zombie gets Marty first and drags him

21   off-camera.  Hadley pulls another lever, and blood flows into an outline of a figure.

22   Another zombie breaks into the cabin and gets Holden with the bear claw, but Dana

23   saves him by stabbing the zombie.  Holden, Dana, and Curt escape in the RV.

24        Back at the facility, Hadley notices that the RV is nearing the mountain

25   tunnel, and that the tunnel is still open.  Sitterson demolishes the tunnel just in time

26   to prevent the students' escape.  Curt tries to jump over the canyon on his

27   motorbike, but hits an electric force-field and falls to his death.  Holden and Dana

28

3

1   turn back in the RV, but Holden is stabbed through the neck by a zombie, and the

2   van crashes into the lake.  Dana does not die, however, and swims to the surface.

3        Sitterson and Hadley celebrate.  When the new security agent at the facility

4   points out that Dana is still alive, they explain that the Virgin's death is optional; it

5   just has to be last.  The facility's party comes to a halt when a call from "upstairs"

6   informs Hadley that the Virgin is *not* the only one left.  Marty, who did not really

7   die as the facility technicians (and the audience) had thought, rescues Dana from a

8   zombie and leads her to an elevator.  The elevator descends, and as it moves

9   sideways, Dana and Marty see numerous glass cubes filled with mythical monsters,

10  including one holding a puzzle ball exactly like the one in the cellar.  Dana realizes

11  that, by picking a trinket in the cellar, they "chose" which monsters would kill them.

12       The facility technicians direct security to locate and kill Marty, who had

13  become immunized from their chemicals and gases by smoking marijuana.  With the

14  help of a severed zombie arm, Marty and Dana escape a security agent and enter the

15  facility.  A voice on the intercom tells them that they are part of something bigger—

16  the facility's task to placate the Ancient Ones.  Marty and Dana run into the elevator

17  control booth, where Dana pushes the button marked "System Purge."  All of the

18  monsters descend through the elevators and slaughter the facility employees in a

19  massive bloodbath.

20       Dana and Marty find the ritual chamber, which contains stone carvings that

21  depict each of the horror archetypes—the Whore, the Athlete, the Scholar, the Fool,

22  and the Virgin.  Dana realizes that she and her friends were the sacrifice.  The

23  female Director arrives and explains that the ancient gods will remain below so long

24  as young people fitting at least these five horror archetypes are sacrificed, leaving

25  the Virgin for last.  The facility's Director, played by Sigourney Weaver, tells Marty

26  that if he does not die in eight minutes, the gods will rise and destroy humanity.

27  Dana is about to shoot Marty to save the world, when she is attacked by a werewolf.

28

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

1  Marty and the Director struggle until the zombie girl strikes the Director in the skull

2  with an ax.  The Director and the zombie fall into the pit of the ancient gods.

3    Dana and Marty banter and smoke a joint as they wait for the world to end.  A

4  giant hand breaks through the ground and destroys the cabin.

5    **B.**  **Plaintiff and His Book,** *The Little White Trip: A Night in the Pines*

6    Plaintiff alleges that he wrote *Little White Trip* between 2004 and 2006.

7  Compl., ¶¶ 13-16.  From approximately June 2006 to November 2007, Plaintiff

8  allegedly distributed and sold about 5,000 copies of the book, mostly in the Santa

9  Monica and Venice Beach areas as a result of a grassroots sales effort on the streets.

10  *Id.*, ¶¶ 18, 25.  Plaintiff alleges that some of the Defendants currently reside and

11  operate out of Santa Monica.  *Id.*, ¶ 20.  Plaintiff also alleges that *Little White Trip*

12  was discussed on blogs and social media websites, and in a profile in the Long

13  Beach Gazette.  *Id.*, ¶¶ 18, 23.  Plaintiff claims that unnamed "multiple credited

14  entertainment industry producers . . . expressed interest in the book."  *Id.*, ¶ 21.

15    *Little White Trip* opens with a note to the reader from Matt Thomas, the

16  narrator and main character, stating that he witnessed the murders of his friends and

17  that Peter Gallagher convinced him to tell the story in a book.  The story shifts to the

18  chilly December night of Matt's graduation from high school in Scottsdale, Arizona.

19  Matt is waiting in line to walk into the ceremony.  He sneaks out of line and heads

20  for his friends' hideout spot, where he meets Sam Canton, "your token fast food

21  eating, high-stress American"; Julie Burnett, a somewhat spoiled rich girl; and Ian

22  Shmelts, a cocky rich kid with absentee parents and an alcohol problem.  They are

23  later joined by Dura Lopez, a feisty athletic girl that Matt likes.

24    The graduates mildly disrupt the graduation ceremony by sitting together

25  instead of in their assigned spots.  After the ceremony, Matt finds Dura and Sam

26  smoking marijuana in Dura's car, and Julie arrives with a very drunk Ian.  They

27  head over to the graduation party, where they play carnival games and win money

28  for raffle tickets.  Dura dumps a lot of her tickets into the drawing for the grand

6855042.2

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

1   prize—an all-expense-paid snowboarding trip to Flagstaff, Arizona, which includes

2   boarding passes, a cabin, free food, and a Lincoln Navigator.  Julie ultimately wins

3   the prize, which she shares with her friends.

4   The following night, on Saturday, Matt meets his friends at the bowling alley,

5   and they then go to their "secret spot" in the state park, where they smoke marijuana

6   and talk.  On Sunday, Matt, Dura, Ian, and Julie meet at a hookah lounge.  Later that

7   night, Dura invites Matt over to her house, where they kiss.  On Monday morning,

8   the friends leave for Flagstaff in the Lincoln Navigator and stop for breakfast at a

9   diner.  About halfway to Flagstaff, Julie gets a call from the rental-car agency saying

10  that she needs to come back to sign a form about liability.  Matt arranges to stop by

11  a sister company to sign the form.  Sam wants to read the fine print, but an impatient

12  Julie directs him to just sign it.  They arrive in snowy Flagstaff by afternoon.

13  The characters go to a steakhouse to use their free-food coupons.  A young

14  waiter named Caswell insists that they sit in a specific booth.  Caswell separately

15  calls Matt over to the bar and asks where they are going.  Matt tells him that they are

16  going to the Brinkley cabin.  Caswell laughs and says that Matt must be mistaken

17  because the police recently seized the cabin after Jeff Brinkley killed his trophy wife

18  and three kids.  Matt thinks Caswell is just trying to scare him, and does not tell the

19  others about the incident.

