1   MATERN LAW GROUP
2   Matthew J. Matern (SBN 159798)
    mmatern@maternlawgroup.com
3   Tagore O. Subramaniam (SBN 280126)
    tagore@maternlawgroup.com
4   1230 Rosecrans Avenue, Suite 200
    Manhattan Beach, California  90266
5   Telephone: (310) 531-1900
    Facsimile:  (310) 531-1901
6
7   Attorneys for Plaintiff
    PETER GALLAGHER
8

9

10

11

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| 12  PETER GALLAGHER, an individual, | Case No. 2:15-cv-02739-ODW(Ex) |
| 13 | |
| 14        Plaintiff, | **FIRST AMENDED COMPLAINT FOR DAMAGES FOR:** |
| 15        vs. | **1.   COPYRIGHT INFRINGEMENT** |
| 16  LIONS GATE ENTERTAINMENT INC., a Delaware corporation; | |
| 17  LIONS GATE FILMS INC., a Delaware corporation; MUTANT | **DEMAND FOR JURY TRIAL** |
| 18  ENEMY, INC., a California corporation; JOSEPH "JOSS" | Judge:       Otis D. Wright, II |
|     WHEDON, an individual; | Courtroom:   11 |
| 19  ANDREW GODDARD, an individual; and DOES 1 through 50, | Complaint Filed: April 13, 2015 |
| 20  inclusive, | Trial Date:       None Set |
| 21        Defendants. | |

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-02739-ODW(Ex)

1    Plaintiff PETER GALLAGHER ("PLAINTIFF"), an individual, demanding

2 a jury trial, hereby alleges as follows against Defendants LIONS GATE

3 ENTERTAINMENT INC., a Delaware corporation, LIONS GATE FILMS INC.,

4 a Delaware corporation, MUTANT ENEMY, INC., a California corporation,

5 JOSEPH "JOSS" WHEDON, an individual, ANDREW GODDARD, an

6 individual, and DOES 1 through 50, inclusive (collectively, "DEFENDANTS"):

7                          **JURISDICTION AND VENUE**

8    1.    This is an action for copyright infringement arising under the

9 Copyright Act of 1976, 17 U.S.C. § 101 *et seq*. This Court has jurisdiction of this

10 action under 28 U.S.C. §§ 1331, 1338(a) and 1338(b). PLAINTIFF's alleged

11 damages exceed the jurisdictional minimum of this Court.

12    2.    Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(a) as

13 a substantial part of the events or omissions giving rise to the claim occurred, and

14 the defendants and/or their agents reside and/or maintain their principal place of

15 business, in this judicial district.

16                                **PARTIES**

17    3.    PLAINTIFF is an individual who resides in Flagstaff, Arizona.

18 PLAINTIFF is the author and owner of all exclusive rights under copyright,

19 including those codified in 17 U.S.C. § 106, of the literary work entitled *The Little*

20 *White Trip, a night in the pines* (hereafter "the Book" or "Little White Trip").

21    4.    PLAINTIFF is informed and believes, and on that basis alleges, that

22 Defendant LIONS GATE ENTERTAINMENT INC. ("LGE") is a corporation

23 existing under the laws of Delaware and maintaining its principal place of business

24 at 2700 Colorado Avenue, Suite 200, Santa Monica, California 90404. PLAINTIFF

25 is further informed and believes, and on that basis alleges, that LGE is qualified to

26 do business and is doing business in the State of California, County of Los Angeles.

27 PLAINTIFF is also informed and believes, and on that basis alleges, that LGE is a

28 motion picture production company and distributor, with numerous film credits,

2

and according to the Internet Movie Database ("IMDB") is one of the production companies and distributors of the motion picture entitled *The Cabin in the Woods* (hereafter the "Film" or "Cabin in the Woods"), released theatrically on April 13, 2012 in the United States.

5.     PLAINTIFF is informed and believes, and on that basis alleges, that Defendant LIONS GATE FILMS INC. ("LGF") is a corporation existing under the laws of Delaware and maintaining its principal place of business at 2700 Colorado Avenue, Suite 200, Santa Monica, California 90404. PLAINTIFF is further informed and believes, and on that basis alleges, that LGF is qualified to do business and is doing business in the State of California, County of Los Angeles. PLAINTIFF is also informed and believes, and on that basis alleges, that LGF is a motion picture production company and distributor, with numerous film credits, and according to IMDB is one of the production companies and distributors of the Film.

