1   ROBERT H. ROTSTEIN (SBN 72452)
   rxr@msk.com
2   ELAINE K. KIM (SBN 242066)
   ekk@msk.com
3   MITCHELL SILBERBERG & KNUPP LLP
   11377 West Olympic Boulevard
4   Los Angeles, CA  90064-1683
   Telephone: (310) 312-2000
5   Facsimile: (310) 312-3100

6   Attorneys for Defendants, Lions Gate
   Entertainment Inc., Lions Gate Films Inc.,
7   Mutant Enemy, Inc., Joseph "Joss" Whedon,
   and Andrew Goddard

8

9             UNITED STATES DISTRICT COURT

10     CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

11

| | |
|---|---|
| 12  PETER GALLAGHER, an individual | CASE NO. 15-CV-02739-ODW-E |
| 13        Plaintiff, | The Honorable Otis D. Wright II |
| 14       v. | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO** |
| 15  LIONS GATE ENTERTAINMENT INC., a Delaware corporation; LIONS | **DISMISS THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY WITH PREJUDICE PURSUANT** |
| 16  GATE FILMS INC., a Delaware corporation; MUTANT ENEMY, INC., | **TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)** |
| 17  a California corporation; JOSEPH "JOSS" WHEDON, an individual; | |
| 18  ANDREW GODDARD, an individual; and DOES 1 through 50, inclusive, | **[[Proposed] Order; Request for Judicial Notice; Declaration of Elaine K. Kim; and Notice of** |
| 19        Defendants. | **Manual Filing Filed Concurrently Herewith]** |
| 20 | |
| 21 | Date:     June 29, 2015 |
| 22 | Time:    1:30 p.m.<br>Crtm:   11 – Spring Street |

23

24

25

26

27

28

1

## NOTICE OF MOTION

2

**TO THE COURT, ALL PARTIES, AND COUNSEL OF RECORD:**

3       **PLEASE TAKE NOTICE** that on June 29, 2015, at 1:30 p.m., or as soon

4  thereafter as the matter may be heard in Courtroom 11, located at 312 N. Spring

5  Street, Los Angeles, CA 90012, Defendants Lions Gate Entertainment Inc.,

6  Lions Gate Films Inc., Mutant Enemy, Inc., Joseph "Joss" Whedon, and Andrew

7  Goddard will and hereby do move, pursuant to Rule 12(b)(6) of the Federal Rules of

8  Civil Procedure, for an Order dismissing, with prejudice, in their favor Plaintiff

9  Peter Gallagher's First Amended Complaint in its entirety.

10       This Motion is made on the grounds that Plaintiff's claim for copyright

11  infringement fails because the works at issue, as a matter of law, are not

12  substantially similar in copyrightable expression, and Plaintiff's allegations fail to

13  establish any reasonable possibility of access to his work.  This Motion is made

14  following the conference of counsel pursuant to L.R. 7-3, which took place on May

15  1, 2015 and May 21, 2015.

16       This Motion is based upon this Notice of Motion; the attached Memorandum

17  of Points and Authorities; the concurrently submitted Request For Judicial Notice

18  and Declaration of Elaine K. Kim and exhibits thereto; all pleadings and other

19  records on file in this action; and such further evidence and arguments as may be

20  presented at or before any hearing on the Motion.

21

22  DATED: June 1, 2015                    Respectfully submitted,

23                                         MITCHELL SILBERBERG & KNUPP LLP

24

25                                         By: /s/ Robert H. Rotstein
                                               Robert H. Rotstein
26                                             Elaine K. Kim
                                               Attorneys for Defendants Lions Gate
27                                             Entertainment Inc., Lions Gate Films Inc.,
                                               Mutant Enemy, Inc., Joseph "Joss"
28                                             Whedon, and Andrew Goddard

1

1

## **TABLE OF CONTENTS**

2
**Page**

3
4
I. INTRODUCTION ...................................................................1

5
II. SUMMARY OF PLAINTIFF'S ALLEGATIONS AND THE WORKS.......1

6
   A. Defendants' Motion Picture – *The Cabin in the Woods* ......................1

7
   B. Plaintiff's  Book – *The Little White Trip: A Night in the Pines* ...........5

8
III. RULE 12(B)(6) STANDARDS IN COPYRIGHT CASES...........................8

9
10
IV. PLAINTIFF CANNOT PLEAD SUBSTANTIAL SIMILARITY...............10

11
   A. The Ninth Circuit's Extrinsic Test Applies On A Motion to
      Dismiss.................................................................................10

12
13
   B. Plaintiff's Claim Fails Each Element Of The Extrinsic Test.............11

14
V. PLAINTIFF HAS FAILED TO PLEAD ACCESS ......................................23

15
VI. CONCLUSION ...................................................................25

16

17

18

19

20

21

22

23

24

25

26

27

28

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

2

3

### FEDERAL CASES

4

*Art Attacks Ink, LLC v. MGA Entertainment Inc.*,
   581 F.3d 1138 (9th Cir. 2009) .................................................................... 24

5

6

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................... 9

7

8

*Benay v. Warner Bros. Entm't, Inc.*,
   607 F.3d 620 (9th Cir. 2010) .................................... 8, 11, 13, 16, 18, 21

9

10

*Berkic v. Crichton*,
   761 F.2d 1289 (9th Cir. 1985) .................................... 10, 11, 12, 13, 23

11

12

*Bernal v. Paradigm Talent & Literary Agency*,
   788 F. Supp. 2d 1043 (C.D. Cal. 2010) .................................................. 14

13

14

*Bissoon-Dath v. Sony Comp. Entm't Am., Inc.*,
   694 F. Supp. 2d 1071, 1078 (N.D. Cal. 2010),
   *aff'd and adopted by*, 653 F.3d 898 (9th Cir. 2011)................................ 8, 10, 13

15

16

*Briggs v. Blomkamp*,
   2014 U.S. Dist. LEXIS 142016 (N.D. Cal. Oct. 3, 2014) .................................... 25

17

18

*Campbell v. The Walt Disney Co.*,
   718 F. Supp. 2d 1108 (N.D. Cal. 2010) .................................................. 9

19

20

*Capcom Co., Ltd, v. The MKR Group, Inc.*,
   2008 U.S. Dist. LEXIS 83836 (N.D. Cal. Oct. 10, 2008) .................... 9, 18, 23

21

22

*Cavalier v. Random House, Inc.*,
   297 F.3d 815 (9th Cir. 2002) .................................................. 10, 22, 23

23

24

*Christianson v. West Publ'g Co.*,
   149 F.2d 202 (9th Cir. 1945) .................................................................. 9

25

*Clay v. Cameron*,
   2011 U.S. Dist. LEXIS 153496 (S.D. Fla. Oct. 20, 2011) .................................... 25

26

27

*Davis v. ABC*,
   2010 U.S. Dist. LEXIS 76145 (W.D. Mich. July 28, 2010) .................... 14, 17

28

ii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*DuckHole Inc. v. NBC Universal Media*,
   2013 U.S. Dist. LEXIS 157305 (C.D. Cal. Sept. 6, 2013) .................................... 9

*Feldman v. Twentieth Century Fox Film Corp.*,
   723 F. Supp. 2d 357 (D. Mass. 2010) ............................................................... 9, 25

*Funky Films, Inc. v. Time Warner Entm't, Inc.*,
   462 F.3d 1072 (9th Cir. 2006) ............................................. 10, 12, 13, 16, 18, 20

*Gable v. Nat'l Broad. Co., Inc.*,
   727 F. Supp. 2d 815 (C.D. Cal. 2010) .................................................................. 23

*Gadh v. Spiegel*,
   2014 U.S. Dist. LEXIS 64081 (C.D. Cal. Apr. 2, 2014) ....................................... 9

*Harper & Row Publrs., Inc. v. Nation Enters.*,
   471 U.S. 539 (1985) ............................................................................................. 10

*Hill v. Gaylord Entm't*,
   85 U.S.P.Q.2D (BNA) 1688 (S.D. Fla. 2008) ........................................................ 9

*Hogan v. DC Comics*,
   48 F. Supp. 2d 298 (S.D.N.Y. 1999) .................................................................... 14

*Jason v. Fonda*,
   526 F. Supp. 774 (C.D. Cal 1981),
   *aff'd*, 698 F.2d 966 (9th Cir. 1982) ............................................................... 23, 24

*Kenney v. Warner Bros. Entm't, Inc.*,
   984 F. Supp. 2d 9 (D. Mass. 2013) ...................................................................... 25

*Kouf v. Walt Disney Pictures & Television*,
   16 F.3d 1042 (9th Cir. 1994) ......................................................................... 10, 13

