O

JS-6

# United States District Court
# Central District of California

| | |
|---|---|
| PETER GALLAGHER, | Case No. 2:15-cv-02739-ODW(Ex) |
|         Plaintiff, | |
|     v. | **ORDER GRANTING** |
| LIONS GATE ENTERTAINMENT INC.; | **DEFENDANTS' MOTION TO** |
| LIONS GATE FILMS INC.; MUTANT | **DISMISS [18]** |
| ENEMY, INC.; JOSEPH "JOSS" | |
| WHEDON; ANDREW GODDARD; and | |
| DOES 1–50, inclusive, | |
|         Defendants. | |

## I.  INTRODUCTION

Plaintiff Peter Gallagher ("Gallagher") has brought suit against Defendants Lions Gate Entertainment Inc., Lions Gate Films Inc., Mutant Enemy, Inc., Joseph "Joss" Whedon, Andrew Goddard, and Does 1 through 50 (collectively "Defendants") for copyright infringement of his book *The Little White Trip: A Night in the Pines* ("*Trip*") by Defendants' film *The Cabin in the Woods* ("*Cabin*").  Defendants now move to dismiss Gallagher's claims for failing to allege the necessary elements for copyright infringement.  For the reasons discussed below, the Court finds that *Cabin*

1  and *Trip* are not similar and therefore **GRANTS** Defendants' Motion to Dismiss with

2  prejudice.[1]  (ECF No. 18.)

3  ## II.   FACTUAL BACKGROUND

4  Gallagher is the author and owner of all exclusive rights under copyright of the

5  literary work *Trip*.  (ECF No. 15, First Am. Compl. ["FAC"] ¶ 12.)   Gallagher

6  developed the idea of *Trip* and drafted an outline of that idea in 2004; he then

7  completed the initial draft of *Trip* between late 2004 and early 2005.  (*Id.* ¶¶ 13–14.)

8  *Trip* was published in or about June 2006, with 2,500 copies of the book printed for

9  sale.  (*Id.* ¶ 17.)  Gallagher then began selling copies of *Trip* on the Venice Beach

10  Boardwalk, the Santa Monica Third Street Promenade, and outside the Chinese

11  Theatre on the Hollywood Walk of Fame.  (*Id.* ¶ 18.)  During this period, Gallagher

12  alleges that multiple producers contacted him and expressed interest in *Trip*.  (*Id.* ¶

13  19.)  Gallagher does not state what exactly the producers' interests were, nor if anyone

14  connected to Defendants were amongst those who contacted him.  Over the course of

15  one and a half years, Gallagher sold approximately 5,000 copies of *Trip*, primarily in

16  the Santa Monica and Venice Beach areas.  (*Id.* ¶ 25.)

17  Defendants are the writers, producers, and distributors of *Cabin*, which was

18  released in 2012.  (*Id.* ¶¶ 4–8.)  All Defendants other than Andrew Goddard and

19  Mutant Enemy, Inc. reside or operate out of Santa Monica, with the other two listed as

20  residing or operating out of Los Angeles County.  (*Id.*)  Gallagher alleges that *Cabin*

21  copied extensively from *Trip* in addition to having access and thereon bases his

22  allegations of copyright infringement.  (*Id.* ¶ 29.)

23  ### A.  Procedural History

24  Gallagher filed his initial Complaint on April 13, 2015.   (ECF No. 1.)

25  Defendants subsequently moved to dismiss the Complaint for failing to allege the

26  necessary elements of copyright infringement on May 18, 2015.  (ECF No. 11.)  In

27

28  [1] After carefully considering the papers filed in support of and in opposition to the Motion, the Court deems the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; L.R. 7-15.

1   response, Gallagher filed the First Amended Complaint on May 19, 2015.  (ECF No.
2   15.)  Defendants moved to dismiss the First Amended Complaint on June 1, 2015.
3   (ECF No. 18.)   A timely opposition and reply were filed.   (ECF Nos. 24, 25.)
4   Defendants' Motion is now before the Court for consideration.

### III.   LEGAL STANDARD

6          A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable
7   legal theory or insufficient facts pleaded to support an otherwise cognizable legal
8   theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  In
9   doing so, "a judge must accept as true all of the factual allegations contained in the
10  complaint."  *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).  A court is generally
11  limited to the pleadings and must construe all "factual allegations set forth in the
12  complaint . . . as true and . . . in the light most favorable" to the plaintiff.  *Lee v. City*
13  *of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001).  However, the court is not required to
14  "accept as true allegations that contradict matters properly subject to judicial notice or
15  by exhibit."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)
16  (internal citations omitted).

17         The factual "allegations must be enough to raise a right to relief above the
18  speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  That is, the
19  complaint must "contain sufficient factual matter, accepted as true, to state a claim to
20  relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The
21  determination whether a complaint satisfies the plausibility standard is a "context-
22  specific task that requires the reviewing court to draw on its judicial experience and
23  common sense."  *Id.* at 679.   But a court need not blindly accept conclusory
24  allegations, unwarranted deductions of fact, and unreasonable inferences.  *Sprewell*,
25  266 F.3d at 988.

26         To prevail on a copyright infringement claim, a plaintiff "must demonstrate (1)
27  ownership of a valid copyright, and (2) copying of constituent elements of the work
28  that are original."  *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th Cir.

2010).   In order to establish infringement when evidence of direct copying is unavailable, the plaintiff must show that the defendant had access to the plaintiff's work and that the two works are "substantially similar."  *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006).

In copyright infringement cases where the court judicially notices the works at issue and it is clear there is no substantial similarity between them as a matter of law, dismissal of the claims is proper.  *E.g.*, *Christianson v. West Publ'g Co.*, 149 F.2d 202, 203 (9th Cir. 1945); *accord Wild v. NBC Universal, Inc.*, 513 Fed. Appx. 640, 641 (9th Cir. 2013).  Accordingly, when substantial similarity is absent after a review of the works at issue no amendment could cure the complaint's deficiencies, thus, dismissal with prejudice is not uncommon.  *E.g., Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (stating that dismissal with prejudice is proper when "it is clear, upon de novo review, that the complaint could not be saved by any amendment."); *Segal v. Rogue Pictures*, No. CV 10-5650-DSF-AJWX, 2011 WL 11512768 (C.D. Cal. Aug. 19, 2011) ("[C]ourts need not grant leave to amend if it would be futile to do so."), *aff'd*, 544 Fed. Appx. 769 (9th Cir. 2013); *Campbell v. The Walt Disney Co.*, 718 F. Supp. 2d 1108, 1116 (N.D. Cal. 2010) (a finding of no substantial similarity is a "defect [that] cannot be cured by amendment."); *Scott v. Meyer*, No. 2:09-cv-06079-ODW, Order Granting Def.'s Mot. to Dismiss at 4 (C.D. Cal. Nov. 24, 2009) (attached as Ex. 3 to ECF No. 18, Attach. 1, Decl. of Elaine K. Kim).