20  The characters follow the directions they received from the rental-car agency

21  and arrive at a cabin.  They ask the family there whether it is the Brinkley cabin.

22  The father at first gets angry, but starts to sob and reveals that Brinkley killed their

23  son.  Ian is shaken by the story, but Sam points out how unbelievable the story is.

24  The characters finally arrive at a massive "new cabin" with a "four-car

25  garage, thick log columns, castle-style double doors, and an enormous balcony

26  offset above the entryway."  While exploring upstairs, Sam sees a door in the

27  ceiling, and they climb up to the attic.  Matt finds a cardboard box with tiny clay

28

6

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

1    dolls, which Julie recognizes as expensive antiques.  Julie finds a family photo with

2    the inscription, "The Brinkley Family."

3         The characters use the cabin's computer to search the Internet for Brinkley.

4    They find nothing about any murders.  Reassured, they barbecue, drink, and get

5    stoned.  A man comes to the door, claiming that his tire blew out and that he needs

6    to call a tow service.  Ian is skeptical, but Matt gives the man Julie's cell phone.

7    The man tells Matt and Dura that Brinkley was chased out of town for preaching too

8    much.  That night, Matt and Dura have sex on the couch, and Sam sees them.

9         The next morning, Sam refuses to go to the mountain, and the girls insist on

10   leaving the car for him.  Matt tries to call a cab using Julie's cell phone but cannot

11   find a signal.  Matt wonders how the visitor was able to make calls, and finds no

12   calls in the call history.  Matt uses the house line to call a cab.  Matt, Dura, Ian, and

13   Julie spend the day snowboarding and having fun at the lodge.

14        At the end of the day, they are picked up by a town car to return to the cabin.

15   The driver shares more gory details about the Brinkley murders, scaring the

16   characters.  They decide to grab Sam and leave, but when they arrive at the cabin,

17   Sam and the car are gone.  Matt and Dura search for Sam in the woods and find the

18   car crashed into a tree.  On the passenger seat is Sam's severed arm.

19        Matt and Dura run back to the cabin, where Ian and Julie have discovered that

20   the phone lines have been ripped out.  While the four are talking, the kitchen

21   window shatters, and a large man in a flannel shirt stabs Dura in the stomach and

22   abducts her.  Matt notices several trails of footprints outside and deduces there must

23   be at least two more assailants.  The three look for the kitchen knives, but someone

24   has taken them.

25        Ian goes outside to retrieve the car.  Hearing Ian's scream, Matt runs to the

26   balcony and sees Jeff Brinkley stabbing Ian repeatedly.  Matt races out and knocks

27   Brinkley down with a punch to the temple.  Matt is about to crush Brinkley's head

28   with a piece of firewood when another huge man grabs and chokes Matt until he

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

1  passes out.  When he awakens, Matt creates a makeshift weapon from a broken

2  whiskey bottle.  While searching for a knife, Matt knocks over a vase, and he and

3  Julie discover a wireless camera amongst the shards.

4       Just then, Brinkley comes in, and Matt and Julie hide behind a recliner chair.

5  Brinkley begins talking to himself and then leaves.  Julie spots a cop car in the

6  driveway, but Matt discovers that the officer inside the car is dead, with his head

7  nearly severed.  Matt is still reeling in horror when Julie is grabbed by Brinkley.

8  Matt lunges for the cop's gun, and Brinkley releases Julie.  Matt shoots Brinkley.

9       Matt and Julie then see a woman coming out of the woods and directing

10 someone to stay back.  Matt sees that Brinkley is not dead but sitting up.  Other

11 people emerge out of the woods, and a short man with a megaphone calls it a

12 "wrap."  Matt listens in shock as this man, Rex Luther, gives an interview to a news

13 reporter, and describes all the preparations that went into making the "world's first

14 full-length reality movie."  Luther reveals that the knives were fake, Brinkley and

15 everyone else were hired actors, and the rental-car form was actually a release.

16      In the epilogue, set a year and half later, Matt recounts how Julie's father

17 hired an attorney to sue the moviemakers and got each of them a settlement of $9.5

18 million.  Matt gave his parents $1 million and moved to Hollywood with Dura.

19 **III.   RULE 12(b)(6) STANDARDS IN COPYRIGHT CASES**

20      Although a court must accept the facts pled as true and draw all reasonable

21 inferences in favor of a plaintiff on a motion to dismiss, a "court need not accept as

22 true . . . allegations that contradict facts that may be judicially noticed by the court."

23 *Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).  A court should "read[]

24 the complaint as a whole, together with matters appropriate for judicial notice, rather

25 than isolating allegations and taking them out of context."  *In re Countrywide Fin.*

26 *Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1145 (C.D. Cal. 2008).

27      To prevail in a copyright infringement action, a plaintiff must prove

28 (1) ownership of a copyright in a work and (2) copying by a defendant of original

6855042.2

1   elements of the work.  *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th

2   Cir. 2010).  "A plaintiff may establish copying either (1) by presenting direct

3   evidence of copying or (2) by showing that the defendant had access to the work and

4   that the works at issue are substantially similar."  *Bissoon-Dath v. Sony Comp.*

5   *Entm't Am., Inc.*, 694 F. Supp. 2d 1071, 1078 (N.D. Cal. 2010), *aff'd and adopted*

6   *by*, 653 F.3d 898 (9th Cir. 2011) (published without opinion).

7        When considering a motion to dismiss an infringement claim for lack of

8   substantial similarity, a court may "take judicial notice of generic elements of

9   creative works," as well as "documents [such as copies of works] which are not

10  physically attached to the complaint but 'whose contents are alleged in [the]

11  complaint and whose authenticity no party questions.'"  *Zella v. The E.W. Scripps*

12  *Co.*, 529 F. Supp. 2d 1124, 1128-29 (C.D. Cal. 2007) (internal citation omitted).