6.     PLAINTIFF is informed and believes, and on that basis alleges, that Defendant MUTANT ENEMY, INC. ("MUTANT ENEMY") is a corporation existing under the laws of California and maintaining its principal place of business in the State of California, County of Los Angeles. PLAINTIFF is further informed and believes, and on that basis alleges, that MUTANT ENEMY is qualified to do business and is doing business in the State of California, County of Los Angeles. PLAINTIFF is also informed and believes, and on that basis alleges, that MUTANT ENEMY is a motion picture production company, with numerous film and television credits, and according to IMDB is one of the production companies of the Film.

7.     PLAINTIFF is informed and believes, and on that basis alleges, that Defendant JOSEPH "JOSS" WHEDON ("WHEDON") is an individual residing in the city of Santa Monica in Los Angeles County, California. PLAINTIFF is further informed and believes, and on that basis alleges, that WHEDON is a writer,

director, and producer with numerous film and television credits, and according to IMDB is the producer and a credited writer of the Film.

8.      PLAINTIFF is informed and believes, and on that basis alleges, that Defendant ANDREW GODDARD ("GODDARD") is an individual residing in Los Angeles County, California. PLAINTIFF is further informed and believes, and on that basis alleges, that GODDARD is a writer, director, and producer with numerous film and television credits, and according to IMDB is the director and a credited writer of the Film.

9.      The true names and capacities of Defendants DOES 1 through 50, inclusive, are presently unknown to PLAINTIFF, who therefore sues these Defendants by such fictitious names. PLAINTIFF is informed and believes, and thereon alleges, that each Defendant designated as a DOE is in some manner responsible for the occurrences alleged herein and that the injuries and damages suffered by PLAINTIFF were proximately caused by the conduct of such DOE Defendants. PLAINTIFF will seek leave of Court to amend this Complaint to allege the true names and capacities of each DOE Defendant, together with such allegations as may be appropriate, when their names have been ascertained.

10.     PLAINTIFF is informed and believes, and thereon alleges, that, at all times material to this Complaint, each Defendant was the agent, servant, employee, partner, successor, assignee, alter ego, integrated enterprise, co-conspirator, joint venture and/or franchisee of each of the remaining Defendants herein, and was at all times acting within the course and scope of said agency, service, employment, partnership, integrated enterprise, joint venture and/or franchise. PLAINTIFF is further informed and believes, and thereon alleges, that each act and omission alleged herein on the part of any one Defendant was done with the approval and consent and was ratified by each of the remaining Defendants.

11.     PLAINTIFF is informed and believes, and thereon alleges, that, at all times material to this Complaint, each Defendant may be held liable for the

infringing acts committed by another Defendant to the extent that each Defendant had the right and ability to control the infringing activities alleged herein and had a direct financial interest in such activities, regardless of whether each Defendant had intent or knowledge of the infringement alleged herein. Furthermore, PLAINTIFF is informed and believes, and thereon alleges, that at all relevant times mentioned in this Complaint each Defendant who knowingly induced, caused, or materially contributed to the infringement alleged herein by another Defendant, but who may not have committed or participated in the infringing acts himself or itself, may be held liable as a contributory infringer as each such Defendant had knowledge, or reason to know, of the infringement.

## BACKGROUND FACTUAL ALLEGATIONS

12.     PLAINTIFF is the author and owner of all exclusive rights under copyright of the literary work entitled *The Little White Trip, a night in the pines* (the "Book"). PLAINTIFF registered the Book with the Writers Guild of America ("WGA") in or about July 2007. PLAINTIFF registered the Book for copyright registration with the United States Copyright Office on March 20, 2015 (Registration Number TX0008004920).

13.     In or about the middle of 2004, PLAINTIFF developed the idea for what would become the Book. PLAINTIFF subsequently created an outline of the idea for the Book in 2004.

14.     After several months of intensive writing, PLAINTIFF completed an initial draft of the Book in between September 2004 and January 2005.

15.     On May 11, 2005, PLAINTIFF had an original unedited manuscript bound and notarized.

16.     From May 2005 through part of 2006, PLAINTIFF worked with various editors to finalize the Book.

17.     In or about June 2006, PLAINTIFF published and made available for sale approximately 2,500 copies of the Book.

18.     PLAINTIFF subsequently began grassroots efforts to sell the Book in Los Angeles, California. PLAINTIFF sold copies of the Book on the Venice Beach Boardwalk, the Santa Monica Free Speech Zone on the popular Third Street Promenade, and outside the Chinese Theatre on the Hollywood Walk of Fame. The majority of PLAINTIFF's sales were done in the Venice Beach and Santa Monica, California areas. The Venice Beach boardwalk where PLAINTIFF sold the Book encompasses approximately 2.5 kilometers and receives millions of visitors each year. PLAINTIFF's marketing efforts further included distributing approximately ten thousand fliers in the Santa Monica and Venice, California areas. Additionally, PLAINTIFF maintained a website and Myspace page for the Book. The Book was further available at multiple retail locations, including Small World Books in Venice, California and online retailers such as Amazon.com. The Book was discussed on multiple blogs as wells as social media websites such as Goodreads.com.