*Loomis v. Cornish*,
   2013 U.S. Dist. LEXIS 162607 (C.D. Cal. Nov. 13, 2013) .................................. 24

*Martinez v. McGraw*,
   2009 U.S. Dist. LEXIS 69862 (M.D. Tenn. Aug. 10, 2009) ................................ 25

iii

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Meta-Film Assocs., Inc. v. MCA, Inc.*,
    586 F. Supp. 1346 (C.D. Cal. 1984)...............................................................23, 25

*Muller v. Twentieth Century Fox Film Corp.*,
    794 F. Supp. 2d 429 (S.D.N.Y. 2011) ....................................................................21

*Narell v. Freeman*,
    872 F.2d 907 (9th Cir. 1989) ....................................................................................18

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
    590 F. Supp. 2d 500 (S.D.N.Y. 2008) ....................................................................24

*Olson v. Nat'l Broad. Co.*,
    855 F.2d 1446 (9th Cir. 1988) ..................................................................................18

*Rice v. Fox Broad. Co.*,
    330 F.3d 1170 (9th Cir. 2003) ..................................................................13, 24, 25

*Rosenfeld v. Twentieth Century Fox Film Corp.*,
    2009 U.S. Dist. LEXIS 9305 (C.D. Cal. Jan. 28, 2009)........................................9

*Schkeiban v. Cameron*,
    2012 U.S. Dist. LEXIS 145384 (C.D. Cal. Oct. 4, 2012),
    *aff'd*, 566 Fed. Appx. 616 (9th Cir. 2014)............................................................9

*Schwarz v. United States*,
    234 F.3d 428 (9th Cir. 2000) ......................................................................................8

*Scott v. Meyer*,
    No. 2:09-cv-06076-ODW, Order Granting Defendants' Motion to
    Dismiss (C.D. Cal. Nov. 24, 2009)....................................................9, 15, 20, 22

*Segal v. Rogue Pictures*,
    2011 U.S. Dist. LEXIS 157933 (C.D. Cal. Aug. 19, 2011) ...............................19

*Sheldon Abend Revocable Trust v. Spielberg*,
    748 F. Supp. 2d 200 (S.D.N.Y. 2010) ....................................................................13

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
    562 F.2d 1157 (9th Cir. 1977) ..................................................................................10

iv

# <u>TABLE OF AUTHORITIES</u>
## <u>(continued)</u>

**Page(s)**

*Thomas v. The Walt Disney Co.*,
   2008 U.S. Dist. LEXIS 14643 (N.D. Cal. Feb. 14, 2008),
   *aff'd*, 337 Fed. Appx. 694 (9th Cir. 2009)................................................................9

*Van v. Cameron*,
   566 Fed. Appx. 615 (9th Cir. 2014) ........................................................................9

*Walker v. Time Life Films, Inc.*,
   615 F. Supp. 430 (S.D.N.Y. 1985),
   *aff'd*, 784 F.2d 44 (2d Cir. 1986)............................................................................9

*Wild v. NBC Universal, Inc.*,
   513 Fed. Appx. 640 (9th Cir. 2013) ........................................................................9

*Zella v. The E.W. Scripps Co.*,
   529 F. Supp. 2d 1124 (C.D. Cal. 2007)..............................................................8, 10

## RULES

Federal Rule of Civil Procedure 12(b)(6)...................................................................8

## I.     INTRODUCTION

Plaintiff Peter Gallagher's First Amended Complaint for copyright infringement fails as a matter of law because he has not alleged that Defendants had access to his book *The Little White Trip: A Night in the Pines* ("*Little White Trip*"), or that Defendants' motion picture *The Cabin in the Woods* ("*Cabin*") is substantially similar in copyrightable expression to *Little White Trip*.  The Court must dismiss the First Amended Complaint if it concludes that Plaintiff has failed to plead either element; in this case, Plaintiff has failed to plead both.

First, Plaintiff has failed to plead access—*i.e.*, that Defendants had a reasonable opportunity to read his book.  Plaintiff bases his access theory solely on the assertion that he distributed 5,000 copies of *Little White Trip* and that his book was discussed in a newspaper article and on the Internet.  Under clear Ninth Circuit law, such limited dissemination is insufficient to establish access as a matter of law.

Second, Plaintiff has not alleged, and cannot allege, that *Cabin* and *Little White Trip* are substantially similar in copyrightable expression.  Plaintiff cannot claim a protectable copyright interest in the mere idea of a horror story in which five people travel to a cabin and are terrorized by outside forces.  Applying the Ninth Circuit's "extrinsic test" for substantial similarity to the copyrightable expression in the two works, it is apparent that *Cabin* and *Little White Trip* are not even remotely similar and in fact differ markedly in plot, characters, setting, dialogue, mood, pace, sequence of events, and themes.  Thus, Plaintiff cannot establish substantial similarity as a matter of law.

For both these independent reasons, Plaintiff's First Amended Complaint should be dismissed with prejudice.

## II.     SUMMARY OF PLAINTIFF'S ALLEGATIONS AND THE WORKS

### A.     Defendants' Motion Picture – *The Cabin in the Woods*

Defendants are the writers, producers, and distributors of *Cabin*, which was released in 2012.  FAC, ¶¶ 4-8.

1

1    *Cabin*[1] is a clear parody of horror movies with often broad comedic scenes.

2    The film opens in the break-room of an underground facility, where two middle-

3    aged men in office attire, Gary Sitterson and Steve Hadley, joke about Hadley's

4    family issues.  A young woman in a lab coat, Wendy Lin, nervously reports that

5    "Stockholm went south," and that only their facility and Japan are left.  Sitterson

6    and Hadley brush off her concerns, saying they haven't had a glitch since 1998.

7         The scene shifts to a house in a college town, where nice-girl Dana Polk, pre-

8    med student Jules Louden, football players Curt Vaughan and Holden McCrea, and

9    stoner Marty Mikalski get into Curt's father's RV and take off on a summer trip.

10   Curt turns the RV into a dilapidated gas station, which looks abandoned until a

11   creepy old man suddenly appears.  Jules asks where Tillerman Road is, and Curt

12   explains that his cousin bought a house there.  The man says it is the old Buckner

13   place, from which a lot of owners have come and gone.  The man insults Jules,

14   calling her a "whore," and the characters leave.  They drive through a mountain

15   tunnel and soon arrive at a foreboding, ramshackle wooden cabin.

16        Sitterson and Hadley watch the characters' activities on monitors in the

17   facility's control room.  Lin reports that the Chem Department recommends a

18   chemical increase for Jules Louden to raise her libido.  Sitterson and Hadley act as

19   bookmakers for an office pool, callously taking wagers from the various facility

20   departments over which among an array of horrible monsters will kill the students.

21        In the cabin, the friends are playing Truth or Dare when a door in the floor

22   suddenly pops open, revealing a cellar filled with bizarre artifacts, such as a puzzle

23   ball.  Each of the characters fiddles around with a different object, until Dana starts

24   reading aloud from the 1903 diary of Anna Patience Buckner, who aspires to torture

25   and kill as her father and brothers did.  Over Marty's protests, Dana reads some

26

---

27   [1] Defendants request the Court to take judicial notice of the two works, which the FAC
incorporates by reference and copies of which are being filed concurrently herewith as Exhibits 1
and 2 to the Declaration of Elaine K. Kim.  Copies of the works, including a paperback copy of
*Little White Trip*, were also previously filed in support of Defendants' Motion to Dismiss the
28   Complaint (Dkt. 11-1 & 12) and are therefore already in the Court's records.

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

1   Latin phrases from the diary, causing a family of zombies to rise from the grave.

2   Back at the facility, Sitterson announces that Maintenance and the intern have won

3   the pool by betting on the Buckners, the "Zombie Redneck Torture Family."

4   Hadley laments that he will never see his monster pick—the Merman.

5       When Jules and Curt go into the woods to make out, the male facility

6   employees watch salaciously from the control room.  Hadley and Sitterson get Jules

7   to take her top off by releasing pheromone mists.  As Curt and Jules are about to

8   have sex, the family of zombies attacks.  One zombie catches Jules in the back with

9   a bear claw, and another beheads her with a saw.  Upon her death, Hadley pulls a

10  lever in the control room, and blood flows into an outline etched in stone.

11      Marty is relieving himself outside when Curt grabs him and knocks out a

12  zombie girl behind Marty.  Back inside the cabin, Curt tells the others that Jules is

13  gone.  A zombie throws Jules's bloody head inside.  Curt comes up with a sensible

14  plan to barricade the cabin and for everyone to stay together.  Sitterson releases a

15  gas into the cabin, which causes Curt to foolishly instruct everyone to split up.