## IV.   DISCUSSION

### A.   Defendants' Requests Are Procedurally Proper in a Motion to Dismiss

As an initial matter, the Court will address the procedural issue raised by Gallagher.  (Opp'n 13–14.)  Gallagher contends that if the Court looks to matters introduced outside the pleadings, "the motion *must* be treated as one for summary judgment."  (*Id.* (emphasis added).)  Accordingly, he argues, the Court "*must*" grant him an opportunity to conduct discovery and present evidence in support of his

claims.  (*Id.* 14 (emphasis added).)  This position, however, is incorrect and entirely unsupported, as evidenced by the lack of case citations in Gallagher's brief.  *See supra* p. 4.  Moreover, since both works in question are now before the court[2], there is no other possible evidence that could be introduced that could sway the Court's finding on substantial similarity and, as a result, of non-infringement.  *E.g., Segal v. Rogue Pictures*, 544 Fed. Appx. 769, 770 (9th Cir. 2013) ("[N]o amount of proof of access will suffice to show copying if there are no similarities.").

**B.    The Extrinsic Test Shows That the Works Are Not Substantially Similar**

In determining whether two works are substantially similar, the Ninth Circuit has consistently relied on a two-part test that requires the plaintiff to prove substantial similarity under both an extrinsic and intrinsic test.  *Benay*, 607 F.3d at 624.  The extrinsic test is an objective analysis of the specific expressive elements in each work that "focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works."  *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1044 (9th Cir. 1994) (quotation omitted).  The intrinsic test, on the other hand, "is a subjective comparison that focuses on 'whether the ordinary, reasonable audience' would find the works substantially similar" in their totality.  *Id.* (quoting *Kouf*, 16 F.3d at 1044).  Therefore, the extrinsic test is capable of being ruled on as a matter of law, whereas the intrinsic test remains solely in the hands

---

[2] Pursuant to Federal Rule of Evidence 201, Defendants have requested the Court take judicial notice of Gallagher's book, *The Little White Trip*, and the Defendants' motion picture, *The Cabin in the Woods*, and provided copies of both works to the Court.  (ECF No. 19, Defs.' Request for Judicial Notice.)  Federal Rule of Evidence 201(c) states that the Court "must take judicial notice if a party requests it and the court is supplied with the necessary information," and 201(d) allows for judicial notice at "any stage of [a] proceeding."  Fed. R. Evid. 201.  Furthermore, on a motion to dismiss the Court may take judicial notice of documents outside the pleadings when the documents are referenced in the complaint.  E.g., *Knievel v. ESPN*, 393 F.3d 1068, 1076–77 (9th Cir. 2005) ("We have extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document").  As the requested works are essential to the outcome of this motion, do not have their authenticity disputed, and are referenced at great length in Gallagher's complaint, the Court **GRANTS** Defendants' Request for Judicial Notice (ECF No. 19) and considers the material therein in ruling on this motion.

of the trier of fact.  *Benay*, 607 F.3d at 624.

However, an examination that finds no substantial similarity under the extrinsic test allows a court to rule on the case at either the motion to dismiss or summary judgment stage.  *Id.* ("If the [Plaintiffs] fail to satisfy the extrinsic test, they cannot survive a motion for summary judgment."); *Segal*, 2011 WL 11512768 (dismissing an infringement claim due solely to failing the extrinsic test).  Such rulings are proper because no jury may find substantial similarity without satisfying both tests.  *Kouf*, 16 F.3d at 1045.

In proceeding under the extrinsic test, a court "must take care to inquire only whether 'the *protect[a]ble elements, standing alone*, are substantially similar.'" *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996) (citation omitted); *accord Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442–43 (9th Cir. 1994). Accordingly, "a court must filter out and disregard the non-protect[a]ble elements in making its substantial similarity determination." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).  Non-protectable elements can arise in the form of "general plot ideas," "stock scenes and themes that are staples of literature," and "scenes-a-faire, [comprising] situations and incidents that flow necessarily or naturally from a basic plot premise."  *Id.* at 823 (citing *Berkic v. Crichton,* 761 F.2d 1289, 1293–4, (9th Cir. 1985)).  The Court will address these elements in turn below.

### 1. PLOT

When applying the extrinsic test, a court must look "beyond the vague, abstracted idea of a general plot."  *Berkic*, 761 F.2d at 1293.  While *Trip* and *Cabin* share the same basic plot premise of five young adults venturing off to a cabin in the wilderness and being manipulated in varying degrees by a third party, "a closer inspection reveals that they tell *very* different stories."  *Benay*, 607 F.3d at 625 (emphasis added).

### a. Basic Plot

The plot of *Cabin* is rather comical and revolves around the idea that to avoid

the "ancient ones" bringing about the apocalypse annual sacrifices, in the form of young people fitting certain specific archetypes common in most horror films, must be made to appease the old gods.  Employees at various facilities located all around the world take this duty upon themselves to set up situations in which the chosen young people will be brought together and then systematically murdered in accordance with the ritual's requirements.  The film's focus is upon a North America facility, and as it is the only facility left that has not yet failed in the current year's ritual, the world will come to an end unless they succeed in appeasing the old gods.

The film begins with the viewer becoming aware of the underground facility and its team, though their end goal is only revealed later in the film, and soon thereafter becoming aware that the team is observing and directing the group of friends during their stay at the cabin.  Focus then changes to a group of college students, Dana, Jules, Curt, Holden, and Marty, preparing for a trip to a cabin and the film continues to alternate scenes between the group of friends and the facility.  The facility's crew does their best to make light of the somber nature of their work by making wagers on which monsters will be selected each year and recognizing the importance of their work in protecting mankind.  Eventually, the two friends still alive discover the underground facility and unleash the horrific, and sometimes comical, monsters on the facility's employees.  When they discover the role they play in the grand scheme of appeasing the old gods, they defiantly refuse to complete the ritual and actually embrace, in some degree, bringing about the destruction of humanity.

In contrast, *Trip* starts off on a very serious note with the preface written by Matt, one of the "survivors," talking about what he went through including witnessing the "murder" of his closest friends; Julie, Dura, Ian, and Sam.  The actual story begins by talking about the group of friends attending their high school graduation and winning a trip to a cabin in Flagstaff.  The friends encounter numerous individuals who talk about the mystery and savagery of the murders that occurred at the cabin at the hands of the previous owner of said cabin.  Over the course of the story, three of

the five friends are "killed" by, who the group believes to be, Jeff Brinkley ("Brinkley"), the former owner that the friends were warned about.  At the end of the story, Matt shoots and "kills" Brinkley and then a production crew flocks out of the woods and only then do the reader and Julie and Matt discover that they have been unwitting participants in the filming of a motion picture and that none of their friends had actually been killed.