13  Courts routinely grant motions to dismiss copyright infringement claims where the

14  works at issue are in the record and it is apparent from the pleadings that the works

15  are not substantially similar as a matter of law.  *Christianson v. West Publ'g Co.*,

16  149 F.2d 202, 203 (9th Cir. 1945); *accord Peter F. Gaito Arch., LLC v. Simone Dev.*

17  *Corp.*, 602 F.3d 57, 63-65 (2d Cir. 2010); *Wild v. NBC Universal, Inc.*, 513 Fed.

18  Appx. 640, 641 (9th Cir. 2013) (affirming where "district court took judicial notice

19  of the two works and dismissed the complaint without leave to amend based on a

20  lack of substantial similarity in their protectable elements"); *Scott v. Meyer*, No.

21  2:09-cv-06076-ODW, Order Granting Defendants' Motion to Dismiss ("MTD

22  Order") at 4 (C.D. Cal. Nov. 24, 2009), attached as Exhibit 3 to the Declaration of

23  Elaine K. Kim.[1]  This approach is consistent with *Bell Atlantic Corp. v. Twombly*,

24

25

26

27

28

---

[1] *See also Van v. Cameron*, 566 Fed. Appx. 615, 615 (9th Cir. 2014); *Gadh v. Spiegel*, 2014 U.S. Dist. LEXIS 64081, at *23 (C.D. Cal. Apr. 2, 2014); *DuckHole Inc. v. NBC Universal Media*, 2013 U.S. Dist. LEXIS 157305, at *23 (C.D. Cal. Sept. 6, 2013); *Schkeiban v. Cameron*, 2012 U.S. Dist. LEXIS 145384, at *6 (C.D. Cal. Oct. 4, 2012), *aff'd*, 566 Fed. Appx. 616 (9th Cir. 2014); *Campbell v. The Walt Disney Co.*, 718 F. Supp. 2d 1108, 1116 (N.D. Cal. 2010); *Rosenfeld v. Twentieth Century Fox Film Corp.*, 2009 U.S. Dist. LEXIS 9305, at *9-10 (C.D. Cal. Jan. 28, 2009); *Capcom Co., Ltd, v. The MKR Group, Inc.*, 2008 U.S. Dist. LEXIS 83836, at *34 (N.D. Cal. Oct. 10, 2008); *Thomas v. The Walt Disney Co.*, 2008 U.S. Dist. LEXIS 14643, at *17 (N.D. Cal. Feb. 14, 2008), *aff'd*, 337 Fed. Appx. 694 (9th Cir. 2009).

9

1  550 U.S. 544 (2007), in which the Supreme Court held that a plaintiff must allege

2  "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.

3       The contents of the works at issue in an infringement case cannot be altered

4  by extraneous allegations.  *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 434

5  (S.D.N.Y. 1985) ("[T]he works themselves supersede and control contrary

6  allegations and conclusions, or descriptions of the works as contained in the

7  pleadings."), *aff'd*, 784 F.2d 44 (2d Cir. 1986).  Thus, where substantial similarity is

8  absent, courts dismiss with prejudice the copyright claim and all derivative claims.

9  *E.g.*, *Campbell*, 718 F. Supp. 2d at 1116 (lack of substantial similarity is a "defect

10  [that] cannot be cured by amendment"); *Thomas*, 2008 U.S. Dist. LEXIS 14643, at

11  *17 ("Because this finding is based on the works themselves and not on [the]

12  pleadings, leave to amend would be futile.").

13       Courts also dismiss copyright infringement claims where, as here, the plaintiff

14  fails to satisfy the *Twombly* pleading standard by failing to allege facts showing that

15  the defendant had access to the plaintiff's work.  *E.g.*, *Feldman v. Twentieth Century

16  Fox Film Corp.*, 723 F. Supp. 2d 357, 365-66 (D. Mass. 2010) (allegations of

17  circulation in Hollywood and book publication not enough to prevent dismissal);

18  *Hill v. Gaylord Entm't*, 85 U.S.P.Q.2D (BNA) 1688, 1691-92 (S.D. Fla. 2008)

19  (allegation of sending script to "publishers and literary agents for possible

20  publication" not enough to prevent dismissal).

21  **IV.   PLAINTIFF CANNOT PLEAD SUBSTANTIAL SIMILARITY**

22       Plaintiff's copyright infringement claim fails because there is a complete lack

23  of substantial similarity between the works.  To prove that two works are

24  substantially similar in protected expression, a plaintiff must satisfy both an

25  "extrinsic" test and an "intrinsic" test.  *Funky Films, Inc. v. Time Warner Entm't,

26  Inc.*, 462 F.3d 1072, 1077 (9th Cir. 2006).  On a motion to dismiss, only the

27  extrinsic test is relevant.  *Zella*, 529 F. Supp. 2d at 1133 n. 8.  The extrinsic test

28  requires an "analytic dissection" of the works, and focuses on "specific, concrete

10

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

1   elements" of expression rather than generalizations. *Bissoon-Dath*, 694 F. Supp. 2d

2   at 1079.  The plaintiff must identify "articulable similarities between the plot,

3   themes, dialogue, mood, setting, pace, characters, and sequence of events" of the

4   two works.  *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1044 (9th Cir.

5   1994).

6        In applying the extrinsic test, the court must first "filter out and disregard the

7   non-protectable elements [of each work] in making [a] substantial similarity

8   determination."  *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).

9   Facts and ideas must be filtered out, because "no author may copyright facts or

10  ideas."  *Harper & Row Publrs., Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985).

11  "It is an axiom of copyright law that the protection granted to a copyrighted work

12  extends only to the particular expression of the idea and never to the idea itself."

13  *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157,

14  1163 (9th Cir. 1977).  The court "compares, not the basic plot ideas for stories, but

15  the actual concrete elements that make up the total sequence of events and the

16  relationships between the major characters."  *Berkic v. Crichton*, 761 F.2d 1289,

17  1293 (9th Cir. 1985).  In addition, "scenes à faire, which flow naturally from generic

18  plot-lines, are not protectable" and must be filtered out as well.  *Funky Films*, 462

19  F.3d at 1077.  The court "must take care to inquire only whether 'the *protectable*

20  *elements*, *standing alone*, are substantially similar.'"  *Id.* (quoting *Cavalier*, 297

21  F.3d at 822) (emphasis in original).

22        Here, Plaintiff's claim fails an analysis of each element of the extrinsic test as

23  a matter of law.