19.     During this time, PLAINTIFF was contacted by multiple credited entertainment industry producers who expressed interest in the Book.

20.     DEFENDANTS WHEDON, LGF, and LGE currently reside and operate out of Santa Monica, California, a short distance from where the Book was sold.

21.     In or about September 2006, PLAINTIFF received an email from the chair of the Johnnie Cochran Middle School English department expressing interest in the Book. The school subsequently ordered 300 copies of the Book and, for a period of time, it was required reading.

22.     Having nearly sold out the first print of the Book, in or about June, 2007, Plaintiff had an additional 5,000 copies of the Book printed.

23.     As a result of PLAINTIFF's successful marketing and sales, on April 2, 2007 the Long Beach Gazette published a profile on PLAINTIFF discussing the Book. The Long Beach Gazette quoted PLAINTIFF as marketing the Book as "a

different way of telling a story you think you've heard before." The tagline for the Film is strikingly similar: "You think you know the story."

24.    In or about July 2007, PLAINTIFF registered the Book with the Writers Guild of America.

25.    From approximately June 2006 to November 2007, PLAINTIFF distributed and sold approximately 5,000 copies of the Book, primarily in the Santa Monica and Venice Beach areas.

26.    On April 13, 2012, DEFENDANTS theatrically released the Film in the United States.

27.    Like the Book, the Film tells the story of five friends (three males and two females) between the ages of 17 and 22 who take a take a trip to a remote cabin in the woods. The cabin's previous inhabitants were murdered by the father of the family, who returns to terrorize the group of friends. Throughout, the friends are being filmed and manipulated by persons behind the scenes, inadvertently playing characters in a real-life horror show. The similarities between the two works are striking. Even the names of the lead characters are similar. In the Book, the lead female blond is named Julie, and in the Film it's Jules. In the Book, the lead dark-haired female is named Dura, and in the Film it's Dana. Similarly, the cabin in the Book is called the Brinkley place, whereas it is the Buckner place in the Film.

28.    A review of the IMDB webpage for the Film and the promotional movie poster for the Film found therein and elsewhere confirms that WHEDON is a producer and a credited writer of the Film, GODDARD is the director and a credited writer of the Film, LGE and LGF are production companies and distributors of the Film, MUTANT ENEMY is a production company of the Film, and the Film was released theatrically on April 13, 2012 in the United States.

29.    PLAINTIFF is informed and believes, and on that basis alleges, that the Film borrows heavily from the Book. Comparing the Book to the Film, the plot, stories, characters, sequence of events, themes, dialogue, and incidents portrayed in

the two works are fictional and, in many respects, the elements in the two works are virtually identical. These substantially similar elements, coupled with DEFENDANTS' access to PLAINTIFF's Book, which was widely disseminated in the Southern California area, and on the Internet, where it was available for sale on websites such as Amazon.com, leave little doubt that numerous substantive original elements of the Book are copied in the Film.

30.     In *The Cabin in the Woods: The Official Visual Companion*, a book published in 2011 before the release of the Film, WHEDON and GODDARD claimed to have written the Film in three days in a hotel in Santa Monica, after WHEDON wrote an "outline."  WHEDON stated, "Would I like to be able to write all my screenplays in three days [laughs]?  Yeah, that'd be great. That doesn't happen. This was a very particular thing, because there was so much structure in this outline that we knew exactly what we needed to accomplish from scene to scene."

## FIRST CLAIM FOR RELIEF

### (COPYRIGHT INFRINGEMENT)

### [17 U.S.C. § 101 *et seq.*]

### (Against All DEFENDANTS)

31.     PLAINTIFF re-alleges each and every allegation set forth in Paragraphs 1 through 30, inclusive, and incorporates them herein by this reference.

32.     PLAINTIFF is currently, and at all relevant times has been, the sole owner of all right, title, and interest in and to the copyrights in the Book.

33.     PLAINTIFF is informed and believes, and on that basis alleges, that DEFENDANTS were knowingly and willfully involved in the copying of the Book and original elements therein to create a work substantially similar to and derivative of PLAINTIFF's copyrighted Book. PLAINTIFF is informed and believes that a non-exhaustive summary of substantial similarities between the respective works includes but is not limited to:

### (a) THEME

Each work has a core theme of horror, resulting from real people unknowingly being manipulated by third parties. These thematic similarities are echoed by statements from the Film's creators, WHEDON and GODDARD. When asked in an interview what the original idea for the Film was at its core, WHEDON responded by stating, "[T]he original idea was exactly what the movie is, which is, you play your normal horror movie —five kids go to a cabin in the woods—and you find out that everything they're doing is being manipulated."  GODDARD stated in an interview that "the base element of [the Film] – [is] how do kids do this [act like they do in horror films], what if someone was making them behave that way."