16      In his room, Marty accidentally breaks a lamp and discovers a camera with

17  wires running up the wall.  Fearing that Marty could derail the ritual, Hadley

18  frantically calls for gas to be pumped in, but a zombie gets Marty first and drags him

19  off-camera.  Hadley pulls a second lever, and blood flows into an outline of a figure.

20  Another zombie breaks into the cabin and attacks Holden with the bear claw, but

21  Dana saves him by stabbing the zombie.  Holden, Dana, and Curt escape in the RV.

22      Back at the facility, Hadley notices that the RV is nearing the mountain

23  tunnel, and that the tunnel is still open.  Sitterson demolishes the tunnel just in time

24  to prevent the students' escape.  Curt tries to jump over the canyon on his

25  motorbike, but hits an electric force-field and falls to his death.  Holden and Dana

26  turn back in the RV, but Holden is stabbed through the neck by a zombie, and the

27  van crashes into the lake.  Dana does not die, however, and swims to the surface.

28

3

1    Sitterson and Hadley celebrate.  When the new security agent at the facility
2    points out that Dana is still alive, they explain that the Virgin's death is optional; it
3    just has to be last.  The facility's party comes to a halt when a call from "upstairs"
4    informs Hadley that the Virgin is *not* the only one left.  Marty, who did not really
5    die as the facility technicians (and the audience) had thought, rescues Dana from a
6    zombie and leads her to an elevator.  The elevator descends, and as it moves
7    sideways, Dana and Marty see numerous glass cubes filled with mythical monsters,
8    including one holding a puzzle ball exactly like the one in the cellar.  Dana realizes
9    that, by picking a trinket in the cellar, they "chose" which monsters would kill them.

10    The facility technicians direct security to kill Marty, whose marijuana had
11    immunized him from their chemicals and gases.  With the help of a severed zombie
12    arm, Marty and Dana escape a security agent and enter the facility.  A voice on the
13    intercom tells them that they are part of something bigger—the facility's task to
14    placate the Ancient Ones.  Marty and Dana run into the elevator control booth,
15    where Dana pushes the "System Purge" button.  All of the monsters descend
16    through the elevators and slaughter the facility employees in a massive bloodbath.

17    Dana and Marty find the ritual chamber, which contains stone carvings that
18    depict each of the horror archetypes—the Whore, the Athlete, the Scholar, the Fool,
19    and the Virgin.  Dana realizes she and her friends were the sacrifice.  The facility's
20    female Director, played by Sigourney Weaver, arrives and explains that the ancient
21    gods will remain below so long as young people fitting at least these five horror
22    archetypes are sacrificed, leaving the Virgin for last.  The Director tells Marty that if
23    he does not die in eight minutes, the gods will rise and destroy humanity.  Dana is
24    about to shoot Marty to save the world, when she is attacked by a werewolf.  Marty
25    and the facility Director struggle until the zombie girl strikes the Director in the
26    skull with an ax.  The Director and the zombie fall into the pit of the ancient gods.

27    Dana and Marty banter and smoke a joint as they wait for the world to end.  A
28    giant hand breaks through the ground and destroys the cabin.

4

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

**B.**     **Plaintiff's  Book – *The Little White Trip: A Night in the Pines***

Plaintiff alleges that he wrote *Little White Trip* between 2004 and 2006. FAC, ¶¶ 13-16.  From about June 2006 to November 2007, Plaintiff allegedly distributed and sold about 5,000 copies of the book, mostly in the Santa Monica and Venice Beach areas as a result of a grassroots sales effort on the streets.  *Id.*, ¶¶ 18, 25; *see also id.*, ¶ 21.  Plaintiff alleges that some of the Defendants currently reside and operate out of Santa Monica.  *Id.*, ¶ 20.  Plaintiff also alleges that *Little White Trip* was discussed on blogs and social media websites, and in a profile in the Long Beach Gazette.  *Id.*, ¶¶ 18, 23.  Plaintiff claims that unnamed "multiple credited entertainment industry producers . . . expressed interest in the Book."  *Id.*, ¶ 19.

*Little White Trip* opens with a note to the reader from Matt Thomas, the narrator and main character, stating that he witnessed the murders of his friends and that Peter Gallagher convinced him to tell the story in a book.  The story shifts to the chilly December night of Matt's graduation from high school in Scottsdale, Arizona. Matt is waiting in line to walk into the ceremony.  He sneaks out of line and heads for his friends' hideout spot, where he meets Sam Canton, "your token fast food eating, high-stress American"; Julie Burnett, a somewhat spoiled rich girl; and Ian Shmelts, a cocky rich kid with absentee parents and an alcohol problem.  They are later joined by Dura Lopez, a feisty athletic girl that Matt likes.

The graduates mildly disrupt the ceremony by sitting together instead of in their assigned spots.  Afterwards, Matt finds Dura and Sam smoking weed in Dura's car, and Julie arrives with a very drunk Ian.  They go to the graduation party, where they play carnival games and win money for raffle tickets.  Dura dumps a lot of her tickets into the drawing for the grand prize—an all-expense-paid snowboarding trip to Flagstaff, Arizona, which includes boarding passes, a cabin, free food, and rental of a Lincoln Navigator.  Julie wins the prize, which she shares with her friends.

The following night, on Saturday, Matt meets his friends at the bowling alley, and they then go to their "secret spot" in the state park, where they smoke marijuana

5

1  and talk.  On Sunday, Matt, Dura, Ian, and Julie meet at a hookah lounge.  Later that
2  night, Dura invites Matt over to her house, where they kiss.  On Monday morning,
3  the friends leave for Flagstaff in the Lincoln Navigator and stop for breakfast at a
4  diner.  About halfway to Flagstaff, Julie gets a call from the rental-car agency saying
5  that she needs to come back to sign a form about liability.  Matt arranges to stop by
6  a sister company to sign the form.  Sam wants to read the fine print, but an impatient
7  Julie directs him to just sign it.  They arrive in snowy Flagstaff by afternoon.

8  The characters go to a steakhouse to use their free-food coupons.  A young
9  waiter named Caswell insists they sit in a specific booth.  Caswell calls Matt over to
10  the bar and asks where they are going.  Matt tells him that they are going to the
11  Brinkley cabin.  Caswell laughs and says Matt must be mistaken because the police
12  recently seized the cabin after Jeff Brinkley killed his trophy wife and three kids.
13  Matt thinks Caswell is just trying to scare him, and does not tell the others.

14  The characters follow the directions they received from the rental-car agency
15  and arrive at a cabin.  They ask the family there whether it is the Brinkley cabin.
16  The father at first gets angry, but starts to sob and reveals that Brinkley killed their
17  son.  Ian is shaken by the story, but Sam points out how unbelievable the story is.

18  The characters finally arrive at a massive "new cabin" with a "four-car
19  garage, thick log columns, castle-style double doors, and an enormous balcony
20  offset above the entryway."  Upstairs, Sam sees a ceiling door, and they climb up to
21  the attic.  Matt finds a box with tiny clay dolls, which Julie recognizes as expensive
22  antiques.  Julie finds a family photo with the inscription, "The Brinkley Family."

23  The characters use the cabin's computer to search the Internet for Brinkley.
24  They find nothing about any murders.  Reassured, they barbecue, drink, and get
25  stoned.  A man comes to the door, claiming that his tire blew out and that he needs
26  to call a tow service.  Ian is skeptical, but Matt gives the man Julie's cell phone.
27  The man tells Matt and Dura that Brinkley was chased out of town for preaching too
28  much.  That night, Matt and Dura have sex on the couch, and Sam sees them.

6

1    The next morning, Sam refuses to go to the mountain, and the girls insist on
2    leaving the car for him.  Matt tries to call a cab using Julie's cell phone but cannot
3    find a signal.  Matt wonders how the visitor was able to make calls, and finds no
4    calls in the call history.  Matt uses the house line to call a cab.  Matt, Dura, Ian, and
5    Julie spend the day snowboarding and having fun at the lodge, and are later picked
6    up by a town car.  The driver shares more gory details about the Brinkley murders,
7    scaring the characters.  They decide to grab Sam and leave, but when they arrive at
8    the cabin, Sam and the car are gone.  Matt and Dura search for Sam in the woods
9    and find the car crashed into a tree.  On the passenger seat is Sam's severed arm.

10   Matt and Dura run back to the cabin, where Ian and Julie have discovered that
11   the phone lines have been ripped out.  While the four are talking, the kitchen
12   window shatters, and a large man in a flannel shirt stabs Dura in the stomach and
13   abducts her.  Matt notices several trails of footprints and deduces there must be at
14   least two more assailants.  The three look for knives, but someone has taken them.