While the two works share a common premise of students travelling to remote locations and subsequently being murdered, real or otherwise, that premise is unprotectable.  The concept of young people venturing off to such locations and being murdered by some evil force is common in horror films and amounts to *scenes a faire* as they flow indispensably from the premise of a horror film.  *See Apple Computer, Inc.*, 35 F.3d at 1444 ("[W]hen similar features in a [genre] are as a practical matter indispensable, or at least standard, in the treatment of a given [idea], they are treated like ideas") (internal quotations and citation omitted).  Another such form of *scenes a faire* takes shape in the presence of the "harbinger" character(s) in each work.  While a gas station attendant warns the students in *Cabin*, and numerous characters warn the friends in *Trip*, the appearance of a character foreshadowing the danger ahead is commonplace in horror films.[3]

b.  PRESENCE OF A CONTROLLING THIRD PARTY

Gallagher emphasizes in his arguments the similarity between the works' plots where a third party controls, at least to some degree, the group of friends during the book and film.[4]   Aside from the abstract idea of a third party manipulating the

---

[3] For example, the film *Friday the 13th* (1980) similarly involved young adults venturing to a remote cabin in the woods after ignoring various warnings of death and danger from harbinger type characters, only to find themselves murdered by an evil force.  This plot pattern has been mimicked in countless horror movies over the decades.

[4] However, the existence of a third party controlling characters' actions and their surroundings is not a novel idea.  For instance, *The Truman Show* (1998) was a motion picture where the main character's entire life was being controlled and filmed in order to make a reality television show.  The main character lived in a small town that was actually a controlled set and everyone who lived there was an actor.  The level of control, manipulation, and psychological impact of the third party in

---

8

characters in various degrees, the facility technicians in *Cabin* and the film crew in *Trip* share almost no similarities whatsoever. In *Cabin*, the purpose of the third party is to appease the "ancient ones" and prevent the cataclysmic annihilation of humanity by sacrificing young adults who fit certain archetypes. The employees do not necessarily take pleasure in murdering these young people, as is made apparent through the various scenes in which the employee's describe their actions as necessary for the greater good and their act of praying after each death. In contrast, in *Trip*, the purpose of the third party is for the sole selfish reason of wishing to make a fortune by filming a reality horror movie. Those who are a part of the film crew show no remorse for their actions and instead appear to take great joy in being a part of "history" as members of the cast.

The presence of a third party is the very first thing the viewer learns of in *Cabin*, whereas in *Trip* the third party is not revealed until the very end of the book in the "surprise reveal." (FAC 11.) Contrary to Gallagher's allegation in the Complaint that the characters in *Trip* sense that "the things that are happening to them are not random, but carried out by some third party controlling the situation," when Matt discovers the camera hidden in the vase, Julie and he simply think that Brinkley is watching them.[5] (FAC 12.) When the film crew exits the woods and their existence is made known, Matt's reaction does not comport with the reaction of a person who was aware that a third party was manipulating him; rather Matt himself narrates that "nothing could've prepared [him] for it," that "[he] felt like [he] had been slipped some awful drug," and that he and Julie were "totally lost."

While Gallagher alleges in his Complaint that the facility employees in *Cabin*

---

that film far outweighs the works before the Court here, but it shows that the abstract premise of both works is not a new idea or form of expression.

[5] This is made quite clear by the dialogue that follows, "[h]ow could he…like you said, where could he watch them from," and "[t]his kind of stuff is wireless. He could probably get a feed from anywhere around here." (emphasis added). If the characters had been sensing that a third party was in control and that awareness "culminated" with the discovery of the camera, why would they speak about a "he" rather than "they."

do what they do for the "enjoyment of others," that simply mischaracterizes the purpose of third party in *Cabin*.  The facility employees do not bring about the friends' deaths for their enjoyment, but rather they do so solely to complete a preordained ritual necessary to prevent the destruction of the world.  Their purpose, in comparison to the film crew in *Trip*, could not be more different.

Furthermore, the degree of manipulation and means of accomplishing it differ drastically between the works.  In *Cabin*, the facility employees manipulate the friends by introducing chemical gasses/compounds to make sure they fall into the stock archetype planned for them.  They lace Jules's hair dye with chemicals to increase her libido and release pheromone mists when Jules and Curt are in the woods to ensure that Jules fits the "Whore" archetype before she dies.  The employees also release chemicals to ensure the friends abandon their common sense and instead engage in common horror movie lapses in judgment by splitting up when it is obvious that odds of survival diminish greatly while doing so.  Outside of ensuring the characters fall into their archetype roles, opening the cellar door, and ensuring that they cannot leave before the ritual is completed, the employees let events unfold on their own.

In contrast, the film crew in *Trip* controls nearly every aspect of the friends experience from rigging the contest through which they win the trip, to removing all weapons from the cabin after the murders begin and planning their script to react to each and every move made by the friends.  The crew's planning and methods are extensive and attempt to account for any variable, though they are caught off guard at times—an element necessary to their success in making a "reality horror movie." Extensive as the manipulation may be, the actions taken are generic and fail to even come close to the extravagance of the means of manipulation in *Cabin*, such as the chemical gas and rigging a tunnel with explosives, and the extent of control extends far past the degrees present in *Cabin*.  The film crew must account for nearly every action taken by the friends, while the facility in *Cabin* need only ensure that the group arrives, stays at the cabin, and fulfill their archetypes for the sacrifice.

1   An additional integral component of the plot in *Cabin* is that the friends actually

2   choose the instrument of their demise depending on what object in the cabin's cellar

3   they choose to interact with.  There are dozens of potential choices, each represented

4   by a different item, and these alternative monsters are what end up tearing the

5   underground facility apart in the latter parts of the film.  There is no counterpart for

6   this aspect of *Cabin* present in *Trip*; the recent graduates do nothing to "choose" their

7   fate and instead are simply set upon by an actor pretending to be the former resident of

8   the cabin they are residing in.

9   Gallagher argues that this element is in fact similar between the works, because

10  *Trip* involves the friends discovery of the cabin's attic, inside of which they find dolls

11  and photographs of the Brinkley family.  According to Gallagher, both works involve

12  finding a "storage space" and inside each, the friends find "items from the previous

13  owners," including "a framed photograph of the family [of the previous owner]."