24        ***Plot.***  A court will "look[] beyond the vague, abstracted idea of a general

25  plot" when assessing similarities.  *Berkic*, 761 F.2d at 1293.  Thus, even where two

26  works "share the same basic plot premise" (which is not the case here), that will be

27  insufficient where "a closer inspection reveals that they tell very different stories."

28  *Benay*, 607 F.3d at 625.

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

1    The plots of the two works here are not substantially similar even at an

2    abstract level.  The basic premise of *Cabin*—a clear parody—is that, to avoid the

3    apocalypse, society must each year offer the ancient gods a ritual sacrifice of young

4    people who fit certain horror archetypes.  Clandestine facilities around the world

5    ensure that the archetypes are killed in accordance with certain horror conventions.

6    In North America, the characters must go to a cabin in the woods, do foolish things,

7    and be killed off by classic horror monsters, with the Virgin left for last.  The story

8    is told through alternating scenes of the technicians in the facility and the college

9    students who have been selected for this year's sacrifice.  The facility technicians

10   party, wager on death, and generally treat the characters' terrifying plight as a

11   sporting event until the technicians get their comeuppance.

12       In contrast, *Little White Trip* is largely a coming-of-age story about a group of

13   high school friends who, for the first third of the book, attend their high school

14   graduation, celebrate, have romantic encounters, drink and take drugs, and ruminate

15   about life.  Eventually, they drive to Flagstaff, Arizona, on a snowboarding trip,

16   which they think they have won at a raffle at their high school graduation party.

17   The characters encounter various people in Flagstaff, who try to convince them that

18   the cabin included in the package was previously owned by a man who murdered his

19   family and was never caught.  After numerous interpersonal encounters having

20   nothing to do with the killings, Matt Thomas, the narrator, witnesses what he thinks

21   are the murders of several of his friends at the hands of this man.  In the end, it is

22   revealed that the entire ski trip was being filmed by individuals who want to release

23   it as a movie, and that in fact, no one was killed.  There are no monsters, zombies, or

24   end-of-the-world sacrifices.

25       The Complaint nevertheless alleges that "[l]ike the Book, Cabin in the Woods

26   tells the story of five friends (three guys and two girls) between the ages of 17 and

27   22 who take a trip to a remote cabin in the woods.  The cabin's previous inhabitants

28   were murdered by the father of the family, who returns to terrorize the group of

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

friends.  In the end, it is revealed that the friends are being filmed and manipulated by persons behind the scenes, thus becoming inadvertent characters in a real-life horror show for the enjoyment of others."  Compl., p. 9.  As Plaintiff acknowledges (Compl., p. 8), however, the concept of characters being filmed and manipulated for the enjoyment of the viewers is an "idea" and is therefore not copyrightable.  Similarly, the notion of a group of guys and girls taking a trip to a house in a remote location is commonplace *scenes à faire* in horror films, from *The Texas Chain Saw Massacre* to *The Evil Dead*.  Indeed, the Complaint itself alleges that *Cabin* and *Little White Trip* use "classic horror movie tropes" (Compl., p. 9), and Plaintiff's book even remarks how clichéd its story is (*e.g.*, p. 285, referring to its own "clichéd plot").  Plaintiff cannot claim ownership of these abstract ideas and stock elements.  *See Berkic*, 761 F.2d at 1293 ("General plot ideas … remain forever the common property of artistic mankind."); *Funky Films*, 462 F.3d at 1077 (only "specific details of an author's rendering of ideas" are protectable).

Moreover, the allegation is inaccurate.  In *Cabin*, it is ***not*** revealed in the end that the characters are being watched; this is known from the beginning.  Unlike in *Little White Trip*, the characters in *Cabin* are not only actually killed, but they are killed to save humanity from the gods' wrath.  Moreover, the characters in *Cabin* are not killed by a man who recently lived in the neighborhood, but by a family of zombies from 1903; the zombie children in *Cabin* were not innocent victims, but actively participated in the torture and killing of others.

Indeed, the Ninth Circuit has found plots with far more similarities than those at issue here to be ***legally dissimilar***.  *See, e.g.*, *Benay*, 607 F.3d at 625 (two works about American war veterans who traveled to Japan to train the Japanese army only to fall in with samurai rebels not substantially similar); *Funky Films*, 462 F.3d at 1077-78, 1081 (two works in which fathers who operate family-run funeral homes die, resulting in the subsequent operation of the homes by two sons, one of whom has been estranged from the family prior to the father's death, not substantially

similar); *Kouf*, 16 F.3d at 1045-46 (two family comedy/adventure films about people who are accidentally shrunk not substantially similar); *Berkic*, 761 F.2d at 1293 (two works that "deal with criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants" not substantially similar).  There is no substantial similarity in plot.

*Characters*.  "The bar for substantial similarity in a character is set quite high." *Sheldon Abend Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010).  Character traits that "flow naturally from [two] works' shared premises" are not protected and cannot form the basis for substantial similarity. *Benay*, 607 F.3d at 626.  "[O]nly distinctive characters are protectable" (*id.*), and courts must be careful "to slice or filter out" mere embodiments of stock ideas, *Bissoon-Dath*, 694 F. Supp. 2d at 1088.

The characters in the two works here are extremely different.  Plaintiff compares Dana Polk in *Cabin* with Dura Lopez in *Little White Trip*, but they are nothing alike.  Dana Polk is a nice and intellectual red-head (not "brunette," as Plaintiff alleges), and is designated to fulfill the female Virgin role.  In contrast, Dura Lopez in *Little White Trip* is half-Dominican and half-Sicilian, with "a soft coffee complexion" and "long brown hair" (p. 24).  She is feisty and like "one of the guys" (p. 24).  She is athletic and was the star volleyball champ, but frequently smokes marijuana.  She has sex with Matt Thomas, and is not the last character to survive, but rather, the second one to be "killed" by the fake murderer.  That the two characters have names that start with the same letter do not make them similar.  *See Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1070 (C.D. Cal. 2010) (no substantial similarity of characters though they had the "similar sounding names" "Susan and Suzanne"); *Davis v. ABC*, 2010 U.S. Dist. LEXIS 76145, at *27 (W.D. Mich. July 28, 2010) (no substantial similarity even though main characters in the works were named "Eli and Ely," another character was named Stanley, and a third was "Ramerez or Ramirez"); *Hogan v. DC Comics*, 48 F.