Both works display a self-referential awareness of classic horror movie tropes and insert third-party puppeteers to manipulate the characters for the fulfillment of narrative requirements and the enjoyment of others. In both works, the third party manipulators struggle to make the friends follow the predetermined narrative structure or "script."  From a thematic perspective, each work provides a commentary on the use of classic horror devices as a mechanism for satisfying consumer desires and expectations.

### (b) PLOT

Like the Book, the Film tells the story of five friends (three guys and two girls) between the ages of 17 and 22 who take a take a trip to a remote cabin in the woods. The cabin's previous inhabitants were murdered by the father of the family, who returns to terrorize the group of friends. In the end, it is revealed to the friends that they are being filmed and manipulated by persons behind the scenes, thus becoming inadvertent characters in a real-life horror show for the enjoyment of others.

### (c) SETTING

The setting of each work takes place in a remote cabin in the woods lacking

1  cell phone reception, where the prior inhabitants of the cabin were murdered. The

2  vehicle, travel, and cabin in each work is filmed, monitored, and manipulated by

3  third parties, who have planted crew members along the way as well as hidden

4  cameras in everyday household objects.

5  ### (d) CHARACTERS

6          The similarities between the characters in both works are striking. Both

7  works have five lead characters between the ages of 17 and 22 (three males and two

8  females). The group of friends consists of two couples and one male. The female

9  leads in both works include a bubbly blonde with blue eyes, and a sweet dark-

10  haired female who recently ended a relationship.  Even the names of the lead

11  characters are similar. The name of the lead blonde in the Book is Julie and in the

12  Film it is Jules. Similarly the name of the lead dark haired female in the Book is

13  Dura, and in the Film it is Dana. Even the name of the remote cabin the characters

14  travel to is similar. The cabin in the book is referred to as the Brinkley place and in

15  the film it is the Buckner place. At the beginning of both works we see the dark-

16  haired female lead (Dura/Dana) beginning a romantic relationship with the more

17  sensitive and mature male (Matt/Holden) which culminates in a love scene in front

18  of the fireplace. Similarly, in both works the female blonde lead (Julie/Jules) has a

19  relationship with the strong, charismatic male character who drinks regularly and

20  looks like a movie star (Ian/Curt). The appearance and behavior of the third male

21  lead (Sam/Marty) is similar in both works. Both have quirky personalities, have

22  messy dirty blonde hair, appear to wear a grey shirt and jeans throughout the film,

23  smoke marijuana, and enjoy gazing up at the stars. Moreover, both are smart, non-

24  athletic, and single.

25  ### (e) MOOD

26          Both works have a similar mood in that they are suspenseful horror films that

27  begin with the enthusiasm of a group of friends going on a trip, followed by the

28  excitement of a night of drinking and romance at a cabin in the woods. The mood

then shifts to a series of frightening murders while at the same time the friends gradually become aware that they are being manipulated and punished by a controlling outside force. This culminates in a surprise reveal where the lead characters learn they are being manipulated for the enjoyment of third parties.

### (f) PACE

The pace of each work is extremely similar. Both are horror films, punctuated with a series of deaths, and enhanced by the unwitting characters becoming aware that these terrible events are not random, but orchestrated against them by an unknown force. This is followed by a surprise reveal that the lead characters are being manipulated for the enjoyment of third parties. Each work begins moderately paced, with a focus on character development and a blossoming relationship. Ultimately, both stories build into a fast-paced suspense horror film where the friends engage in a series of wrong turns and struggle to resolve unanswered question which are only revealed to them at the end.

### (g) SEQUENCE OF EVENTS

Both stories start off with the preparations of a lighthearted trip amongst friends. The friends take a large borrowed vehicle to a remote cabin. Unbeknownst to the friends the interior of the vehicle is rigged with hidden cameras and monitored by third parties behind the scenes. The details of where the cabin is located are vague and uncertain. On the way, in both stories, the friends make a stop which puts them in a tense, almost violent, interaction with an older white male who has been placed there by the watching parties behind the scenes. The man knows of the cabin and the history of the previous inhabitants. He makes an unnerving forewarning about the cabin, and the friends' safety if they continue on their path, but the friends ignore him.