15   Ian goes outside to retrieve the car.  Hearing Ian's scream, Matt runs to the
16   balcony and sees Jeff Brinkley stabbing Ian repeatedly.  Matt races out and knocks
17   Brinkley down.  Matt is about to crush Brinkley's head with a piece of firewood
18   when another huge man grabs and chokes Matt until he passes out.  When he
19   awakens, Matt creates a makeshift weapon from a broken whiskey bottle.  While
20   searching for a knife, Matt knocks over a vase, and he and Julie discover a wireless
21   camera amongst the shards.  Just then, Brinkley comes in, and Matt and Julie hide
22   behind a recliner chair.  Brinkley begins talking to himself and then leaves.  Julie
23   spots a cop car in the driveway, but Matt discovers that the officer inside is dead, his
24   head nearly severed.  As Matt reels in horror, Brinkley grabs Julie.  Matt lunges for
25   the cop's gun, and Brinkley releases Julie.  Matt shoots Brinkley.

26   Matt and Julie then see a woman coming out of the woods and directing
27   someone to stay back.  Matt sees that Brinkley is not dead but sitting up.  Other
28   people emerge out of the woods, and a short man with a megaphone calls it a

7

1  "wrap."  Matt listens in shock as this man, Rex Luther, gives an interview to a news

2  reporter, and describes all the preparations that went into making the "world's first

3  full-length reality movie."  Luther reveals that the knives were fake, Brinkley and

4  everyone else were hired actors, and the rental-car form was actually a release.

5      In the epilogue, set a year and half later, Matt recounts how Julie's father

6  hired an attorney to sue the moviemakers and got each of them a settlement of $9.5

7  million.  Matt gave his parents $1 million and moved to Hollywood with Dura.

8  **III.    RULE 12(b)(6) STANDARDS IN COPYRIGHT CASES**

9      To prevail in a copyright infringement action, a plaintiff must prove

10  (1) ownership of a copyright in a work and (2) copying by a defendant of original

11  elements of the work.  *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th

12  Cir. 2010).  "A plaintiff may establish copying either (1) by presenting direct

13  evidence of copying or (2) by showing that the defendant had access to the work and

14  that the works at issue are substantially similar."  *Bissoon-Dath v. Sony Comp.*

15  *Entm't Am., Inc.*, 694 F. Supp. 2d 1071, 1078 (N.D. Cal. 2010), *aff'd and adopted*

16  *by*, 653 F.3d 898 (9th Cir. 2011) (published without opinion).

17      Although a court must accept the facts pled as true and draw all reasonable

18  inferences in favor of a plaintiff on a motion to dismiss, a "court need not accept as

19  true . . . allegations that contradict facts that may be judicially noticed by the court."

20  *Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).  When considering a

21  motion to dismiss an infringement claim for lack of substantial similarity, a court

22  may "take judicial notice of generic elements of creative works," as well as

23  "documents [such as copies of works] which are not physically attached to the

24  complaint but 'whose contents are alleged in [the] complaint and whose authenticity

25  no party questions.'"  *Zella v. The E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1128-29

26  (C.D. Cal. 2007) (internal citation omitted).  The Ninth Circuit has long held that

27  dismissal of copyright infringement claims is proper where the works at issue are in

28  the record and it is apparent from the pleadings that the works are not substantially

1    similar as a matter of law.  *Christianson v. West Publ'g Co.*, 149 F.2d 202, 203 (9th

2    Cir. 1945); *accord Wild v. NBC Universal, Inc.*, 513 Fed. Appx. 640, 641 (9th Cir.

3    2013).[2]  This approach is consistent with *Bell Atlantic Corp. v. Twombly*, 550 U.S.

4    544 (2007), in which the Supreme Court held that a plaintiff must allege "enough

5    facts to state a claim to relief that is plausible on its face."  *Id.* at 570.

6        Furthermore, courts routinely dismiss copyright infringement claims <u>with</u>

7    <u>prejudice</u> where substantial similarity is absent.  *E.g.*, *Scott v. Meyer*, No. 2:09-cv-

8    06076-ODW, Order Granting Defendants' Motion to Dismiss ("MTD Order") at 4

9    (C.D. Cal. Nov. 24, 2009) (Wright J.), attached as Exhibit 3 to Declaration of Elaine

10   K. Kim; *Campbell*, 718 F. Supp. 2d at 1116 (lack of substantial similarity is a

11   "defect [that] cannot be cured by amendment"); *Thomas*, 2008 U.S. Dist. LEXIS

12   14643, at *17 (same).  That is because the contents of the works at issue cannot be

13   altered by extraneous allegations.  *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430,

14   434 (S.D.N.Y. 1985), *aff'd*, 784 F.2d 44 (2d Cir. 1986).

15       Courts also dismiss infringement claims under *Twombly* where, as here, the

16   plaintiff fails allege facts showing that the defendant had access to his work.  *E.g.*,

17   *Feldman v. Twentieth Century Fox Film Corp.*, 723 F. Supp. 2d 357, 365-66 (D.

18   Mass. 2010) (alleged circulation in Hollywood and book publication not enough to

19   prevent dismissal); *Hill v. Gaylord Entm't*, 85 U.S.P.Q.2D (BNA) 1688, 1691-92

20   (S.D. Fla. 2008) (allegation of sending script to "publishers and literary agents for

21   possible publication" insufficient to prevent dismissal).

22

23

24   _____

    [2] *See also Van v. Cameron*, 566 Fed. Appx. 615, 615 (9th Cir. 2014); *Gadh v. Spiegel*, 2014 U.S.
25   Dist. LEXIS 64081, at *23 (C.D. Cal. Apr. 2, 2014); *DuckHole Inc. v. NBC Universal Media*,
    2013 U.S. Dist. LEXIS 157305, at *23 (C.D. Cal. Sept. 6, 2013); *Schkeiban v. Cameron*, 2012
26   U.S. Dist. LEXIS 145384, at *6 (C.D. Cal. Oct. 4, 2012), *aff'd*, 566 Fed. Appx. 616 (9th Cir.
    2014); *Campbell v. The Walt Disney Co.*, 718 F. Supp. 2d 1108, 1116 (N.D. Cal. 2010); *Rosenfeld*
27   *v. Twentieth Century Fox Film Corp.*, 2009 U.S. Dist. LEXIS 9305, at *9-10 (C.D. Cal. Jan. 28,
    2009); *Capcom Co., Ltd, v. The MKR Group, Inc.*, 2008 U.S. Dist. LEXIS 83836, at *34 (N.D.
28   Cal. Oct. 10, 2008); *Thomas v. The Walt Disney Co.*, 2008 U.S. Dist. LEXIS 14643, at *17 (N.D.
    Cal. Feb. 14, 2008), *aff'd*, 337 Fed. Appx. 694 (9th Cir. 2009).

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

## IV.   PLAINTIFF CANNOT PLEAD SUBSTANTIAL SIMILARITY

### A.   The Ninth Circuit's Extrinsic Test Applies On A Motion to Dismiss

Plaintiff's copyright infringement claim fails because there is a complete lack of substantial similarity between the works.  To prove that two works are substantially similar in protected expression, a plaintiff must satisfy both an "extrinsic" test and an "intrinsic" test.  *Funky Films, Inc. v. Time Warner Entm't, Inc.*, 462 F.3d 1072, 1077 (9th Cir. 2006).  Only the extrinsic test is relevant on a motion to dismiss.  *Zella*, 529 F. Supp. 2d at 1133 n. 8.  The extrinsic test requires an "analytic dissection" of the works, and focuses on "specific, concrete elements" of expression rather than generalizations.  *Bissoon-Dath*, 694 F. Supp. 2d at 1079.  The plaintiff must identify "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" of the two works.  *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1044 (9th Cir. 1994).

Under the extrinsic test, the court must first "filter out and disregard the non-protectable elements [of each work] in making [a] substantial similarity determination."  *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).  "[N]o author may copyright facts or ideas."  *Harper & Row Publrs., Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985).  "It is an axiom of copyright law that the protection granted to a copyrighted work extends only to the particular expression of the idea and never to the idea itself."  *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1163 (9th Cir. 1977).  The court "compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters."  *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985).  In addition, "scenes à faire, which flow naturally from generic plot-lines, are not protectable."  *Funky Films*, 462 F.3d at 1077.  The court "must take care to inquire only whether 'the *protectable elements*, *standing alone*, are substantially similar.'"  *Id.* (emphasis in original).