14  (FAC 11–12.)  This comparison, however, grossly mischaracterizes what occurs in

15  *Cabin* when the friends are lured into the cabin's basement.  Aside from the diary that

16  Dana reads from, summoning the zombie Buckner family, none of the items in the

17  basement belong to the previous owners of the cabin.  Similarly at odds with

18  Gallagher's allegations, there is no framed photograph of the Bucker family within the

19  cellar, nor are clay dolls in the cellar in *Cabin*.  Of the numerous objects discovered by

20  the friends in *Cabin* there are no similarities to those found by the friends in *Trip*.[6]

21  Furthermore, the *actual* death of the friends in *Cabin* is *required* in order to complete

22  the ritual and prevent the end of the world.  In *Trip* there are *no* deaths and it is

23  revealed at the end of the story that all of the "murders" were faked.

24  Moreover, a key plot component of *Trip* is that the existence of the film crew is

25  not made known to the reader or the characters until the very end of the book, nor do

26  the characters have any awareness of the presence of a third party until that point.

27
28  [6] In *Cabin*, the friends interact with a spherical puzzle, a conch, a music box topped with a ballet dancer figurine, a locket, an old film reel, a dairy, and an old dress.  In contrast, in *Trip* the friends discover a box filled with tiny clay figurines and a photo of the Brinkley family.

1   Conversely, the viewer is informed of the facility and its employees in the first scene

2   of the film and consistently throughout; there is never any doubt in the viewer's mind

3   as to what is happening.  The characters are initially unaware, though Marty senses

4   something is afoot, until roughly two-thirds through the film when they descend into

5   the underground facility and, eventually, bring about the apocalypse.

6                    c.  ADDITIONAL UNRECIPROCATED PLOT ELEMENTS

7          The differences in key plot features in the works do not end with those

8   described above.  For instance, the final third of *Cabin* revolves around Marty and

9   Dana entering the underground facility, releasing the remaining monsters to savagely

10   kill every employee of the facility, and eventually refusing to complete the ritual

11   thereby causing the end of the world.  *Trip* succinctly ends after the surprise reveal of

12   the film crew.  There are no monsters to kill the crew and there is no end of the world;

13   rather the story ends with Matt moving away with his new girlfriend happily.

14          Therefore, while "[a]t first blush[] the apparent similarities in plot appear

15   significant[,] . . . an actual [review] of the two works reveals greater, more significant

16   differences and few real similarities at the levels of plot."  *Funky Films*, 462 F.3d at

17   1078.  The concept of a third party turning young adults into unwitting victims of

18   horrible violence at remote locations is the very abstract premise of the plot behind the

19   two works here.  However, "[s]haring a simple plot feature . . . is insufficient to satisfy

20   the extrinsic test for substantial similarity."  *Segal*, 544 Fed. Appx. At 770.  The *idea*

21   behind an artistic work is not copyrightable, only the *expression* of that idea in a

22   tangible medium falls within the realm of copyright law.  *Berkic*, 761 F.2d at 1293.

23   While both works share some abstract similarities in their underlying concept, their

24   vastly differing expressions of that concept throughout the works are blatantly

25   dissimilar.  The plot of *Trip* is that of a suspenseful horror/thriller novel, while *Cabin*

26   is a comedic spin on the classic motifs of the horror-film genre and, as such, "the plots

27   of the two stories develop quite differently."  *Funky Films*, 462 F.3d at 1078.  As a

28   result, the two works tell "*fundamentally different* stories, though they share [a

similar] premise and a number of elements that flow naturally from that premise." *Benay,* 607 F.3d at 626 (emphasis added).

### 2. Characters

Ordinarily, characters are not afforded copyright protection, *see Warner Bros. Pictures, Inc. v. Columbia Broad. Sys.*, 216 F.2d 945, 950 (9th Cir. 1954), but "characters that are 'especially distinctive' or the 'story being told' receive protection apart from the copyrighted work." *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003). Seldom are characters in copyrighted works afforded their own copyright protection outside of the works they are found in, and those characters "have displayed consistent, widely identifiable traits." *Id.*; *e.g., Toho Co., Ltd. v. William Morrow and Co., Inc.*, 33 F. Supp. 2d 1206, 1215 (C.D. Cal. 1998) (affording copyright protection to the character Godzilla); *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Corp.*, 900 F. Supp. 1287, 1297 (C.D. Cal. 1995) (James Bond); *Anderson v. Stallone*, 1989 WL 206431, *7 (C.D. Cal. 1989) (Rocky Balboa). It naturally follows that "[t]he bar for substantial similarity in a character is set quite high." *Sheldon Abend Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010).

Substantial similarity in characters cannot be based on "shared attributes of appearance and [general] demeanor [that] are generic and common to [characters in horror works]." *Rice*, 330 F.3d at 1176; *see also Bernal*, 788 F. Supp. 2d. at 1069 ("Generalized character types are not protected by copyright law."). Similarities that "flow naturally from the works' shared premises" also are unprotected. *Benay*, 607 F.3d at 626. Accordingly, a court must be sure "to slice or filter out the unprotectable elements" that arise from the embodiment of stock ideas in characters in a work. *Bisson-Dath v. Sony Computer Entm't Am., Inc.*, 694 F. Supp. 2d 1071, 1087 (N.D. Cal. 2010) *aff'd sub nom. Dath v. Sony Computer Entm't Am., Inc.*, 653 F.3d 898 (9th Cir. 2011).

Gallagher argues that the two groups of friends in the works have "striking"

similarities, and lists out the same alleged similarities in his Opposition as he does in his Complaint. (Opp'n 5–6; FAC 10.) He argues that both works follow a group that shares the same number of friends and the age group they fall into and both groups consist of "two couples and one male." (Opp'n 5.) Before discussing each character and their alleged counterpart separately, the Court wishes to point out that, while *Trip* indeed contains two couples and one lone male, *Cabin* clearly contains only one couple. This example, along with the other alleged similarities between the characters, is almost entirely the result of Gallagher's mischaracterizations.

### a. *TRIP*'S DURA AND *CABIN*'S DANA

Turning first to *Trip*'s Dura and *Cabin*'s Dana, Gallagher alleges that both are "sweet dark-haired female[s] who recently ended a relationship" and that at the beginning of both works the dark-haired female lead "begin[s] a romantic relationship with the more sensitive and mature male (Matt/Holden) which culminates in a love scene in front of the fireplace." (*Id.* 5–6.) In *Trip*, Dura is described as a star volleyball player, frequent marijuana smoker, feisty and "one of the guys" as well as having a "soft coffee complexion" and long brown hair. Dura is intimate with Matt before leaving for the cabin and is romantically involved with him. In contrast, Dana is a pale redhead who was recently dumped by one of her college professors, rather than having "recently ended a relationship," and is far from feisty as she is shown as being quite reserved and shy throughout most of the film. Additionally, Dana is not athletic, nor does she smoke marijuana, outside of the final scene of the movie, and *Cabin* does not begin with Dana starting a relationship with Holden. When Dana is told about Holden at the beginning of *Cabin* she tells Jules that if they try to set her up with him she will not be happy and consistently through the first half of the movie says that she is not interested in any sort of relationship. While Gallagher alleges that both works include a "love scene in front of the fireplace," Dana and Holden only briefly kiss—far from a love scene.