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

Supp. 2d 298, 311 (S.D.N.Y. 1999) (no substantial similarity where main "half-vampire" characters in the two works "share[d] the same name: Nicholas Gaunt"). And while Plaintiff alleges that both "recently ended a relationship" (Compl., p. 9), Dana Polk has just been dumped by her professor, whereas Dura develops a relationship with Matt before the trip, and her previous boyfriend was a family friend of whom her father approved (p. 84).

Nor do Holden McCrea in *Cabin* and Matt Thomas in *Little White Trip* have anything in common. Holden is smart and fulfills the Scholar role, although he is also a good-looking football player. Far from being a scholar, Matt Thomas has "subpar grades" (p. 7). Contrary to Plaintiff's assertion that Matt is "more sensitive, shy, and mature" (Compl., p. 9), Matt is the class clown who, throughout school, "fought to stay at the center of attention even though many times it landed [his] ass in the principal's office" (p. 4). He "love[s] entertaining" and "love[s] being right even more" (p. 4). Matt has thick black hair, and a broken nose and blood spots in his eye from a childhood accident (p. 4). Matt is the narrator of *Little White Trip*, and is never "killed" off, whereas Holden McCrea is killed by a zombie.

Jules Louden in *Cabin* is a smart pre-med student, but in the cabin becomes the Whore archetype. She is the first to be killed. By contrast, Julie Burnett in *Little White Trip* is no more promiscuous than Dura. She is never "killed," but is one of the final two characters remaining. That characters' names are similar does not give rise to substantial similarity. *See supra.* Neither do the superficial similarities that they have blonde hair (because Jules Louden dyes it just before the trip) or that they are stereotypically bubbly, because such characters are *scenes à faire* in the horror/slasher genre including, for example, in the well-known movie *Scream. See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1176 (9th Cir. 2003) ("[W]hile there may exist similarities between the magician 'characters,' any shared attributes of appearance and mysterious demeanor are generic and common to all magicians.").

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

1    Curt Vaughan in *Cabin* and Ian Shmelts in *Little White Trip* are not remotely
2    similar characters.  Curt is a football player who fulfills the Athlete archetype, but is
3    actually a sociology major on a full academic scholarship.  He is not an alcoholic.
4    *Little White Trip*'s Ian, in contrast, is not an athlete, has a chronic alcohol problem,
5    and wears "vintage rags that cost way too much" (p. 11).  He is also resentful
6    because he is well-off (p. 67).  *See Scott v. Meyer*, No. 2:09-cv-06076-ODW, MTD
7    Order at 5 ("To the extent that the male protagonists are dashing young men
8    tormented by their powers, such similarities are far too general to be actionable.").
9    Neither are Marty Mikalski in *Cabin* and Sam Canton in *Little White Trip*
10   similar.  Marty is supposed to fulfill the Fool archetype, but he is actually the most
11   observant and serves as the voice of reason during the film.  Marty has no romantic
12   interest in any other character, and is one of the final two to survive.  *Little White*
13   *Trip*'s Sam Canton, in contrast, is the first one to be "killed."  Sam is romantically
14   interested in Dura, but discovers that Dura likes Matt.  Plaintiff alleges that Marty
15   and Sam have "quirky personalities" (Compl., p. 10), but this abstraction only belies
16   the absence of any real similarity.  In fact, the two have markedly different
17   personalities:  Marty is laid back and does not seem to care about popularity.  Sam is
18   "your token fast food eating, high-stress American" (p. 8), who tried to infiltrate the
19   hip crowd and join the football team, but never made it (pp. 9-10).[2]
20   In addition, under the extrinsic test, courts take note of characters with no
21   counterparts in the other party's work.  *See Funky Films*, 462 F.3d at 1079
22   (emphasizing characters from defendant's work who were not present in plaintiff's
23   work); *Benay*, 607 F.3d at 627 ("There are a number of important characters in the

---

25   [2] Plaintiff alleges that Marty and Sam both "have messy dirty blonde hair, wear a grey shirt and
     jeans throughout the film, smoke marijuana, and enjoy gazing up the stars."  Compl., p. 10.
26   Although having similar hair color or wearing jeans do not make two characters substantially
     similar, Marty has brown hair, and he also wears a blue jean shirt and brown sweater.  Curt—
27   whom Plaintiff does not contend is similar to Sam—wears a grey shirt and jeans.  Plaintiff
     mischaracterizes *Cabin* in alleging that Marty "enjoy[s] gazing up the stairs"; Marty simply looks
28   up at the sky at one point and notices that there are no stars.  And in *Little White Trip*, it is Dura
     who brings the marijuana, not Sam, and all of the characters in the book smoke it.

16

6855042.2

1   Film and the Screenplay who have no obvious parallel in the other work."). *Cabin*

2   has many characters with no counterparts in *Little White Trip*, including key

3   characters such as Sitterson, Hadley, the other facility employees, zombies, and

4   supernatural monsters.  Conversely, *Little White Trip* has many characters with no

5   counterparts in *Cabin*, such as high school teacher Mrs. Adams, Matt's parents and

6   kid brother, the "Mailer family" whose son was purportedly murdered, the late-night

7   visitor, and the town-car driver.  There is no similarity in character.

8        ***Setting.***  The settings of *Cabin* and *Little White Trip* are likewise vastly

9   different.  *Cabin* takes place primarily in two locations—in and around the cabin in

10  the woods and in the underground facility—and is set in the summer.  Much of *Little*

11  *White Trip* takes place in Scottsdale, Arizona, where the characters live and attend

12  their high school graduation and party.  On their trip, which occurs in December, the

13  characters go to Flagstaff, where there are a university, restaurants, markets, other

14  cabins, and a ski resort where they snowboard.

15       The Complaint alleges merely that "[t]he setting of each work takes place in a

16  remote cabin in the woods, where the prior inhabitants of the cabin were murdered."