Eventually, the friends arrive at the cabin, which is so remote that cell phones cannot be used. There is a mix of curiosity and weariness about the free place of lodging, but the friends settle in. On that first night, the friends stumble upon an old

storage space (attic /basement) and they venture inside. They find old items from the previous owners, clay dolls, figurines and a framed photograph of the family (Brinkley family/ Buckner family) who previously inhabited the cabin. The friends are unnerved after their time in the storage space but shake it off and proceed to drink, play games and have fun.

Unbeknownst to the friends, the cabin as well as the surrounding woods are a controlled "set" being monitored by unidentified persons behind the scenes who will soon trap, chase, and terrorize the friends. These persons intend to turn the innocent group of friends into the real-life characters in a horror story.

Later that night, the established couple (Ian and Julie /Curt and Jules) go off to be alone and the courting couple (Matt and Dura/ Holden and Dana) have a romantic scene on the couch in front of the fireplace, which is witnessed by the odd man out (Sam/ Marty).

In both stories, the first murder takes place in the woods. The friends back at the cabin are unaware of this until they are told about the blood and gore witnessed by their friend(s) who return from the woods frazzled. In both stories, the villain shatters through a plate glass window, grabs, stabs, and drags a lead character away into the night.

The remaining friends try to devise a plan and make sense out of what is going on, but they are trapped, and the people behind the scenes head them off at every turn. Little by little, they begin to suspect that the things that are happening to them are not random, but carried out by some third party controlling the situation. This culminates in both stories when a character accidentally knocks over a ceramic object (vase/ lamp) and finds a hidden camera in the shattered pieces. The people behind the scenes scramble as they watch him holding the tiny black camera in his hand, and they don't know what to do. But then they are relieved and surprised to see the killer show up and distract the character's attention.

In the end, one couple and one male are left alive, but then the male from the remaining couple is killed, leaving just two friends. The friends cling to each other and discuss a last resort escape plan. As the story comes to a climax, the two friends find themselves behind the scenes of the project that they have unwittingly become a part of, and everything becomes clear when they are approached by the "director" who informs them that they have been manipulated by third parties.

### (h) SCENE SIMILARITIES

A non-exhaustive list of some of the specific scene similarities between each work is set forth below:

| | | *The Little White Trip, a night in the pines* | *The Cabin in the Woods* |
|---|---|---|---|
| | 1. | A group of five friends (three males and two females) who recently graduated from high school go on a getaway to a remote cabin in the woods. The group consists of one couple, one newly courting couple, and one odd man out. | A group of five college friends (three males and two females) go on a getaway to a remote cabin in the woods. The group consists of one couple, one newly courting couple, and one odd man out. |
| | 2. | The cabin is near a lake. It is a place of free lodging, offered up by a third party. The location is isolated, so far off the grid that cell phones cannot be used. | The cabin is near a lake. It is a place of free lodging, offered up by a third party. The location is isolated, so far off the grid that neither GPS nor cell phones can be used. |
| | 3. | The friends are unaware that the cabin is actually a controlled "set" where they are being filmed, monitored, and manipulated by a | The friends are unaware that the cabin is actually a controlled "set" where they are being filmed, monitored, and manipulated by a |

| | | | |
|---|---|---|---|
| | | third party. This third party intends to put the friends through terrible and bloody events, casting them as real-life characters in a horror story for the enjoyment of others. | third party. This third party intends to put the friends through terrible and bloody events, casting them as real-life characters in a horror story for the enjoyment of others. |
| | 4. | The name of the cabin which the friends go to is referred to as the "Brinkley" place. | The name cabin which the friends go to is referred to as the "Buckner" place. |
| | 5. | The names of the female lead characters are Julie (blond hair and blue eyes) and Dura (dark hair). | The names of the female lead characters are Jules (blond hair and blue eyes) and Dana (dark hair). |
| | 6. | The blond-haired, blue-eyed female character (Julie) is showy, sexy, and loud. She is in a relationship with the strong, charismatic male character who drinks regularly and looks like a movie star (Ian). | The blond-haired, blue-eyed female character (Jules) is showy, sexy, and loud. She is in a relationship with the strong, charismatic male character who drinks regularly looks like a movie star (Curt). |
| | 7. | The shy, innocent, dark-haired female character (Dura) has recently exited a hurtful relationship. She is single when the story opens, but a relationship develops between her and the sensitive male lead (Matt) | The shy, innocent, dark-haired female character (Dana) has recently exited a hurtful relationship. She is single when the film opens, but a relationship develops between her and the |