1
      **B.**    **Plaintiff's Claim Fails Each Element Of The Extrinsic Test**

2
     *Plot.*  A court must "look[] beyond the vague, abstracted idea of a general

3 plot" when assessing similarities. *Berkic*, 761 F.2d at 1293. Even where two works

4 "share the same basic plot premise," no substantial similarity exists where "a closer

5 inspection reveals that they tell very different stories." *Benay*, 607 F.3d at 625.

6
     The plots of the two works here are dissimilar even at an abstract level. The

7 basic premise of *Cabin*—a clear parody—is that, to avoid the apocalypse, society

8 must annually offer the ancient gods a ritual sacrifice of young people who fit

9 certain horror archetypes. Clandestine facilities around the world ensure that the

10 archetypes are killed in accordance with certain horror conventions. In North

11 America, the characters must go to a cabin in the woods, do foolish things, and be

12 killed off by classic horror monsters, with the Virgin left for last. The story is told

13 by cutting between scenes of the technicians in the facility and scenes of the college

14 students selected for this year's sacrifice. The facility technicians party, wager on

15 death, and generally treat the characters' terrifying plight as a sporting event until

16 the technicians get their comeuppance.

17
     In contrast, *Little White Trip* is largely a coming-of-age story about a group of

18 high school friends who, for the first third of the book, attend their high school

19 graduation, celebrate, have romantic encounters, drink and take drugs, and ruminate

20 about life. Eventually, they drive to Flagstaff, Arizona, on a snowboarding trip,

21 which they have won at a raffle at their graduation party. The characters encounter

22 various people in Flagstaff, who try to convince them that the cabin included in the

23 package was previously owned by a man who murdered his family and was never

24 caught. After numerous interpersonal encounters having nothing to do with the

25 killings, Matt Thomas, the narrator, witnesses what he thinks are the murders of his

26 friends at the hands of this man. In the end, it is revealed that the entire ski trip was

27 being filmed by individuals who want to release it as a movie, and that in fact, no

28 one was killed. There are no monsters, zombies, or end-of-the-world sacrifices.

11

1    The FAC nevertheless alleges that "[l]ike the Book, the Film tells the story of

2    five friends (three guys and two girls) between the ages of 17 and 22 who take a trip

3    to a remote cabin in the woods.  The cabin's previous inhabitants were murdered by

4    the father of the family, who returns to terrorize the group of friends.  In the end, it

5    is revealed to the friends that they are being filmed and manipulated by persons

6    behind the scenes, thus becoming inadvertent characters in a real-life horror show

7    for the enjoyment of others."  FAC, p. 9:20-26.  However, the notion of youths

8    taking a trip to a house in a remote location where they become the unwitting

9    victims of evil forces is commonplace *scenes à faire* in horror films, from *The Texas*

10   *Chain Saw Massacre* to *The Evil Dead*.  Indeed, the FAC itself alleges that *Cabin*

11   uses "classic horror movie tropes" (FAC, p. 9:12-13), and Plaintiff's book even

12   remarks how "clichéd" its plot is (*e.g.*, p. 285).  Plaintiff cannot claim ownership of

13   such stock ideas and elements.  *See Berkic*, 761 F.2d at 1293 ("General plot ideas …

14   remain forever the common property of artistic mankind."); *Funky Films*, 462 F.3d

15   at 1077 (only "specific details of an author's rendering of ideas" are protectable).

16   Furthermore, as Plaintiff acknowledges (FAC, p. 9:5-8), the vague concept of

17   characters being watched and manipulated "for the enjoyment of others" is a non-

18   copyrightable "idea."  This idea of voyeurism is expressed in completely different

19   ways in the two works.  In *Cabin*, the facility technicians use chemicals and gases to

20   transform the students into their stock roles for the ritual sacrifice—which is entirely

21   different from filmmakers trying to make a movie.  And in his initial Complaint,

22   Plaintiff repeatedly asserted that the works are similar because it is revealed only

23   "[i]n the end," in a "surprise reveal," that the characters are being watched and

24   manipulated.  Compl., pp. 9, 10, 14.  In fact, there is no such "surprise reveal" in

25   *Cabin*:  The audience knows from the start that the students are being watched, and

26   watches the students along with the technicians, who are also main characters.

27   Plaintiff's allegations are also inaccurate and misleading.  The characters in

28   *Cabin* are not terrorized by a man (or an actor) who recently lived in the

neighborhood and killed the rest of his family, as Plaintiffs wrongly alleges.  Rather, the *Cabin* characters are attacked by a family of zombies from 1903, and the zombie children were not innocent victims, but actively participated in the torture and killing of others.  And in *Cabin*, not only are the characters actually killed, they are killed to save humanity from the gods' wrath.

The Ninth Circuit has rejected claims involving far more similar plots than in the works at issue here.  *See, e.g.*, *Benay*, 607 F.3d at 625 (works about American war veterans who traveled to Japan to train the Japanese army only to fall in with samurai rebels were not substantially similar); *Funky Films*, 462 F.3d at 1077-78, 1081 (works in which fathers who operate family-run funeral homes die, resulting in the two surviving sons' operation of the homes, one of whom was estranged prior to the father's death, were not substantially similar); *Kouf*, 16 F.3d at 1045-46 (family comedy/adventure films about accidentally shrunken people were not substantially similar); *Berkic*, 761 F.2d at 1293 (works about "criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants" were not substantially similar).  Likewise, *Cabin* and *Little White Trip* are not substantially similar in plot.

**Characters.**  "The bar for substantial similarity in a character is set quite high."  *Sheldon Abend Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010).  Character traits that "flow naturally from [two] works' shared premises" are not protected.  *Benay*, 607 F.3d at 626.  "[O]nly distinctive characters are protectable" (*id.*), and courts must be careful "to slice or filter out" mere embodiments of stock ideas, *Bissoon-Dath*, 694 F. Supp. 2d at 1088.  *See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1176 (9th Cir. 2003) ("[W]hile there may exist similarities between the magician 'characters,' any shared attributes of appearance and mysterious demeanor are generic and common to all magicians.").

Plaintiff attempts to compare Dana Polk in *Cabin* with Dura Lopez in *Little White Trip*, but they are nothing alike.  Dana Polk is a nice and intellectual red-head

13

(not "dark-haired" or "brunette," as Plaintiff alleged in his initial Complaint), and functions as the female Virgin archetype.  In contrast, Dura Lopez in *Little White Trip* is half-Dominican/half-Sicilian, with "a soft coffee complexion" and "long brown hair" (p. 24).  She is feisty and like "one of the guys" (p. 24).  She is athletic and was the star volleyball champ, but frequently smokes marijuana.  She has sex with Matt on the trip, and is not the last character to survive, but rather, the second one to be "killed" by the fake murderer.  Two characters are not similar just because their names start with the same letter.  *See Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1070 (C.D. Cal. 2010) (no substantial similarity of characters though they had the "similar sounding names" "Susan and Suzanne"); *Davis v. ABC*, 2010 U.S. Dist. LEXIS 76145, at *27 (W.D. Mich. July 28, 2010) (no substantial similarity even though main characters in the works were named "Eli and Ely," another character was named Stanley, and a third was "Ramerez or Ramirez"); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 311 (S.D.N.Y. 1999) (no substantial similarity where main "half-vampire" characters in the works "share[d] the same name: Nicholas Gaunt").  While Plaintiff alleges that Dana and Dura "recently ended a relationship" and begin "a romantic relationship with the more sensitive and mature male" "which culminates in a love scene in front of the fireplace" (FAC, p. 10:10, 16-19), Dana Polk has just been dumped by her professor, meets Holden for the first time on the trip, and briefly kisses him.  In contrast, Dura's previous boyfriend was a family friend of whom her father approved (p. 84), she develops a relationship with Matt before the trip, and she then has sex with him.

Nor do Holden McCrea (*Cabin*) and Matt Thomas (*Little White Trip*) have anything in common.  Holden is smart and fulfills the Scholar role, although he is also a good-looking football player.  Far from being a scholar, Matt has "subpar grades" (p. 7).  Contrary to Plaintiff's assertion that Matt is "more sensitive and mature" (FAC, p. 10:16-17), Matt is the class clown who, throughout school, "fought to stay at the center of attention even though many times it landed [his] ass

14

in the principal's office" (p. 4).  He "love[s] entertaining" and "love[s] being right even more" (p. 4).  Matt has thick black hair, and a broken nose and blood spots in his eye from a childhood accident (p. 4).  Matt is the narrator of *Little White Trip*, and is never "killed" off, whereas Holden McCrea is killed by a zombie.