Furthermore, the role that Dana and Dura play in the plot of the works is vastly different.  Dura is the second person to be "killed" by the fake Brinkley, while Dana is the main character of the film and one of the last two survivors before she and Marty bring about the end of the world.  Indeed, it seems that the only similarity between the characters is that they have similar sounding names but that alone cannot suffice to find substantial similarity.  *E.g., Bernal*, 788 F. Supp. 2d at 1070 ("Susan and Suzanne are not similar.  Although the women have similar sounding names, the characters do not have much in common. . . . The roles that the two women play in the works are also different.").  Contrary to Gallagher's assertion that similar character names should influence the Court in finding that "Defendants did in fact copy," the authority he uses to support that argument references the names of the works themselves, not of the characters.  (Opp'n 6.)  Perhaps if numerous other similarities existed between *Cabin* and *Trip*, similar names could prove to be the decisive element; that is simply not the case here.[7]  Accordingly, Dana and Dura are not substantially similar.

### b. *Trip*'s Matt and *Cabin*'s Holden

Next, the Court finds that *Trip*'s Matt and *Cabin*'s Holden are far from similar.  Holden is the student selected to fill the "Scholar" archetype for the ritual and necessarily is very intelligent, as shown by the fact that he had learned to speak Latin by the time he was in 10th grade.  He is shown to be mature throughout the film; first by disclosing the two-way mirror to Dana, then by not pushing Dana to move further than just their kissing, and also by reassuring Dana that they would be okay up until his death.  In *Trip*, however, Matt is said to have "subpar grades," was the class

---

[7] While Gallagher claims copying by Defendants due, in part, to similar sounding names and, in reality, very little else, it is puzzling to discover that the prime antagonist behind the scenes of the horror Matt and Julie endured in *Trip* is named Rex Luther; one's mind immediately thinks of Superman's arch-nemesis, Lex Luthor.  Indeed, it would seem that Rex and Lex are substantially more similar than any of the characters in *Cabin* that Gallagher argues are "striking[ly]" so.  If the Court were to find that any of *Cabin*'s characters were substantially similar to *Trip*'s by following Gallagher's argument and logic, the Court would also find that Gallagher has infringed upon Superman by copying Lex Luthor to make *Trip*'s antagonist Rex Luther.

clown, and often landed himself in trouble in school.  Matt is also the narrator and
main character of *Trip*, and was never "killed," whereas Holden is stabbed through the
neck by a zombie.  The alleged similarities between Matt and Holden are only found
in the Complaint, the works themselves reveal two rather different characters and the
Court finds them to be so.

### c.  *TRIP*'S JULIE AND *CABIN*'S JULES

The Court also finds *Trip*'s Julie and *Cabin*'s Jules to be quite different.  In *Trip*
Julie is a spoiled rich girl who begins a relationship with Ian right before the trip starts
and is one of the last two survivors, alongside Matt.  Jules, on the other hand, had
already been in a relationship with Curt, is a pre-med student, and is the first character
to die in *Cabin.*  She had been induced into acting differently than normal by means of
chemicals introduced by the chemistry department of the underground facility,.
Though both characters do have blonde hair, it is shown in *Cabin* that Jules had just
dyed her hair when the film begins, and, regardless, simply sharing the same hair
color does not render characters substantially similar.  The fact they are both "bubbly"
is irrelevant because such characters are *scenes a faire* in the horror genre.  Again, the
similarity of names is insufficient to find substantial similarity, and there are no other
striking similarities between Jules and Julie by which to reach that conclusion.  *See
supra* p. 15.

### d.  *TRIP*'S IAN AND *CABIN*'S CURT

Gallagher's characterization of Curt when drawing the alleged similarities to
Ian amounts to blatant misstatements in light of the content of the works.  While
Gallagher alleges that both Ian and Curt "drink[] regularly," when, outside of one
scene at the cabin, Curt is never shown as an alcoholic or party animal in any way.
(FAC 10.)  In reality, Curt is a football player and sociology major on academic
scholarship, whereas Ian is described as a wealthy alcoholic, and non-athletic.  The
similarity that they are both strong and look like movie stars is unavailing, for if *Trip*

1     were to secure the copyright on strong and attractive males, there would be few works

2     that do not infringe upon that common casting type. The fact that movie star Chris

3     Hemsworth, the actor who plays Curt, "looks like a movie star" does not suffice to

4     establish substantial similarity.

5               e.   *TRIP*'S SAM AND *CABIN*'S MARTY

6          The final main character in the group of friends is Marty in *Cabin* and Sam in

7     *Trip*. Marty is the only regular marijuana smoker out of the group of friends, and

8     though Marty is the sole voice of reason during the film, he is cast as the "Fool"

9     character in the ritual and provides much comic relief throughout the film. He has no

10    romantic interest in any other character and, along with Dana, is one of the last to die

11    in *Cabin*. In *Trip*, Sam is the first character to die and has a crush on Dura, which

12    causes friction between him and Matt. Sam is described as a "your token fast food

13    eating, high-stress American" who attempted to infiltrate the popular crowd during

14    high school. This description puts him as the polar opposite of Marty who is

15    extremely laid back throughout almost the entire film. Though Gallagher alleges that

16    Marty is the only single character in *Cabin*, that allegation is blatantly false and

17    appears designed solely to fabricate similarities between, the otherwise dissimilar,

18    Marty and Sam. (Opp'n 6.) Simply sharing a "quirky personalit[y]" is not enough to

19    find substantial similarity, for such a trait is quite generic in this genre—as evidenced

20    by the existence of the "Fool" character as a part of the ritual sacrifice.

21               f.  OTHER CHARACTERS

22          Outside of the five main characters that comprise each group of friends, both

23    works have numerous characters that have no counterpart in the other, and the

24    pervasiveness of these characters points the Court towards finding that the works are

25    not substantially similar. *E.g., Benay*, 607 F.3d at 637 ("There are a number of

26    important characters in the Film and the Screenplay who have no obvious parallel in

27    the other work.") The friends in *Trip* interact with numerous people before they arrive

28    at the cabin and during their stay, none of whom are represented in *Cabin*. Both

works include a harbinger character that warns of impending danger, but the forms they take are far from similar.[8]  Moreover, their shared purpose is *scenes a faire* in horror movies and, as such, is unprotected by copyright law.