17  Compl., p. 9.  Again, the setting of a horror story in a house with a violent or

18  mysterious history in an isolated location, so that the victims cannot easily escape or

19  seek help, is part of the basic formula of horror and is not protectable.  Moreover,

20  the "cabins" in the two works are nothing alike.  The cabin in *Cabin* is dark and

21  spooky, and has an eerie one-way mirror and creepy painting.  The furniture looks

22  like it is from the pioneer days.  By contrast, the "cabin" in *Little White Trip* could

23  not be more different—an eight-room, estate-style resort with a "hot tub, Internet

24  connection, outdoor heating, theater-quality entertainment center, and much more"

25  (p. 108).  It has "perfectly placed, expensive-looking furniture," and is "complete

26  with artwork, lavish fixtures, and the new-house feel like we were the proud first

27  owners," and the air inside is "as clean and fresh inside as it [is] out in the trees"

28  (pp. 135-36).  That the names of the places start with the same letter do not make

6855042.2

1  them substantially similar.  *See Davis*, 2010 U.S. Dist. LEXIS 76145, at *27 ("A

2  name . . . generally is an unprotectible generic element of a work.").[3]

3      ***Dialogue.***  "[E]xtended similarity of dialogue [is] needed to support a claim

4  of substantial similarity . . . ."  *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th

5  Cir. 1988).  The Complaint does not allege that there is any similarity in dialogue

6  between *Cabin* and *Little White Trip*, and there is none.

7      ***Mood.***   *Cabin* and *Little White Trip* differ radically in terms of mood.  The

8  Complaint alleges that "[b]oth works have a similar mood in that they are horror

9  films that begin with the enthusiasm of a group of friends going on a trip, followed

10  by the excitement of a night of drinking and romance at a cabin in the woods.  The

11  mood then shifts to a series of frightening murders which culminates in a surprise

12  reveal that the lead characters are being manipulated for the enjoyment of third

13  parties."  Compl., p. 10.  As this allegation confirms, the only similarity between the

14  two works is that they involve horror.  In *Cabin*, the mood is comical and satirical;

15  Sitterson and Hadley play practical jokes and dance along with the characters.  The

16  killing is less realistic and less suspenseful, and involves fantastic monsters such as

17  the Merman, a werewolf, and a unicorn.  *Little White Trip*, in contrast, is more

18  serious and somber in tone, as Matt Thomas describes the murders and how he and

19  his friends were ill-prepared for what would happen.

20

21

22  [3] Courts have repeatedly found no substantial similarity in cases involving far more similar settings.  *See, e.g.*, *Funky Films*, 462 F.3d at 1080 ("Although both works take place in a

23  contemporary, family-run funeral home, the similarities in setting end there. 'Six Feet Under' takes place in a well-maintained funeral home in Los Angeles … [whereas] 'The Funk Parlor',

24  located in Connecticut, is in shambles."); *Benay*, 607 F.3d at 627 (no substantial similarity where both works followed Americans from the United States to seat of the Japanese Emperor due to

25  dissimilarities in some specific settings within the works); *Capcom Co.*, 2008 U.S. Dist. LEXIS 83836, at *29 (no substantial similarity despite both stories taking place in "a rural two-story mall

26  with a helipad on top and a gun shop and music playing inside," because one mall was "relatively small with a major department store and an ice rink" while the other was "a modern mega-mall

27  without a major department store or ice rink"); *Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429, 446-47 (S.D.N.Y. 2011) ("Although both works are primarily set in or near

28  Antarctica, and both use an underground pyramid and archeological excavation settings, these are not forms of expression that can be copyrighted.").

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

1      ***Pace.***  The Complaint alleges that the pace of the works is supposedly similar

2  because "[b]oth are horror films, punctuated with a series of deaths, followed by a

3  surprise reveal that the lead characters are being manipulated for the enjoyment of

4  third parties."  Compl., p.10.  Again, this allegation underscores that the only

5  similarity is that the works involve horror.  That two works in the horror genre

6  involve a series of deaths does not make their pace similar.  *See Segal v. Rogue*

7  *Pictures*, 2011 U.S. Dist. LEXIS 157933, at *20 (C.D. Cal. Aug. 19, 2011) (mood

8  and pace of two works not similar despite allegation that they both "have a dark,

9  foreboding mood and the pace quickens as harsher events occur as the stories

10  progress," because this mood and pace are generic in religious horror).

11      In fact, the pace of the two works is highly different.  *Cabin* is a fast-paced

12  parody in which cuts of the college students are interlaced with cuts of frantic

13  facility employees, and which swiftly proceeds to fast-paced graphic horror.  In

14  *Cabin*, almost no time is spent in the characters' college town; they leave almost

15  immediately for the cabin.  The zombies appear early on into the film.  Then, the

16  last third of the film follows Marty and Dana as they fight back against the facility.

17  In contrast, *Little White Trip* is a slowly unfolding coming-of-age story that has high

18  school kids ruminating about graduation and going on a long road trip.  The first

19  third of the book follows the characters before they arrive in Flagstaff, and involve

20  scenes at their graduation ceremony and party, their homes, and various hang-out

21  places around town.  The first character is not "killed" until more than two-thirds

22  into the book, and the narrative promptly ends after the characters and the reader

23  learn that no one actually died and the trip was being filmed to be made into a

24  movie.

25      ***Sequence of Events.***  The Complaint's allegation regarding the sequence of

26  events is just a repetition of the generalized allegations regarding plot.  *See* Compl.,

27  p. 10.  The Complaint completely disregards the actual events that occur in each

28  work, including the entire first third of *Little White Trip* and the entire third act of

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

*Cabin*, in which Marty and Dana fight back and release the monsters into the facility.  The Complaint also ignores the actual sequence (or any other details) of the deaths, which is important to *Cabin*'s narrative:  Jules (the Whore) dies first, and Marty (the Fool) and Dana (the Virgin) are the last ones to die.  In contrast, in *Little White Trip*, Sam (who Plaintiff alleges is similar to Marty) "dies" first, and Matt and Julie (who Plaintiff compares to Holden and Jules) survive.  And, contrary to Plaintiff's allegation, *Cabin* does not culminate in a surprise reveal that the characters are being watched; the audience knows that the college students are being watched from the first several minutes of the film.  There is no substantial similarity of sequence of events.  *See Funky Films*, 462 F.3d at 1077 (extrinsic test requires analysis of "the actual concrete elements that make up the total sequence of events"); *Scott v. Meyer*, No. 2:09-cv-06076-ODW, MTD Order at 6 ("Insofar as both works present a similar sequence of marriage, consummation and child birth, such similarities in stock elements are not actionable.").