| | | | |
|---|---|---|---|
| | | as the story progresses. | sensitive male lead (Holden) as the film progresses. |
| 8. | | The third male lead (Sam) is an outsider who is not romantically involved with any of the female characters. He has a quirky personality and messy, dirty-blond hair. He wears a gray shirt and jeans throughout the story. | The third male lead (Marty) is an outsider who is not romantically involved with any of the female characters. He has a quirky personality and messy, dirty-blond hair. He appears to wear a gray shirt and jeans throughout the film. |
| 9. | | The friends take a large borrowed vehicle (SUV) to the cabin. Unbeknownst to the friends, the vehicle is rigged with cameras and being watched by third parties. | The friends take a large borrowed vehicle (motor home) to the cabin. Unbeknownst to the friends, the vehicle is rigged with cameras and being watched by third parties. |
| 10. | | On the way to the cabin, the friends become confused about directions and make a stop where they run into a strange and tense situation. They encounter a gruff, older white male who views the friends skeptically as unwanted guests on his property. This man works for the controlling parties behind the scenes. | On the way to the cabin, the friends become confused about directions and make a stop where they run into a strange and tense situation. They encounter a gruff, older white male who views the friends skeptically as unwanted guests on his property. This man works for the controlling parties behind the scenes. |
| 11. | | The man seems edgy and confrontational when the friends ask | The man seems edgy and confrontational when the friends |

| | | |
|---|---|---|
| | about the cabin. He knows the history of the place and its former inhabitants. The man warns the friends about their safety if they choose to continue their journey to the cabin, but the friends do not take him seriously. A fist fight between the man and the friends is narrowly avoided, and the friends head on to the cabin. | ask about the cabin. He knows the history of the place and its former inhabitants. The man warns the friends about their safety if they choose to continue their journey to the cabin, but the friends do not take him seriously. A fist fight between the man and the friends is narrowly avoided, and the friends head on to the cabin. |
| 12. | On the first night in the cabin, the characters stumble on an old storage area (attic). | On the first night in the cabin, the characters stumble on an old storage area (basement). |
| 13. | In the storage area, the friends uncover some objects which belonged to the cabin's previous owner: toy figurines, dolls, and a framed photograph of the family which was taken at the cabin. | In the storage area, the friends uncover some objects which belonged to the cabin's previous owner: toy figurines, dolls, a diary, and a framed photograph of the family which was taken at the cabin. |
| 14. | In the storage area, the female lead (Julie) finds an object (a Hummel figurine) that she would like to take. | In the storage area, the female lead (Jules) finds an object (an amulet) that she would like to take. |
| 15. | The cabin's previous owners (the Brinkleys) have a haunted history. The father killed the mother and | The cabin's previous owners (the Buckners) have a haunted history. The father killed the mother and |

| | | | |
|---|---|---|---|
| | | their three children. | the rest of the family (three children – Anna, Judda, and Matthew) died. |
| | 16. | After the scene in the attic, the tone is unnerving, but the friends shake it off and begin to drink alcohol and to play games. | After the scene in the basement, the tone is unnerving, but the friends shake it off and begin to drink alcohol and to play games. |
| | 17. | At the end of the first night, one of the couples (Julie and Ian) leaves the others to be together (upstairs in bed). The newly courting couple (Dura and Matt) have a romantic scene in front of the fireplace, which is witnessed by the odd man out (Sam). | At the end of the first night, one of the couples (Jules and Curt) leaves the others to be together (in the woods). The newly courting couple (Dana and Holden) have a romantic scene in front of the fireplace, which is witnessed by the odd man out (Marty). |
| | 18. | The outsider male lead (Sam), who is not romantically involved with any of the females, smokes marijuana and walks outside to look at the stars. | The outsider male lead (Marty), who is not romantically involved with any of the females, smokes marijuana and walks outside to look at the stars. |
| | 19. | The first "killing" happens outside of the cabin, in the woods. The remaining friends, still back at the cabin, are unaware of this but they soon find out when Matt and Dura return to the shelter of the cabin with news of the blood and gore | The first killing happens outside of the cabin, in the woods. The remaining friends, still back at the cabin, are unaware of this but they soon find out when Curt return to the shelter of the cabin with news of the blood and gore he's |

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-02739-ODW(Ex)

| | | | |
|---|---|---|---|
| | | they've witnessed. | witnessed. |
| | 20. | The first "death" is hard to believe for the friends, but the appearance of a severed body part (arm) confirms any doubts that the friends may have had of the "killing." | The first death is hard to believe for the friends, but the appearance of a severed body part (head) confirms any doubts that the friends may have had of the killing. |
| | 21. | The villain shatters through a plate glass window, grabs, stabs, and drags a lead character away into the night. | The villain shatters through a plate glass window, grabs, stabs, and drags a lead character away into the night. |
| | 22. | Once it becomes apparent that a speedy escape is necessary, the friends' ability to leave the controlled "set" is limited (when the car is destroyed) by manipulating outside forces. | Once it becomes apparent that a speedy escape is necessary, the friends' ability to leave the controlled "set" is limited (when the tunnel is destroyed) by manipulating outside forces. |
| | 23. | It appears that the group is stuck since the SUV has been destroyed, but the athletic, handsome friend (Ian) has a risky plan (to leave the others and go off into the woods to recover the SUV.)  Before initiating his plan, he promises valiantly, "I'm not gonna leave you. I'll get the car and come back for you." | It appears that the group is stuck since the tunnel has been destroyed, but the athletic, handsome friend (Curt) has a risky plan (to leave the others and jump a gorge on his dirt bike.) Before initiating his plan, he promises valiantly, "I'm coming back here." |