Jules Louden in *Cabin* is a smart pre-med student, but becomes the Whore archetype.  She is the first to be killed while fooling around with her boyfriend Curt.  By contrast, Julie Burnett in *Little White Trip* is no more promiscuous than Dura.  She is a spoiled rich girl who throws tantrums and begins a romantic relationship with Ian right before the trip starts.  Also, she is never "killed," but is one of the final two remaining.  That the characters' names are similar does not give rise to substantial similarity.  *See supra.*  Neither do the superficial similarities that they have blue eyes and blonde hair (because Jules Louden dyes it just before the trip) or that they are stereotypically bubbly, because such characters are *scenes à faire* in the horror/slasher genre including, for example, in the well-known movie *Scream*.

Curt Vaughan (*Cabin*) and Ian Shmelts (*Little White Trip*) are not remotely similar.  Curt is a football player who fulfills the Athlete archetype, but is actually a sociology major on a full academic scholarship.  He is not an alcoholic.  Ian, in contrast, is not an athlete, has a chronic alcohol problem, and wears "vintage rags that cost way too much" (p. 11).  He is also resentful because he is well-off (p. 67).  Plaintiff's comparison of them as strong, charismatic, and good-looking (FAC, p. 10:19-20) is legally insufficient.  *See Scott v. Meyer*, MTD Order at 5 ("To the extent that the male protagonists are dashing young men tormented by their powers, such similarities are far too general to be actionable.").

Marty Mikalski (*Cabin*) and Sam Canton (*Little White Trip*) are not similar either.  Marty is supposed to fulfill the Fool archetype, but he is actually the most observant and serves as the voice of reason.  Marty has no romantic interest in any other character, and is one of the final two to die.  *Little White Trip*'s Sam Canton, in contrast, is the first one to be "killed."  Sam is romantically interested in Dura,

but discovers that Dura likes Matt.  Plaintiff alleges that Marty and Sam have "quirky personalities" (FAC, p. 10:21), but this abstraction only belies the absence of any real similarity.  In fact, the two have markedly different personalities:  Marty is laid back and does not seem to care about popularity.  Sam is "your token fast food eating, high-stress American" (p. 8), who tried to infiltrate the hip crowd and join the football team, but never made it because of his bad luck of getting an erection during the physical exam (pp. 9-10).  And although Plaintiff alleges that Sam is "smart" and "non-athletic" (FAC, p. 10:23), he is no smarter than Ian or Matt, and none of the male characters in *Little White Trip* is an athlete.[3]

In addition, under the extrinsic test, courts take note of characters with no counterparts in the other party's work.  *See Funky Films*, 462 F.3d at 1079 (emphasizing characters from defendant's work who were not present in plaintiff's work); *Benay*, 607 F.3d at 627 ("There are a number of important characters in the Film and the Screenplay who have no obvious parallel in the other work.").  *Cabin* has many characters with no counterparts in *Little White Trip*, including key characters such as Sitterson, Hadley, the other facility employees, zombies, and supernatural monsters.  Conversely, *Little White Trip* has many characters with no counterparts in *Cabin*, such as high school teacher Mrs. Adams, Matt's parents and kid brother, the "Mailer family" whose son was purportedly murdered, the late-night visitor, and the town-car driver.  There is no similarity in character in these works.

***Setting.***  The settings of *Cabin* and *Little White Trip* are likewise vastly different.  *Cabin* takes place primarily in two locations—in and around the cabin in the woods and in the underground facility—and is set in the summer.  Much of *Little*

---

[3] Plaintiff alleges that Marty and Sam "have messy dirty blonde hair, appear to wear a grey shirt and jeans throughout the film, smoke marijuana, and enjoy gazing up the stars." FAC, p. 10:21-23. Having similar hair color or wearing jeans do not make two characters substantially similar, but in any event, Marty has brown hair, and also wears a blue jean shirt and brown sweater. Curt—who Plaintiff does not contend is similar to Sam—wears a grey shirt and jeans for part of the film. Plaintiff mischaracterizes *Cabin* in alleging that Marty "enjoy[s] gazing up the stairs"; Marty simply looks up at the sky at one point and notices there are no stars.  And in *Little White Trip*, it is Dura who brings the marijuana, not Sam, and all of the characters in the book smoke it.

1   *White Trip* takes place in Scottsdale, Arizona, where the characters live and attend

2   their high school graduation and party.  On their trip, which occurs in December, the

3   characters go to Flagstaff, where there are a university, restaurants, markets, other

4   cabins, and a ski resort where they snowboard.

5          The FAC alleges that "each work takes place in a remote cabin in the woods

6   lacking cell phone reception, where the prior inhabitants of the cabin were

7   murdered."  FAC, pp. 9:28-10:1.  However, the setting of a horror story in a house

8   with a violent or mysterious history in an isolated location, so that the victims

9   cannot easily escape or seek help, is part of the basic formula of horror and not

10  protectable.  And while most remote locations lack cell phone reception, that is not a

11  story point in *Cabin*; no one even tries to use a phone during the film.  That the

12  names of the prior inhabitants start with the same letter ("Buckner" vs. "Brinkley")

13  do not make them substantially similar.  *See Davis*, 2010 U.S. Dist. LEXIS 76145,

14  at *27 ("A name . . . generally is an unprotectible generic element of a work.").

15         The "cabins" in the two works are nothing alike.  In *Cabin*, the house is dark

16  and spooky, with old rustic furniture, an eerie one-way mirror, and creepy painting.

17  The "cabin" in *Little White Trip* could not be more different—an eight-room, estate-

18  style resort with a "hot tub, Internet connection, outdoor heating, theater-quality

19  entertainment center, and much more" (p. 108), including phones (p. 185).  It has

20  "perfectly placed, expensive-looking furniture," and is "complete with artwork,

21  lavish fixtures, and the new-house feel like we were the proud first owners," and the

22  air inside is "as clean and fresh inside as it [is] out in the trees" (pp. 135-36).

23         Although Plaintiff alleges that the settings are similar because "[t]he vehicle,

24  travel, and cabin in each work is filmed, monitored, and manipulated by third

25  parties, who have planted crew members along the way as well as hidden cameras in

26  everyday household objects" (FAC, p. 10:2-4), the idea of hidden cameras follows

27  directly from the idea of being watched by a third person, and is not protectable.

28  Moreover, the facility employees in *Cabin* do not "film" the college students to

1   make a movie, and there are no "crew members."  Rather, the facility employees

2   watch the students to ensure that the sacrifice is conducted according to the ancient

3   gods' demands.  There is no similarity in setting between the works.[4]

4       ***Dialogue.***  "[E]xtended similarity of dialogue [is] needed to support a claim

5   of substantial similarity . . . ."  *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th

6   Cir. 1988).  No similarity in dialogue exists between *Cabin* and *Little White Trip*.  It

7   is insufficient that both works use the phrase "come back" or "coming back."  *See*

8   FAC, p. 18:25-26.  *See Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989) (no

9   copyright protection for common expressions such as "describing a group of family

10  relationships as a 'staggering network,' a muddy street as a 'cow path' or a river

11  bank populated by sluggish, broad-headed loricates as 'crawling with alligators'").

12      ***Mood.***  *Cabin* and *Little White Trip* differ radically in mood.  The FAC

13  alleges that "[b]oth works have a similar mood in that they are suspenseful horror

14  films that begin with the enthusiasm of a group of friends going on a trip, followed

15  by the excitement of a night of drinking and romance at a cabin in the woods.  The

16  mood then shifts to a series of frightening murders while at the same time the

17  friends gradually become aware that they are being manipulated and punished by a

18  controlling outside force.  This culminates in a surprise reveal where the lead

19  characters learn they are being manipulated for the enjoyment of third parties."

20  FAC, pp. 10:26-11:4.  This allegation confirms that the only similarity between the

21  two works is that they involve horror.  In *Cabin*, the mood is comical and satirical;

22  Sitterson and Hadley play practical jokes and dance along with the characters.  The

23  

24  

25  

26  

27  

28  

---

[4] Courts have repeatedly found no substantial similarity in cases involving far more similar settings.  *See, e.g.*, *Funky Films*, 462 F.3d at 1080 ("Although both works take place in a contemporary, family-run funeral home, the similarities in setting end there.  'Six Feet Under' takes place in a well-maintained funeral home in Los Angeles … [whereas] 'The Funk Parlor', located in Connecticut, is in shambles."); *Benay*, 607 F.3d at 627 (no substantial similarity where both works followed Americans from the United States to seat of the Japanese Emperor due to dissimilarities in some specific settings within the works); *Capcom Co.*, 2008 U.S. Dist. LEXIS 83836, at *29 (no substantial similarity despite both stories taking place in "a rural two-story mall with a helipad on top and a gun shop and music playing inside," because one mall was "relatively small with a major department store and an ice rink" while the other was "a modern mega-mall without a major department store or ice rink").