Similarly without a counterpart are two of *Cabin*'s main characters outside of the group of friends, Gary and Steve, the facility employees that the film's facility scenes are primarily focused on.  Gary and Steve represent a central points of the film's focus, and are integral to telling the story to the viewer.  In *Trip*, however, not only is there is no counterpart, but the entire role that Gary and Steve play is absent from the book, because the existence of the third party is a secret until the very end of the story.

Further, the Director in *Cabin* is quite different than Rex Luther, the film director in *Trip*.  Both appear at the end of each work and both are in charge of the third party that has controlled the happenings in both works, but that is where the similarities end.  The Director appears to plead with Dana and Marty to do what is necessary to save the world; Rex Luther appears only to gloat to a television reporter about the genius of his plan.  Their appearance, demeanor, and purpose could not be more different, in addition to the fact they are opposite genders.

    *3. Setting*

Apart from the basic fact that both groups of friends end up going to a cabin, there is nearly nothing similar between the settings in the two works.  In *Trip* only about half the book involves the friends actually at the cabin, a large part of the story is set in their hometown where they graduate and celebrate, and then another portion involves their travel to the cabin and the various things they encounter on the way. *Cabin*'s setting is quite different; the film begins with a scene in the underground facility, and numerous scenes throughout the first two-thirds of the movie are set there

---

[8] In *Trip* a waiter at the restaurant they visit warns the group about the Brinkley murders, as does a family the friends visit, and a cab driver.  In *Cabin*, the friends encounter an old man at a gas station who insults them and warns them about the Buckner place.  There is nothing similar, outside of their purpose of warning of danger and being ignored, between those characters.

1    in addition to the entire final third of the film. The friends almost immediately leave
2    their homes for the cabin, stopping only for gas.
3
4         The cabins themselves are in stark contrast with one another.   *Trip* is set in
5    wintery and snowy Flagstaff while *Cabin* occurs during the summer.  In *Trip* the cabin
6    is a massive estate with a four-car garage, enormous balcony, and is fully equipped
7    with a hot tub, Internet, and full theater-quality entertainment center.  In *Cabin* the
8    characters arrive and discover a run-down and creepy cabin, complete with a one-way
9    mirror in one of the bedrooms and disturbing artwork.  Thus, "[b]eyond the basic
10   premise of a [remote cabin], there are no similarities in the setting" of the works.
11   *Funky Films*, 462 F.3d at 1080; *see also Bernal*, 788 F. Supp. 2d at 1071 ("[T]he only
12   similarity in setting between the two works is that they are both set in a suburban
13   neighborhood.").
14        There is no parallel setting in *Trip* for the underground facility in *Cabin*, where
15   around half the film is shot.   Gallagher alleges that the underground facility
16   "resembles a sound mixing stage," and argues that a similar setting was not included
17   in *Trip* because the existence of the film crew is kept a secret until the end of the
18   book.  (Opp'n 7.)  Needless to say, the elaborate underground facility in *Cabin,*
19   stocked with countless monsters and horrors that is large enough to necessitate
20   employees driving golf-carts between sectors and happens to be built on top of a
21   portal to the old gods, does not remotely resemble a sound mixing stage.  Moreover,
22   even if the existence of the film crew had not been a secret, there is no conceivable
23   reason they would have been located in a comparable setting.  While Gallagher also
24   asserts that the existence of the facility is only a "minor difference," the Court is not
25   convinced that the setting for half of *Cabin*'s scenes and an integral aspect of the plot
26   constitutes merely a minor difference.  (*Id.*)  *See Benay*, 607 F.3d at 628 (holding that
27   settings were not similar partly because "[t]he Film includes extended scenes in a
28   samurai village" and "[n]o such village appears in the Screenplay.").

### 4. Dialogue

In order to support a claim of substantial similarity based on dialogue, "extended similarity of dialogue" must be demonstrated. *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988). "Ordinary words and phrases are not entitled to copyright protection, nor are phrases or expressions conveying an idea typically expressed in a limited number of stereotyped fashions." *Bernal*, 788 F. Supp. 2d at 1072 (internal quotation omitted). Here, Gallagher points to three sentences in *Cabin* that he claims are similar to the dialogue in *Trip*.[9] (Opp'n 8.) A mere three sentences taken from a 302-page book compared to three sentences from a 90-minute motion picture falls far short of the "extended similarity" required for a finding of substantial similarity for dialogue. Not only does this comparison fail to demonstrate "extended similarity," but also the allegedly similar dialogue itself is not actually similar and amounts to nothing more than generic and common phrases.

### 5. Mood

The moods of the two works are radically different; *Cabin* is comedic and satirical whereas *Trip* is dark, suspenseful, and scary. *See Bernal*, 788 F. Supp. 2d at 1070 ("Although both works deal with dark subject matter, *Homeless* is a drama, while *Desperate Housewives* is a comedy."). Some form of comic relief, to keep the mood light-hearted, immediately follows the majority of the scary or suspenseful scenes in *Cabin*.[10] In contrast, while *Trip* contains humorous elements, those

---

[9] The dialogue that Gallagher claims to be similar includes *Trip*'s Ian saying, "I'm not going to leave you. I'll get the car and come back for you[,]" compared to *Cabin*'s Curt promising "I am coming back here." (Opp'n 8.) An additional allegedly similar dialogue consists of *Trip*'s Julie stating "[t]here's nothing we can do[,]" while *Cabin*'s Dana says "[t]hat won't work. Something will happen." (*Id.*) The final alleged similarity in the dialogue arises when *Trip*'s Matt says "What if we turn off the all the outside lights and make a run for the woods[,]" while *Cabin*'s Holden states "[W]e just leave the roads all together. Drive as far as we can into the forest, and then we go on foot from there." (*Id.*)

[10] For example, right after Dana summons the zombie Buckner family and they menacingly rise from their graves and march towards the cabin the scene swaps to the underground facility and the celebration of the people who won the office pool and Steve being sad about the Merman once again not being selected.

elements disappear when the murders start and it is pure suspense and terror from that point on. *See Id.* ("Plaintiff's work has few humorous elements. . . . By comparison, Defendant's work is consistently funny throughout the entire show.").

      6. *Pace*

Gallagher alleges that "[b]oth works begin moderately paced, with a focus on character development and a blossoming relationship" and "a group of friends going on a trip to a remote cabin." (FAC 11; Opp'n 7.) *Trip* begins with the friends' graduation and they win the trip to the cabin about one-sixth through the book, page 50 out of 302, and go about their lives and eventually travel to the cabin, arriving about halfway through the work on page 135 out of 302. In contrast, *Cabin* begins with the introduction of Steve and Gary in the underground facility, changes scene to the friends and immediately sets them on their way to the cabin. There is no blossoming relationship in *Cabin*; contrary to Gallagher's claims Dana and Holden have not even met at this point.