**Themes.**  The Complaint alleges that "[e]ach work has a core theme of horror, resulting from unknowingly being manipulated by third parties," "for the fulfillment of the narrative requirements and the enjoyment of others."  Compl., pp. 8, 9.  This alleged similarity would apply to the entire horror genre.  Moreover, the allegation that both works "display a self-referential awareness of classic horror movie tropes," (*id.*, p. 9) would describe all horror parodies from *Scream* to *Scary Movie*.  Such commonplace themes do not render *Cabin* similar, let alone substantially similar, to *Little White Trip.  See Benay*, 607 F.3d at 627 (no substantial similarity although "both works explore[d] general themes of the embittered war veteran, the 'fish-out-of water,' and the clash between modernization and traditions," because "themes ar[o]se naturally from the premise of an American war veteran who travels to Japan to fight the samurai"); *Muller*, 794 F. Supp. 2d at 445 ("Any thematic similarities are incidental to the idea of an expedition to a dangerous and remote location, or the stock theme of action-adventure meets science-fiction, and accordingly are

6855042.2

1  unprotected."); *Goldberg v. Cameron*, 787 F. Supp. 2d 1013, 1020 (N.D. Cal. 2011)

2  (theme "commonplace in science fiction" did not make two works substantially

3  similar); *Gable v. Nat'l Broad. Co., Inc.*, 727 F. Supp. 2d 815, 838-48 (C.D. Cal.

4  2010) (two works about themes of karma and redemption, and ideas of righting past

5  wrongs and good things happening to good people, not substantially similar as a

6  matter of law).

7        Moreover, the works' themes differ in important respects.  *Cabin* is about the

8  destruction of the entire human race and has an apocalyptic theme.  *Little White Trip*

9  is about a group of high school kids who are tricked and who become older, wiser,

10  and richer as a result.

11        ***List of Random Alleged Similarities.***  Finally, the Complaint's list of random

12  alleged similarities cannot change the content of the two works, or change the fact

13  that they are not substantially similar as a matter of law.  As the Ninth Circuit has

14  held, a "compilation of 'random similarities scattered throughout the works' is

15  'inherently subjective and unreliable.'"  *Cavalier*, 297 F.3d at 825 (quoting

16  *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)); *see Scott v. Meyer*,

17  No. 2:09-cv-06076-ODW, MTD Order at 5 (noting "the Ninth Circuit's directive

18  that district courts be 'particularly cautious where, as here, the [plaintiff] emphasizes

19  random similarities scattered throughout the works'" (quoting *Litchfield*, 736 F.2d at

20  1356)).

21        Many of the alleged similarities in Plaintiff's list are repeats of the ones

22  previously addressed, which either mischaracterize the works or consist of ideas and

23  *scenes à faire*, such as the general plot point of a group of five friends who go to a

24  remote cabin in the woods and are killed by local psychopaths/zombies (Alleged

25  Similarities No. 1, 3, 10, 16-19, 22), the purported superficial similarities in

26  characters or names (Nos. 2, 4, 13, 14), and the idea of characters being watched and

27  manipulated (No. 23-25).  These ideas and elements are not protectable and, as

28  discussed, are expressed in extremely different ways in the two works.  The other

purported similarities in Plaintiff's list are likewise abstracted to the level of generalities or mischaracterize the works, so as to concoct similarities where they do not exist.  But even if that were not the case, the alleged similarities are stock elements and tropes that flow directly from the tried-and-true slasher story and the abstract idea of someone watching—the use of a vehicle to get to the cabin (No. 3), the classic "harbinger" character (No. 5), the lack of cell phone reception (No. 6), an old storage area with various objects (Nos. 7-9), a period of time before the murders, in which the unsuspecting characters drink, have fun, and make out (Nos. 11-13, 15), severed body parts (No. 18), and the characters' discovery that they are being watched and manipulated (Nos. 20-21).  These classic horror tropes and stock elements do not make *Cabin* substantially similar to *Little White Trip*.  *See Cavalier*, 297 F.3d at 823 ("Scenes-a-faire, or situations or incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement."); *Berkic*, 761 F.2d at 294 ("[D]epictions of the small miseries of domestic life, romantic frolics at the beach, and conflicts of ambitious young people on the one hand, and conservative or evil bureaucracies on the other" are "unprotectable").[4]

In sum, the works at issue are not substantially similar as a matter of law, and Plaintiff's copyright infringement claim should be dismissed with prejudice because the lack of substantial similarity cannot be cured by amendment.

---

[4] *See also, e.g.*, *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (works not substantially similar although they both began "with the murder of a black and a white policeman with a handgun at close range; both depict cockfights, drunks, stripped cars, prostitutes and rats; both feature as central characters third- or fourth-generation Irish policemen who live in Queens and frequently drink; both show disgruntled, demoralized police officers and unsuccessful foot chases of fleeing criminals"); *Capcom Co.*, 2008 U.S. Dist. LEXIS 83836, at *18-*19 (*Dawn of the Dead* film and *Dead Rising* video game not substantially similar, despite alleged similarities "that: (1) both works are set in a bi-level shopping mall; (2) the mall has a gun shop, in which action takes place; (3) the mall is located in a rural area with the National Guard patrolling its environs; (4) both works are set in motion by a helicopter that takes the lead characters to a mall besieged by zombies; (5) many of the zombies wear plaid shirts; (6) both works feature a subtext critique of sensationalistic journalism through their use of tough, cynical journalists, with short brown hair and leather jackets, as a lead male character; (7) both works feature the creative use of items such as propane tanks, chainsaws, and vehicles to kill zombies; (8) both works are a parody of rampant consumerism; (9) both works use music in the mall for comedic effect; and (10) Dead Rising's use of the word 'hell' references the tagline for Dawn of the Dead's release ('When there's no more room in hell, the dead will walk the earth.')").