| | | |
|---|---|---|
| 24. | Ian dies while attempting to execute his plan. | Curt dies while attempting to execute his plan |
| 25. | After Ian's "death", Julie and Matt are alone together and Matt begins to talk about how he is going to save the two of them. Julie is unresponsive and feels defeated by the overwhelming force and omnipresence of the "killer." She begins to make disheartened statements such as "[t]here's nothing we can do." | After Curt's death, Dana and Holden are alone together and Holden begins to talks about how he is going to save the two of them. Dana is unresponsive and feels defeated by the overwhelming force and omnipresence of the killer. She begins to make disheartened statements such as "[t]hat won't work. Something will happen." |
| 26. | Matt is not ready to give up, and he will not allow Julie to either. Matt proposes an escape by fleeing through the darkness of the woods. He states "What if we turn off all the outside lights and make a run for the woods?" | Holden is not ready to give up, and he will not allow Dana to either. Holden proposes an escape by fleeing through the darkness of the woods. He states "[W]e just leave the roads all together. Drive as far as we can into the forest, and then we go on foot from there." |
| 27. | Male lead (Ian) gets attacked and "killed" off outside the cabin by homicidal Brinkley father that previously lived there. | Male lead (Holden) gets attacked, and killed off outside the cabin by presumably homicidal Buckner father (zombie version) that previously lived there. |

| | | | |
|---|---|---|---|
| 28. | Considering the night's events, lead male (Matt) begins to suspect that the group is being set up, monitored, and manipulated by outside forces. | Considering the night's events, lead male (Marty) begins to suspect that the group is being set up, monitored, and manipulated by outside forces. |
| 29. | Lead male (Matt) accidentally knocks over a ceramic vase and discovers a hidden camera inside the shattered pieces, set up to observe the friends. He holds the tiny black camera in his hand and stares directly into the lens in bewilderment. | Lead male (Marty) accidentally knocks over a ceramic lamp and discovers a hidden camera inside the shattered pieces, set up to observe the friends. He holds the tiny black camera in his hand and stares directly into the lens in bewilderment. |
| 30. | The persons behind the scenes see all of this and fret, thinking they've been made. Lead male (Matt) has a moment of time to consider the camera, who put it there and why. The people behind the scenes don't know what to do, but then the killer appears and distracts the attention of the male character. | The persons behind the scenes fret, thinking they've been made. Lead male (Marty) has a moment of time to consider the camera, who put it there and why. The people behind the scenes don't know what to do, but then the killer appears and distracts the attention of the male character. |
| 31. | At the end of the story, only two of the friends remain—no couples, one male lead (Matt) and one female lead (Julie). They cling to each other and discuss a last resort | At the end of the film, only two of the friends remain—no couples, one male lead (Marty) and one female lead (Dana). They cling to each other and discuss a last resort |

| | | escape plan. | escape plan. |
|---|---|---|---|
| | 32. | It is revealed that the friends have been manipulated by third parties for a new form of reality filmmaking. | Lead character (Marty) suspects that he is being manipulated by a reality television show. |
| | 33. | The "director" (reality film director) appears from the sidelines and reveals the twist: unbeknownst to the lead characters they have been watched and manipulated by a crew of others for the enjoyment of viewers. | The "Director" (project director) appears from the sidelines and reveals the twist: unbeknownst to the lead characters they have been watched and manipulated by a crew of others for the enjoyment of viewers. |

34.   PLAINTIFF is further informed and believes, and on that basis alleges, that DEFENDANTS' copying of the Book infringes PLAINTIFF's copyright and that DEFENDANTS are distributing, and intend to continue to distribute, unauthorized works similar to and derivative of the Book.

35.   The natural, probable, and foreseeable result of DEFENDANTS' wrongful conduct has been, and will continue to be, to deprive PLAINTIFF of the benefits deriving from the exploitation of the copyrighted literary work, and to deprive PLAINTIFF of the goodwill that would necessarily be associated therewith.