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

1   killing is less realistic and involves fantastic monsters such as a Merman, werewolf,

2   and unicorn.  It is also less suspenseful, as the audience is fully aware of what the

3   facility technicians are doing.  *Little White Trip*, in contrast, is more serious and

4   somber in tone, as Matt describes the murders and how they were ill-prepared, and

5   the reader does not discover that the murders were not real until the end.

6       ***Pace.***  The FAC alleges that the pace of the works is similar because "[b]oth

7   are horror films, punctuated with a series of deaths, and enhanced by the unwitting

8   characters becoming aware that these terrible events are not random, but

9   orchestrated against them by an unknown force.  This is followed by a surprise

10  reveal that the lead characters are being manipulated for the enjoyment of third

11  parties."  FAC, p. 11:6-10.  Again, this allegation underscores that the only

12  similarity is that the works involve horror.  In the horror genre, a series of character

13  deaths caused by unknown forces is insufficient to establish similarity of pace.  *See*

14  *Segal v. Rogue Pictures*, 2011 U.S. Dist. LEXIS 157933, at *20 (C.D. Cal. Aug. 19,

15  2011) (works not similar despite allegation that they "have a dark, foreboding mood

16  and the pace quickens as harsher events occur as the stories progress," because this

17  mood and pace are generic in religious horror).

18      The pace of the two works is highly different.  *Cabin* is a fast-paced parody in

19  which cuts of the college students are interlaced with cuts of frantic facility

20  employees, and which swiftly proceeds to fast-paced graphic horror.  Contrary to

21  Plaintiff's allegation that "[e]ach work begins moderately paced, with a focus on

22  character development and a blossoming relationship" (FAC, p. 11:10-12), in *Cabin*,

23  almost no time is spent in the students' college town; they leave almost immediately

24  for the cabin.  There is little character development, and the zombies appear early on

25  into the film.  The entire film takes place over one day, and the three students who

26  are killed by zombies all die before the third act.  The last third of the film follows

27  Marty and Dana as they fight back against the facility.  In contrast, *Little White Trip*

28  is a slowly unfolding coming-of-age story that has high school kids ruminating

19

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

about graduation and going on a long road trip.  The first third of the book follows the characters before they arrive in Flagstaff, and involve scenes at their graduation ceremony and party, their homes, and various hang-out places.  The first character is not "killed" until more than two-thirds into the book, and the narrative promptly ends after the characters and the reader learn that no one actually died and the trip was being filmed to be made into a movie.

***Sequence of Events.***  The sequence of events alleged in the FAC completely disregards key events that occur in each work, including the entire first third of *Little White Trip*, in which the characters graduate from high school and the two couples start dating, and the entire third act of *Cabin*, in which Marty and Dana fight back and release the monsters into the facility.  The FAC also ignores the actual sequence (or any other details) of the deaths, which is important to *Cabin*'s narrative:  Jules (the Whore) dies first, and Marty (the Fool) and Dana (the Virgin) are the last ones to die, after defeating the facility and triggering the apocalypse.  In contrast, in *Little White Trip*, Sam (who Plaintiff alleges is similar to Marty) "dies" first, and Matt and Julie (who Plaintiff compares to Holden and Jules) survive.

Plaintiff misleadingly alleges that in both works, third persons are monitoring the characters while they travel to and are in the cabin and that "[t]he people behind the scenes scramble . . ." when a camera is discovered.  FAC, pp. 11-12.  In fact, in *Little White Trip*, the reader does not find out that third persons even exist until the end; this "surprise reveal" to the reader is a key aspect of the book's sequence of events.  And, contrary to Plaintiff's allegation, the characters never suspect that "some third party [is] controlling the situation."  FAC, p. 12:22.  When Julie and Matt discover the camera, they think they are being watched by the murderer (pp. 252-54), and are completely surprised when crew members reveal themselves in the end.  There is no substantial similarity of sequence of events.  *See Funky Films*, 462 F.3d at 1077 (extrinsic test requires analysis of "the actual concrete elements that make up the total sequence of events"); *Scott v. Meyer*, MTD Order at 6 ("Insofar as

20

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

1    both works present a similar sequence of marriage, consummation and child birth,

2    such similarities in stock elements are not actionable.").[5]

3         ***Themes.***  The FAC alleges that "[e]ach work has a core theme of horror,

4    resulting from unknowingly being manipulated by third parties," "for the fulfillment

5    of the narrative requirements and the enjoyment of others."  FAC, p. 9:2-3, 13-14.

6    This alleged similarity would apply to the entire horror genre.  And the allegation

7    that the works "display a self-referential awareness of classic horror movie tropes"

8    and "provide[] a commentary on the use of classic horror devices as a mechanism

9    for satisfying consumer desires and expectations" (*id.*, p. 9:12-18) would describe

10   all horror parodies from *Scream* to *Scary Movie*.  Such commonplace themes do not

11   render *Cabin* similar, let alone substantially similar, to *Little White Trip.  See Benay*,

12   607 F.3d at 627 (no substantial similarity although "both works explore[d] general

13   themes of the embittered war veteran, the 'fish-out-of water,' and the clash between

14   modernization and traditions," because "themes ar[o]se naturally from the premise

15   of an American war veteran who travels to Japan to fight the samurai"); *Muller v.*

16   *Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429 445 (S.D.N.Y. 2011) ("Any

17   thematic similarities are incidental to the idea of an expedition to a dangerous and

18   remote location, or the stock theme of action-adventure meets science-fiction, and

19   accordingly are unprotected.").

20

21   ─────────────────

     [5] Plaintiff also alleges that "the friends make a stop which puts them in a tense, almost violent,
     interaction with an older white male who has been placed there by the watching parties behind the

22   scenes."  FAC, p. 11:20-25.  In fact, in *Cabin*, the students make one stop at a gas station, attended
     by a creepy old man who speaks vaguely and ominously, and whose purpose is to fulfill the stock

23   "Harbinger" role from such classic horror films as *The Texas Chain Saw Massacre*.  By contrast,
     in *Little White Trip*, the characters go to a rental-car lot, a diner, another rental-car place, a

24   steakhouse, a market, and then another cabin where they meet a couple with three kids, who try to
     convince the characters of the murders (pp. 122-28).  Plaintiff also omits that the characters get a

25   late-night visit from another older man, go snowboarding the next day, and meet another older
     man/town-car driver who also tries to convince them about the murders—all before Matt and Dura

26   finally find Sam's fake severed arm.  These events and sequences are not similar.

     Furthermore, although Plaintiff alleges that both works involve a scene in a storage area with

27   objects, these events are entirely dissimilar:  In *Cabin*, the facility technicians pop open the cellar
     door so that the students will "choose" a trinket which will determine the monsters that are

28   unleashed.  In *Little White Trip*, the characters happen to find an attic where they find some
     objects belonging to the real Brinkley family, not the fake murderer.

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

In fact, *Little White Trip* does ***not*** "provide[] a commentary on the use of classic horror devices."  For example, unlike *Cabin*, *Little White Trip* does not explain why the blonde girl is oversexualized in horror films or why the characters do foolish things such as read Latin incantations from an old diary.  The themes in the two works differ in other important respects.  *Cabin* plays homage to horror films and also parodies them, and sets the classic horror story against the backdrop of the destruction of the entire human race.  *Little White Trip* is about a group of high school kids who are tricked and who become older, wiser, and richer as a result.  The works are thematically dissimilar.

***List of Random Alleged Similarities.***  Finally, the list of random similarities alleged in the FAC (pp. 13-21) does not buttress Plaintiff's claim, because the Court must evaluate the actual content of the two works rather than Plaintiff's mischaracterizations of them.  The Ninth Circuit has held that a "compilation of 'random similarities scattered throughout the works' is 'inherently subjective and unreliable.'"  *Cavalier*, 297 F.3d at 825; *see Scott v. Meyer*, MTD Order at 5 (noting "the Ninth Circuit's directive that district courts be 'particularly cautious where, as here, [plaintiff] emphasizes random similarities scattered throughout the works'").