Additionally, while Gallagher states that both works "culminate[] in a surprise reveal," there is no surprise for the audience in *Cabin*, and even the characters slowly become aware of what is happening, the Director only tells them what happens if the ritual is not completed. The reveal in *Trip* takes both the reader and the characters by complete surprise and there is no indication up to this point that the third party exists, contrary to Gallagher's assertions discussed *supra* p. 9.

*Cabin* is very fast-paced, the entire film occurring over the span of a single day, and constantly cuts between the group of friends and the employees of the facility in various degrees of joy and duress. *Trip* unfolds rather slowly, as mentioned above the characters do not reach the cabin until halfway through the book, with a large focus on the characters before they reach the cabin. By the time the first character is "killed" in *Trip* about two-thirds through, Dana and Marty in *Cabin* have already begun their infiltration of the underground facility and the other friends are long gone. The fact that both works' pace quickens when the murders begin is insufficient to find

substantial similarity; such escalation is common for the horror genre and amounts to *scenes a faire*.  *E.g., Segal*, 2011 WL 11512768 (holding that "the pace quicken[ing] as harsher events occur as the stories progress" is "generic in this [horror] genre.").

Lastly, there exists an inherent substantial difference in pace between the two works due to the medium of their conveyance.  *See Bernal*, 788 F. Supp. 2d at 1070 (finding the pace between works were not similar because  "*Homeless* is paced as a feature film; whereas, *Desperate Housewives* is paced as a television series with multiple hour-long episodes.").   A motion picture will necessarily have a much different pace than a novel simply due to how the viewer views it.  A motion picture is conveyed entirely in, generally, one and a half to two hours, a novel takes even the most avid reader many hours to digest.

### 7.  Sequence of Events

Other than the shared similarity of both groups of friends going to a cabin at some point and subsequently being killed off, there is no similarity of sequence of events.  The allegedly similar sequence of both works beginning with friends getting ready to go on a trip misstates the events in *Trip*.  (FAC 11.)  As noted above, the friends in *Trip* do not win the trip to the cabin until a sixth of the way through the story, and do not arrive until halfway through.  While *Cabin* actually begins with the introduction of the third party, the friends are introduced soon thereafter and immediately prepare and depart for the cabin.  Accordingly, the first scene of *Cabin* is, essentially, the climactic finale of *Trip*—the introduction of the third party.  At only the second scene of *Cabin*, does the film parallel the events of *Trip* that occur nearly one-third through the book.  There is no parallel for *Trip*'s first third in *Cabin*, nor is there a parallel for *Cabin*'s final third in *Trip*.

Gallagher also alleges that both friends take "large borrowed vehicle[s]" to the cabin and that both vehicles are rigged with cameras.  (FAC 11.)  In *Cabin*, Curt drives his father's RV and there are no cameras installed inside to monitor the friends. In *Trip*, the characters are given a Lincoln Navigator as a rental car for part of their

prize and the film crew fully rigged the SUV previously in order to record the group. The two groups then proceed to travel to the cabin, both encountering a harbinger character before reaching their destination and both ignore their warnings.   The presence of a harbinger takes vastly different forms in the two works, but this type of character is *scenes a faire* in horror films.   *See supra* note 3.   The group in *Cabin* reaches their destination very early in the film, whereas the group in *Trip* does not arrive until halfway through the book after various other events that are not paralleled in *Cabin*.

Gallagher argues that both groups then start to relax and celebrate, eventually discovering the attic in *Trip*, or being lured to the basement in *Cabin,* and soon thereafter start to be fake-killed in *Trip,* and viciously murdered in *Cabin*.   However, at this point in *Cabin* one of the key plot elements takes place where Dana chooses the Buckner family to be the monsters tasked with killing them.   In *Trip* the friends merely find a box of clay dolls and a photo of the Brinkley family.   Additionally, all throughout these events *Cabin* swaps scenes to events in the underground facility numerous times, no such parallel exists in *Trip*; the reader is kept unaware of the film crew until the "surprise reveal."

Next, Gallagher states that both works contain a lead character being dragged away through a window, Dura in *Trip* and Marty in *Cabin*.   (FAC 11.)   Afterwards, in both works, a character breaks an item in the cabin and discovers a hidden camera. (*Id.*)   According to Gallagher, Marty has already been abducted by the time a hidden camera is discovered in either work.   (*Id.*)   This sequence of events is puzzling to the Court because Marty is the only character to discover a hidden camera in *Cabin*, and was very much alive and inside the cabin when he did so; it was only after he discovered the camera that a zombie abducted him.

In addition, the way in which these events transpired and their timing is quite different.   Upon Marty's discovery, roughly halfway through *Cabin*, he thinks he is being filmed for a reality television show.   In contrast, Matt breaks a vase and Julie

spots a small wireless camera in the wreckage near the end of *Trip*, on page 252 out of 302.  Matt and Julie believe that Brinkley is watching them so that he can kill them.  Furthermore, only Jules has died in *Cabin* when Marty discovers the camera, and his discovery does not lead the other survivors to become aware of the third party because he is soon after abducted by a zombie—much to the relief of Steve and Gary who were both trying to incapacitate Marty in other ways.  The other characters only become aware of the third party after Curt crashes into an electric force field.  In *Trip*, however, only Matt and Julie remain "alive" when the hidden camera is discovered, and though Gallagher alleges that the film crew was scrambling behind the scenes at this point, similar to Steve and Gary in *Cabin*, the reader still has no knowledge of their existence at this point of the book.

After the confrontation with Brinkley in *Trip* that occurs shortly after the camera was discovered, the film crew is revealed and the story promptly ends.  *Cabin*, however, does not promptly come to an end.  Roughly half of the film remains.  Curt and Holden are both killed shortly after the discovery and Dana is left as the sole survivor of the night.  The facility employees celebrate and relax, until they discover that Marty is still alive.  The last third of the film involves Dana and Marty infiltrating the facility, killing everyone inside it, and bringing about the end of the world.  There is no parallel for any part of this in *Trip*.

Though Gallagher argues that the fact "there are some differences between the third acts of the works" is "for all intents and purposes, irrelevant," the Court is not persuaded that the analysis of the sequence of events in a work should completely ignore the entire final third of *Cabin*.  Similarly, the Court believes that the fact the first third of *Trip* is unparalleled in *Cabin* is noteworthy.  The sequence of events described by Gallagher does not follow the actual order of events in the works.  Instead, Gallagher deliberately placed certain events out of order to draw a stronger comparison.  The misrepresentation of the events and their sequence between the two works adds to the Court's conclusion that the works lack substantial similarity.  *E.g.,*

1    *Bernal*, 788 F. Supp. 2d at 1072 (In holding the sequence of two works was not

2    similar, "[t]he sequence of events refers to the actual sequence of the scenes, not just

3    having similar scenes out of sequence. In shuffling the [order of the] events, Plaintiff's

4    expert demonstrates that the two stories do not have a similar sequence of events.")