6855042.2

## V.     PLAINTIFF HAS FAILED TO PLEAD ACCESS

To establish access, Plaintiff must allege that the *Cabin* creators had an "opportunity to view or copy" *Little White Trip* before they created *Cabin*, and must demonstrate that the *Cabin* creators had a "reasonable possibility" to do so.  *Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1355 (C.D. Cal. 1984).  A "bare possibility" of access is not enough.  *Jason v. Fonda*, 698 F.2d 966, 967 (9th Cir. 1982).  Further, access "may not be inferred through mere speculation or conjecture."  *Gable*, 727 F. Supp. 2d at 827.

Here, there are simply no facts supporting any reasonable possibility that the creators of *Cabin* had access to *Little White Trip*.  Plaintiff alleges that he distributed and sold about 5,000 copies of his book, primarily in Santa Monica and Venice Beach.  Compl., ¶ 26.  However, "[a]s a general matter, in order for a work to be widely disseminated, it must achieve a high degree of commercial success or be readily available in the relevant market."  *Loomis v. Cornish*, 2013 U.S. Dist. LEXIS 162607, at *11 (C.D. Cal. Nov. 13, 2013).

In *Art Attacks Ink, LLC v. MGA Entertainment Inc.*, 581 F.3d 1138 (9th Cir. 2009), the Ninth Circuit held there was no access as a matter of law, although the plaintiff sold about 16,000 t-shirts featuring its "Spoiled Brats" characters (2,000 per year from 1993 to 2001) at Wal-Mart stores and at Southern California county fairs, and specifically at the Los Angeles County Fair from 1998 to 2001, when MGA began selling its "Bratz" dolls.  *Id.* at 1141-43.  In addition to sales, the plaintiff displayed its characters at the fairs, which were attended by millions of people, and MGA's employee attended the Los Angeles County Fair during the relevant time period.  *Id.* at 1142-44.  The Ninth Circuit held that, even accounting for the lesser attentional requirements needed to view T-shirts as opposed to books or videos, the plaintiff "cannot demonstrate that its Spoiled Brats designs were widely disseminated to the extent necessary to create more than 'a bare possibility' that MGA had access to the designs."  *Id.  See also Rice*, 330 F.3d at 1178 (sales of

1   17,000 copies of plaintiff's video did not constitute widespread dissemination);

2   *Jason v. Fonda*, 526 F. Supp. 774, 776 (C.D. Cal 1981), *aff'd*, 698 F.2d 966 (9th

3   Cir. 1982) (no access as a matter of law although plaintiff sold up to 700 copies in

4   bookstores in Southern California, where defendants resided).

5           Further, well-established cases hold that as a matter of law, a plaintiff cannot

6   maintain a plausible theory of access based on the alleged discussion about his or

7   her work on the Internet or in a newspaper.  "[T]he mere fact that [plaintiff's] work

8   was posted on the internet prior . . . is insufficient by itself" to establish access.

9   *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 515-16

10  (S.D.N.Y. 2008) (collecting authorities).  Nor do articles or other publicity about the

11  work demonstrate widespread dissemination.  *See Rice*, 330 F.3d at 1178 (feature

12  about the plaintiff's video on a television show and in a trade publication

13  insufficient to show widespread dissemination); *Kenney v. Warner Bros. Entm't,*

14  *Inc.*, 984 F. Supp. 2d 9, 12 (D. Mass. 2013) (dismissing claim when plaintiff alleged

15  access "(1) through registration of his screenplay with the Writer's Guild of

16  America; (2) from his 'TheGhostmanMovie.com' website; and (3) his promotion of

17  the work through 'press interviews' and 'media outlets'"); *Feldman*, 723 F. Supp.

18  2d at 365-66 (dismissing infringement claim where plaintiff alleged access based,

19  *inter alia*, on promotion on a local radio show).

20          Plaintiff's vague allegation that he "was contacted by multiple credited

21  entertainment industry producers" (Compl., ¶ 19) likewise fails to state a plausible

22  theory of access.  *See Meta-Film Assocs.*, 586 F. Supp. at 1355-59 (submission to

23  entertainment industry individuals was insufficient to support access as a matter of

24  law, as there was not "a shred of evidence" supporting plaintiff's hypothesis that the

25  defendant creator had seen plaintiff's submission).[5]

26
27  ---
    [5] *See also Briggs v. Blomkamp*, 2014 U.S. Dist. LEXIS 142016, at *26 (N.D. Cal. Oct. 3, 2014)
    (no access where plaintiff "posted drafts of the screenplay" on a website, "sent queries to agents
    seeking representation, posted short synopses of the storyline on screenwriter websites, and
28  entered screenwriting competitions"; "these communications and Internet postings do not
    constitute evidence of wide dissemination of the screenplay."); *Clay v. Cameron*, 2011 U.S. Dist.

24

6855042.2

1    Thus, the Complaint should be dismissed for the independent reason that

2    Plaintiff has failed to allege access.

3    **VI.    CONCLUSION**

4    The Court should dismiss Plaintiff's complaint in its entirety and with

5    prejudice.

6

7    DATED: May 18, 2015                    Respectfully submitted,

8                                           MITCHELL SILBERBERG & KNUPP LLP

9

10

11                                          By:/s/ Robert H. Rotstein
                                               Robert H. Rotstein
12                                             Elaine K. Kim
                                               Attorneys for Defendants Lions Gate
13                                             Entertainment Inc., Lions Gate Films Inc.,
                                               Mutant Enemy, Inc., Joseph "Joss"
                                               Whedon, and Andrew Goddard

14

15

16

17

18

19

20

21

22

23

24

25    _____
      (…continued)
26    LEXIS 153496, at *5 (S.D. Fla. Oct. 20, 2011) (dismissing complaint when "[a]lthough [plaintiff]
      has alleged that her work was widely circulated, she has alleged no nexus between her circulation
27    of the work in 1990 and [defendant]"); *Martinez v. McGraw*, 2009 U.S. Dist. LEXIS 69862, at
      *14 (M.D. Tenn. Aug. 10, 2009) (dismissing copyright infringement claim when Plaintiff did not
28    allege "how his song got into the hands of [defendant's] personnel and songwriters or even that his
      song was played in hearing range").

6855042.2

**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**