36.   PLAINTIFF is informed and believes, and on that basis alleges, that PLAINTIFF has lost, and will continue to lose, substantial revenues from the production and sale of the Film and has sustained, and will continue to sustain, damages as a result of DEFENDANTS' wrongful conduct and DEFENDANTS' production and sale of their infringing Film and other unauthorized works derivative of the Book. PLAINTIFF is further informed and believes, and thereon

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-02739-ODW(Ex)

alleges, that DEFENDANTS' wrongful conduct has deprived, and will continue to deprive, PLAINTIFF of opportunities for expanding the goodwill associated with the Book.

37.     By their actions alleged above, DEFENDANTS have infringed and will continue to infringe PLAINTIFF's copyright in and relating to the Book by producing, distributing, and placing upon the market products which are derivative of PLAINTIFF's copyrighted Book.

38.     PLAINTIFF is further entitled to recover from DEFENDANTS the damages, including attorney's fees and costs, PLAINTIFF has sustained and will sustain, and any gains, profits, and advantages obtained by DEFENDANTS as a result of DEFENDANTS' acts of infringement alleged above. At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by PLAINTIFF, but PLAINTIFF is informed and believes, and thereon alleges, that such damages equal or exceed $10,000,000.00.

## PRAYER FOR RELIEF

**WHEREFORE**, PLAINTIFF prays for judgment against DEFENDANTS as follows:

1.     That the Court find that DEFENDANTS have infringed PLAINTIFF's copyrights in the Book;

2.     That the Court find a substantial likelihood that DEFENDANTS will continue to infringe PLAINTIFF's copyrights in the Book unless enjoined from doing so;

3.     That DEFENDANTS, their directors, officers, agents, servants, employees, and all other persons in active concert or privity or in participation with them, be enjoined from directly or indirectly infringing PLAINTIFF's copyrights in the Book or continuing to market, offer, sell, dispose of, license, lease, transfer, display, advertise, reproduce, develop, or manufacture any works derived or copied from the Book or to participate or assist in any such activity;

4.      That DEFENDANTS, their directors, officers, agents, servants, employees, and all other persons in active concert or privity or in participation with them, be enjoined to recall from all distributors, wholesalers, jobbers, dealers, retailers, and distributors, and all others known to DEFENDANTS, any originals, copies, facsimiles, or duplicates of any works shown by evidence to infringe any copyright in the Book;

5.      That DEFENDANTS be enjoined to deliver upon oath, to be impounded during the pendency of this action and destroyed pursuant to judgment herein, all originals, copies, facsimiles, or duplicates of any work shown by the evidence to infringe any copyright in the Book;

6.      That DEFENDANTS be required to file with the Court and to serve on PLAINTIFF, within 30 days after service of the Court's order as herein prayed, a report in writing under oath setting forth in detail the manner and form in which DEFENDANTS have complied with the Court's order;

7.      That at PLAINTIFF's election, if so made, judgment be entered for PLAINTIFF and against DEFENDANTS for PLAINTIFF's actual damages according to proof, and for any profits attributable to infringements of PLAINTIFF's copyrights in the Book, in accordance with proof.

8.      That at PLAINTIFF's election, if so made, judgment be entered for PLAINTIFF and against DEFENDANTS for statutory damages based upon DEFENDANTS' acts of infringement, pursuant to the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*;

9.      That DEFENDANTS be required to account for all of their gains, profits, and advantages derived from DEFENDANTS' acts of infringement and for their other violations of law alleged herein;

10.      That all gains, profits, and advantages derived by DEFENDANTS from their acts of infringement and other violations of law alleged herein be deemed to be held in constructive trust for the benefit of PLAINTIFF;

11.  That PLAINTIFF have judgment against DEFENDANTS for PLAINTIFFS' costs and attorney's fees;

12.  That the Court grant such other and further relief as the Court deems just and proper under the circumstances.

DATED: May 19, 2015                    Respectfully submitted,

                                       MATERN LAW GROUP


                            By:  /s/ Matthew J. Matern
                                 MATTHEW J. MATERN
                                 TAGORE O. SUBRAMANIAM
                                 Attorneys for Plaintiff
                                 PETER GALLAGHER


## DEMAND FOR JURY TRIAL

PLAINTIFF hereby demands a jury trial with respect to all issues triable of right by jury.

DATED: May 19, 2015                    Respectfully submitted,

                                       MATERN LAW GROUP


                            By:  /s/ Matthew J. Matern
                                 MATTHEW J. MATERN
                                 TAGORE O. SUBRAMANIAM
                                 Attorneys for Plaintiff
                                 PETER GALLAGHER

FIRST AMENDED COMPLAINT
CASE NO. 2:15-cv-02739-ODW(Ex)