As discussed, many of the alleged similarities in Plaintiff's list consist of unprotectable ideas and *scenes à faire*, such as the general plot point of friends who go to a remote house and are killed by local psychopaths/zombies (Alleged Similarities Nos. 1, 2, 15, 19, 21, 27), superficial similarities in characters (Nos. 4-8), and the idea of characters being watched and manipulated (Nos. 3, 32-33).  Other elements in Plaintiff's list are either abstracted to a level of unprotectable generality or else mischaracterize the works, so as to concoct similarities where they do not exist.  The remaining alleged "scene similarities" are stock elements and tropes that flow directly from the tried-and-true slasher/horror story and the abstract idea of someone watching—*e.g.*, the use of a vehicle to get to the house and hidden cameras (No. 9), a tense exchange with an older character (Nos. 10-11), an old storage area

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

1  with strange or unsettling objects (Nos. 12-14), a period of time before the murders,

2  in which the unsuspecting characters drink, have fun, and make out (Nos. 16-18),

3  severed body parts (No. 20), failed plans to escape and seek help (Nos. 22-26, 31);

4  and the characters' discovery they are being manipulated (Nos. 28-30). These ideas,

5  classic horror tropes, and stock elements are expressed in extremely different ways

6  in the two works, and cannot sustain an infringement claim. *See Cavalier*, 297 F.3d

7  at 823 ("Scenes-a-faire, or situations or incidents that flow necessarily or naturally

8  from a basic plot premise, cannot sustain a finding of infringement.").[6]

9      In sum, *Cabin* and *Little White Trip* are not substantially similar as a matter of

10  law. Plaintiff's copyright infringement claim should be dismissed with prejudice.

11  ## V.    PLAINTIFF HAS FAILED TO PLEAD ACCESS

12      To establish access, Plaintiff must allege that the *Cabin* creators had a

13  "reasonable possibility" to view or copy *Little White Trip* before they created *Cabin*.

14  *Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1355 (C.D. Cal. 1984). A

15  "bare possibility" of access is not enough. *Jason v. Fonda*, 698 F.2d 966, 967 (9th

16  Cir. 1982). Access "may not be inferred through mere speculation or conjecture."

17  *Gable v. Nat'l Broad. Co., Inc.*,727 F. Supp. 2d 815, 827 (C.D. Cal. 2010).

18      Here, there are simply no facts supporting any reasonable possibility that the

19  creators of *Cabin* had access to *Little White Trip*. Plaintiff alleges that he distributed

20  and sold about 5,000 copies of his book, primarily in Santa Monica and Venice

21

22  [6] *See, e.g.*, *Berkic*, 761 F.2d at 294 ("depictions of the small miseries of domestic life, romantic frolics at the beach, and conflicts of ambitious young people on the one hand, and conservative or

23  evil bureaucracies on the other" are "unprotectable"); *Capcom Co.*, 2008 U.S. Dist. LEXIS 83836, at *18-*19 (*Dawn of the Dead* film and *Dead Rising* video game not substantially similar, despite

24  alleged similarities "that: (1) both works are set in a bi-level shopping mall; (2) the mall has a gun shop, in which action takes place; (3) the mall is located in a rural area with the National Guard

25  patrolling its environs; (4) both works are set in motion by a helicopter that takes the lead characters to a mall besieged by zombies; (5) many of the zombies wear plaid shirts; (6) both

26  works feature a subtext critique of sensationalistic journalism through their use of tough, cynical journalists, with short brown hair and leather jackets, as a lead male character; (7) both works

27  feature the creative use of items such as propane tanks, chainsaws, and vehicles to kill zombies; (8) both works are a parody of rampant consumerism; (9) both works use music in the mall for

28  comedic effect; and (10) Dead Rising's use of the word 'hell' references the tagline for Dawn of the Dead's release ('When there's no more room in hell, the dead will walk the earth.')").

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

Beach.  FAC, ¶ 25.  Plaintiff alleges that the Venice Beach boardwalk "encompasses approximately 2.5 kilometers and receives millions of visitors a year" (*id.*, ¶ 18), and that some of the Defendants currently reside and operate out of Santa Monica (*id.*, ¶ 20).  However, "[a]s a general matter, in order for a work to be widely disseminated, it must achieve a high degree of commercial success or be readily available in the relevant market."  *Loomis v. Cornish*, 2013 U.S. Dist. LEXIS 162607, at *11 (C.D. Cal. Nov. 13, 2013).

In *Art Attacks Ink, LLC v. MGA Entertainment Inc.*, 581 F.3d 1138 (9th Cir. 2009), the plaintiff sold about 16,000 t-shirts featuring its "Spoiled Brats" characters (2,000 per year from 1993 to 2001) at Wal-Mart stores and at Southern California county fairs, and specifically at the Los Angeles County Fair from 1998 to 2001, when MGA began selling its "Bratz" dolls.  *Id.* at 1141-43.  In addition to sales, the plaintiff displayed its characters at the fairs, which were attended by "millions of people," and MGA's employee even attended the Los Angeles County Fair during the relevant time period.  *Id.* at 1142-44.  The Ninth Circuit refused to find access as a matter of law, holding that, even accounting for the lesser attentional requirements to view t-shirts as opposed to books, the plaintiff "cannot demonstrate that its Spoiled Brats designs were widely disseminated to the extent necessary to create more than 'a bare possibility' that MGA had access to the designs."  *Id.* at 1144. *See also Rice*, 330 F.3d at 1178 (sales of 17,000 copies of plaintiff's video did not constitute widespread dissemination); *Jason v. Fonda*, 526 F. Supp. 774, 776 (C.D. Cal 1981), *aff'd*, 698 F.2d 966 (9th Cir. 1982) (no access as a matter of law although plaintiff sold up to 700 copies in Southern California, where defendants resided).

Plaintiff cannot, as a matter of law, maintain a plausible theory of access based on alleged discussion about his work on the Internet or in a newspaper (FAC, ¶¶ 18, 23).  Indeed, courts have held that even where the work has been posted on the Internet, that is insufficient to establish access.  *See O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 515-16 (S.D.N.Y. 2008) ("the mere fact that

24

1 [plaintiff's] work was posted on the internet . . . is insufficient by itself" to establish

2 access) (collecting authorities).  Nor do articles or other publicity about the work

3 demonstrate widespread dissemination.  *See Rice*, 330 F.3d at 1178 (feature about

4 plaintiff's video on television show and in trade publication did not show

5 widespread dissemination); *Kenney v. Warner Bros. Entm't, Inc.*, 984 F. Supp. 2d 9,

6 12 (D. Mass. 2013) (dismissing claim when plaintiff alleged access "(1) through

7 registration of his screenplay with the Writer's Guild of America; (2) from his

8 'TheGhostmanMovie.com' website; and (3) his promotion of the work through

9 'press interviews' and 'media outlets'"); *Feldman*, 723 F. Supp. 2d at 365-66

10 (promotion on a local radio show, *inter alia*, insufficient to allege access).

11     Plaintiff's vague allegation that he "was contacted by multiple credited

12 entertainment industry producers" (FAC, ¶ 19) likewise fails to state a plausible

13 theory of access.  *See Meta-Film Assocs.*, 586 F. Supp. at 1355-59 (submission to

14 entertainment industry individuals was insufficient to support access as a matter of

15 law, as there was not "a shred of evidence" supporting plaintiff's hypothesis that the

16 defendant creator had seen plaintiff's submission).[7]

17 ## VI.   CONCLUSION

18     Plaintiff's FAC fails to plead either of the requisite elements for copyright

19 infringement—access to his work or substantial similarity in copyrightable

20 expression.  Any attempt at amendment would be futile, as the works, which are in

21 the record, establish the absence of substantial similarity as a matter of law.

22     The Court should dismiss Plaintiff's FAC in its entirety, with prejudice.

23

24 [7] *See also Briggs v. Blomkamp*, 2014 U.S. Dist. LEXIS 142016, at *26 (N.D. Cal. Oct. 3, 2014)
(no access where plaintiff "posted drafts of the screenplay" on website, "sent queries to agents
25 seeking representation, posted short synopses of the storyline on screenwriter websites, and
entered screenwriting competitions," as they did "not constitute evidence of wide dissemination of
26 the screenplay"); *Clay v. Cameron*, 2011 U.S. Dist. LEXIS 153496, at *5 (S.D. Fla. Oct. 20, 2011)
(dismissing complaint when "[a]lthough [plaintiff] has alleged that her work was widely
27 circulated, she has alleged no nexus between her circulation of the work . . . and [defendant]");
*Martinez v. McGraw*, 2009 U.S. Dist. LEXIS 69862, at *14 (M.D. Tenn. Aug. 10, 2009)
28 (dismissing infringement claim when Plaintiff did not allege "how his song got into the hands of
[defendant's] personnel and songwriters or even that his song was played in hearing range").

1    DATED: June 1, 2015                Respectfully submitted,
                                        MITCHELL SILBERBERG & KNUPP LLP
2

3

4                                       By:/s/ Robert H. Rotstein
                                            Robert H. Rotstein
5                                           Elaine K. Kim
                                            Attorneys for Defendants
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**