5           8. *Themes*

6           Gallagher alleges that both works share "a core theme of horror, resulting from

7    real people unknowingly being manipulated by third parties," and that both works

8    "display a self-referential awareness of classic horror movie tropes" while

9    "provid[ing] a commentary on the use of classic horror devices." (FAC 9.) Such a

10    broad and generic theme could apply to any number of works, and Defendants provide

11    *Scream* and *Scary Movie* as examples of films that display self-referential awareness

12    of classic horror tropes. (Mot. 21.) Generic and common themes do not render the

13    two works before the Court similar; more is needed. *See Benay*, 607 F.3d at 627

14    (finding that the works were not similar when "both works explore general themes of

15    the embittered war veteran, the 'fish-out-of water,' and the clash between

16    modernization and traditions" because "those themes arise naturally from the [shared]

17    premise [of the works]."); *Funky Films*, 462 F.3d at 1079 (finding that "[a]lthough

18    both works explore themes of death" they were not substantially similar since the plot

19    revolved around a family operating a funeral home).

20           Moreover, the Court does not believe that *Trip* actually "provides a

21    commentary on the use of classic horror devices," as alleged in the Complaint. (FAC

22    9.) *Trip* reads as a pure horror thriller, riddled with suspense and danger; nowhere is

23    there any apparent "commentary" on why horror movie characters act the way they

24    do. In contrast, *Cabin* creates its own lavish and outlandish explanations for how

25    people in horror movies act and those explanations are revealed throughout the film as

26    they arise. For instance, Jules acts very promiscuously only because the facility

27    chemists have dosed her with libido-increasing chemicals, Curt acts more belligerent

28    and makes poor choices due to gasses pumped into the cabin, the "Whore" character

must always die first because of the ancient ritual's strict requirements and the "Virgin" must be last or the only survivor.  Each of these comment on common motifs in horror films; *Trip* does not include any such elaborate and comical explanations.

The works may both have a core theme of horror, but *Cabin*'s core of horror is spliced with heavy amounts of comedy and parody.  Indeed, the way each work plays out is drastically different than the other, as is the way they develop their core themes and how they provide commentary.  *E.g., Benay*, 607 F.3d at 627 (finding that although the works shared several themes, "the works develop those themes in very different ways."); *Funky Films*, 462 F.3d at 1079 (holding that works with similar themes and plot were not substantially similar because they explore the themes "in very different ways.").  A reader will likely reach the conclusion of *Trip* and feel furious about Rex Luther's actions and how selfish he was, but most viewers at the end of *Cabin* would understand and sympathize, to some degree at least, with the horrible task the facility's employees are forced to perform for the greater good.

### 9.  Random Alleged Similarities

Included in Gallagher's Complaint is a list of thirty-three "specific scene similarities" between *Cabin* and *Trip* that he uses to argue that the plot and sequence of events of the works are substantially similar.  (FAC 13–21; Opp'n 3.)  However, the Ninth Circuit has held that a list of "random similarities scattered throughout the works" is "inherently subjective and unreliable."  *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984).  Additionally, the Ninth Circuit has also held that the argument against relying on these lists "is especially strong here since the alleged similarities are selected from over 280 pages of submissions."  *Cavalier*, 297 F.3d at 825.  That argument is even stronger in this case because the similarities are drawn from a 302-page book and a 90-minute film, rather than 280 combined pages between the two works.

Even if the Ninth Circuit's prior holdings were unopposed to such lists, a cursory glance over the alleged similarities and the order in which they occur prove to

the Court that Gallagher's list is completely unreliable. The list grossly mischaracterizes the facts of both works in nearly every alleged "similarity" provided and describes the scenes in an astronomically abstract way in a futile attempt to create similarities.[11]  The few alleged similarities that are not grossly misstated involve unprotectable forms of expression such as the group going to a cabin or the alpha-male character attempting a risky escape plan to bring back help.  Accordingly, the list of random similarities only further convinces the Court of one thing; after thorough analysis of both works and application of the extrinsic test, *The Cabin in the Woods* and *The Little White Trip* are not substantially similar.

## C.  Defendants' Degree of Access to the Work is Irrelevant

Gallagher argues strongly that Defendants had access to his work as he was distributing his book in the Santa Monica and Venice Beach areas of California. Those arguments, however, are irrelevant due to the Court finding that the works were not similar because "[n]o amount of proof of access will suffice to show copying if there are no similarities."[12]  *Segal*, 544 Fed. Appx. at 770; *e.g., Funky Films*, 462 F.3d

---

[11] In his Complaint, Gallagher references Ian's "death" as a similarity to *both* Curt's and Holden's murder at separate points in the list, equating Ian with Curt and also with Holden, who is alleged to be the parallel of Matt, when its convenient.  (FAC 19:24–27.)  Not only does this misstate the sequence of "similar" events, but also in and of itself it shows that the characters truly are not similar. If the characters were similar, there would be no need for mental gymnastics to try and piece together similarities.  Nor would there be the need to refer to characters as "lead character" instead of their name when drawing similarities across works—this only becomes necessary when the parallels being drawn clearly do not match up with the allegedly similar characters.

[12] Gallagher also argues that the Court should apply the "inverse-ratio" rule, which decreases the amount of similarity necessary as the degree of the alleged copier's access increases.  *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) ("[W]e require  a lower standard of proof of substantial similarity when a high degree of access is shown."). The inverse-ratio rule, however, does not apply here.  Application of this rule has been strictly limited to apply only in cases in which the alleged copier has conceded access to the work while also containing numerous similarities; neither of which is present in the current case.  *See Funky Films*, 462 F.3d at 1081 n. 4 (holding that the inverse-ratio rule did not apply because "this is not a circumstance in which the defendant has conceded access to the purportedly copied material."); *Rice*, 330 F.3d at 1179 (holding that inverse-ratio rule did not apply, even though the alleged copier was also a former distributer of the work allegedly copied, because "[h]ere, there is no such concession of access as most of *Rice's* claims are based purely on speculation and inference.").

at 1082 ("[I]n this case, additional discovery [for proof of access] would not change the fact that the two works lack any concrete or articulable similarities.").

## V.    CONCLUSION

As discussed above, the Court has reviewed the works in question in their entirety and found they are not similar, thus, making proof of access a moot point and any amendment futile.   Therefore, the Court **GRANTS** Defendants' Motion to Dismiss with prejudice.  (ECF No. 18.)  The Clerk of Court will close this case.


**IT IS SO ORDERED.**


September 11, 2015


_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**